

FILED

JAN 1 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **J. TIMOTHY HOWARD**<br>8400 Parham Court<br>McLean, VA 22102,<br><br>       **Plaintiff,**<br><br>       **v.**<br><br>**JAMES B. LOCKHART III**, in his official<br>capacity as Director of the Office of Federal<br>Housing Enterprise Oversight, an office<br>within the United States Department of Housing<br>And Urban Development<br>1700 G Street, N.W.<br>Washington, DC 20552,<br><br>       **Defendant.** | CASE NUMBER 1:07MS00020<br><br>JUDGE: Richard J. Leon<br><br>DECK TYPE: Miscellaneous<br><br>DATE STAMP: 01/12/2007 |

### J. TIMOTHY HOWARD'S MOTION TO REQUIRE THE DIRECTOR OF OFHEO TO PURSUE HIS NOTICE OF CHARGES AGAINST MR. HOWARD IN THIS COURT

J. Timothy Howard, through counsel, hereby moves pursuant to 12 U.S.C. § 4635(a) for an order requiring the Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") to pursue his Notice of Charges (No. 2006-1) against Mr. Howard in this Court rather than administratively.[1]  The grounds for this motion are set forth more fully in the memoranda of law submitted herewith.

Prior to filing this motion, undersigned counsel conferred with in-house counsel at OFHEO via telephone pursuant to Local Rule 7(m) to discuss the issues raised in this motion and the relief sought.  The Director opposes the relief sought by this motion.



---

[1] By separate motion filed this date in *In re Fannie Mae Derivative Litigation*, Civil Action No. 1:04-cv-01783, Mr. Howard has asked this Court to join OFEHO to that action as a necessary party under Fed. R. Civ. P. 19.

A proposed order is attached.

Dated:  January 12, 2007

Respectfully submitted,

Steven M. Salky (D.C. Bar No. 360175)
Eric Delinsky (D.C. Bar No. 460958)
Holly A. Pal (D.C. Bar No. 490737)
Miles Clark (D.C. Bar No. 489388)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Washington, D.C. 20036
202-778-1800 (telephone)
202-822-8106 (facsimile)

*Counsel for J. Timothy Howard*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

JAN 1 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **J. TIMOTHY HOWARD**<br>8400 Parham Court<br>McLean, VA 22102,<br><br>         **Plaintiff,**<br><br>         **v.**<br><br>**JAMES B. LOCKHART III**, in his official<br>capacity as Director of the Office of Federal<br>Housing Enterprise Oversight, an office<br>within the United States Department of Housing<br>And Urban Development<br>1700 G Street, N.W.<br>Washington, DC 20552,<br><br>         **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Misc. No. _07-20_____ |

**MEMORANDUM OF LAW IN SUPPORT OF J. TIMOTHY HOWARD'S
MOTION TO REQUIRE THE DIRECTOR OF OFHEO
TO PURSUE HIS NOTICE OF CHARGES AGAINST MR. HOWARD IN THIS COURT**

On December 18, 2006, the Director of the Office of Federal Housing Enterprise
Oversight ("OFHEO") issued a Notice of Charges ("Notice") against Franklin D. Raines, J.
Timothy Howard, and Leanne G. Spencer. A copy of the Notice is attached hereto as Exhibit A.
That Notice seeks to have the Director's claims adjudicated before an administrative law judge
("ALJ") in accordance with the Administrative Procedures Act. *See* Notice at ¶¶ 506, 507. This
Court, however, has statutory authority to order the Director of OFHEO to litigate the Notice in
this Court, rather than administratively. As demonstrated below, the Court should exercise that
power here because (1) the administrative process is unavailable to the Director under
controlling law regarding agency bias, and (2) several legal actions involving the exact same

subject matter already have been consolidated before this Court for the express purpose of coordinating pretrial proceedings before a single judge.[1]  In the interests of fairness and judicial economy, the allegations and claims against Mr. Howard in the Notice must be adjudicated before this Court.

### A.    The Safety and Soundness Act Authorizes the Director to Elect to Pursue the Notice of Charges Either Administratively or Before This Court.

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. § 4501 et seq. ("Safety and Soundness Act" or "Act"), authorizes the Director of OFHEO to pursue a notice of charges against a former officer of a regulated enterprise before an ALJ, in accordance with the Administrative Procedures Act.  *See* 12 U.S.C. § 4633(a)(3).[2]  The Act also provides a mechanism for the Director – through, or with the assistance of, the Attorney General – to pursue the same notice of charges in the District Court for the District of Columbia.  *See* 12 U.S.C. § 4635(a).  Specifically, it authorizes the Director to bring an action in this forum not only for the enforcement of any final "order" but also of any "notice" issued under subchapter III of the Act.  *Id.*[3]

---

[1] The plaintiffs in *In re Fannie Mae Derivative Litigation*, Civil Action No. 1:04-cv-01783, seek relief that is nearly identical to the relief sought by OFHEO in the Notice of Charges, based on virtually identical allegations of fact.  By separate motion filed on this date in the derivative case, we have asked the Court to join OFEHO to that action as a necessary party under Fed. R. Civ. P. 19.

[2] 12 U.S.C. § 4633(a)(3) provides that any hearing under §§ 4631 and 4636(c) "shall be conducted in accordance with chapter 5 of Title 5."

[3] 12 U.S.C. § 4635(a) provides in full:

> The Director may request the Attorney General of the United States to bring an action in the United States District Court for the District of Columbia for the enforcement of any effective notice or order issued under this subchapter [12 U.S.C.A. § 4631 et seq.] or subchapter II [12 U.S.C.A. § 4611 et seq.] of this chapter or may, under the direction and control of the Attorney General, bring such an action.  Such court shall have jurisdiction and power to order and require compliance herewith.

**B.    The Court Has the Power to Require the Director of OFHEO to Pursue the Notice of Charges in This Forum.**

While the Act grants the Director of OFHEO the authority to elect whether to pursue a notice of charges administratively or – with the aid of the Department of Justice – in the United States District Court for the District of Columbia, the Act also supplies this Court with unrestricted authority to require the Director to pursue any such notice of charges judicially rather than administratively.   Thus, not only does 12 U.S.C. § 4635(a) initially confer adjudicative jurisdiction on the United States District Court for the District of Columbia when the Director elects to enforce a notice of charges in federal court, but the statute additionally provides that "[s]uch court shall have jurisdiction *and power to order and require compliance herewith.*"   12 U.S.C. § 4635(a) (emphasis added).   In light of the cardinal rule of statutory construction to "giv[e] effect, if possible, to every clause and word of a statute," *Clark v. Arizona*, -- U.S. -- , 126 S. Ct. 2709, 2723 n.24 (2006), this language indisputably grants the United States District Court for the District of Columbia authority to compel the Director to proceed judicially.[4]

**C.    This Particular Court is the Proper Forum Available to the Director to Pursue the Notice of Charges.**

This Court should exercise its statutory authority and require the Director to pursue his claims against Mr. Howard in this United States District Court, rather than administratively, for two principal reasons.   First, the Director has disqualified himself from self-adjudicating

---

[4] Subsection (b) of § 4635, which limits the district court's jurisdiction to interfere with ongoing administrative proceedings, does not preclude jurisdiction or the relief sought here.  By its own terms, this provision does not take away jurisdiction that is "otherwise provided" in subchapter III of the Act.  Thus, read together with subsection (a) discussed above, subsection (b) plainly applies only after the forum determination has been settled, and it precludes interference by courts in ongoing administrative proceedings to the extent that the forum determination was resolved in favor of an administrative forum.  Here, we are not asking this Court to interfere in ongoing proceedings (indeed, as of the date of this pleading, an administrative law judge has not even been appointed); rather, we simply are asking the Court to decide the threshold question of whether the Notice of Charges shall proceed to be adjudicated in an administrative forum or in this judicial forum.

administrative proceedings involving Mr. Howard (and the other Respondents), as his public statements show that he impermissibly has prejudged the matter. Second, because consolidated multidistrict litigation involving the same subject matter is pending before this particular Court, and OFHEO is actively involved in those proceedings, judicial economy demands it.

### 1.    Director Lockhart Has Prejudged the Case and Cannot Act as the Ultimate Trier of Fact or Law.

Although the Director has authority to pursue a notice of charges administratively, an administrative forum is not appropriate here. Because "a fair trial in a fair tribunal is a basic requirement of due process," it is well established that "a biased decisionmaker is constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975). As evidenced by numerous public statements, Director Lockhart has concluded that Mr. Howard is "guilty as charged." Accordingly, Director Lockhart – the ultimate decision-maker in any administrative proceeding[5] – is disqualified from adjudicating an administrative enforcement proceeding against Mr. Howard.

The test for disqualification in this Circuit is "whether a disinterested observer may conclude that [the agency decision-maker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quotation omitted). In *Cinderella*, the D.C. Circuit explained that agency decision-makers are without "license to

---

[5] OFHEO's Rules of Practice and Procedure authorize the Director to select an ALJ or "any other person" to hear evidence and submit recommended findings of fact and conclusions of law to the Director. *See* 12 C.F.R. §§ 1780.3(h), 1780.5, 1780.53(a). The Director, however, retains exclusive power "to grant any motion to dismiss the proceeding or make a final determination of the merits of the proceeding," and therefore is free to reject the recommendation of the ALJ or other person chosen to preside over the proceeding. *Id.* § 1780.5(b)(7); *see also id.* §§ 1780.53-.55; 12 U.S.C. § 4633(b)(1) ("the Director shall render the decision"). Furthermore, the Director "may, at any time during the pendency of a proceeding, perform, direct the performance of, or waive performance of any act that could be done or ordered by the presiding officer." 12 C.F.R. § 1780.4. As a result, the Director is not only the ultimate trier of fact and law in administrative proceedings, but the Director also maintains absolute control over the administrative process.

prejudge cases or to make speeches which give the appearance that the case has been prejudged," and which also "may have the effect of entrenching [the decision-maker] in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record." *Id.* at 590. In this regard, the court distinguished between press releases indicating that an agency "has reason to believe" that violations of law have occurred and public statements that "give that appearance that [the agency] has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves." *Id.* The agency adjudicator in *Cinderella* was found to have engaged in the latter, by suggesting in a single speech that an advertisement by the petitioner was deceptive. *Id.* at 589-90. The court accordingly disqualified the official from participating in the adjudication.

Not just one, or a few, but several public statements by Director Lockhart leave no doubt that he personally has prejudged the claims against Mr. Howard and predetermined their outcome. In press conferences, press releases, interviews and other similar contexts, he has stated, among other things:

- "When things went bad they did some accounting ticks, they basically created, ignored losses in some years. In some years they made so much money they actually figured out how to get losses. *But the whole story here was there was incredible arrogance, unethical activity, by the senior management and in particular this report talks about Franklin Raines and the CFO* but also many other people in the organization." *Interview with James Lockhart: Fannie Mae Investigation*, C-SPAN, May 23, 2006 (emphasis added).

- "The image of Fannie Mae as one of the lowest risk and best-in-class institutions vas a false façade. Our examination found an environment where the ends justified the means. As you will read in the Special Examination Report, *senior Fannie Mae executives were precisely managing earnings actually to the one-hundredth of a penny to maximize their bonuses while neglecting investments in systems, internal controls and risk management.*" *Press conference: Report on Fannie Mae*, C-SPAN, May 23, 2006 (emphasis added).

- *"**Actually their actions were much more much worse than foolish, they were flat-out wrong.**  Or, to use the proper regulatory phrase, **they were managing Fannie Mae in an unsafe and unsound manner.  Senior management manipulated accounting, reaped maximum undeserved bonuses and prevented the rest of the world from knowing about it.  They co-opted their internal auditors and other managers.  They stonewalled OFHEO.**"  Press conference: Report on Fannie Mae,* C-SPAN, May 23, 2006 (emphasis added).

- *"**Senior executives were managing Fannie Mae in an unsafe and unsound condition.  They also co-opted their internal auditors.  They stonewalled OFHEO.**  During the period covered by this report, Fannie Mae hit earnings-per-share targets with uncanny precision each quarter, by deliberately and systematically using inappropriate accounting and improper earnings management.  **Senior management of Fannie Mae benefited greatly from these manipulations. . . . This inappropriate tone at the top** spread throughout the organization."*  Statement of James B. Lockhart III on OFHEO's Report of the Special Examination of Fannie Mae, Before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises (June 6, 2006) (emphasis added).

- *"**To me, it's not just accounting fraud here.  This is mismanagement of the company.**  And I'm not referring necessarily to the present management, but **I'm talking about the management during this period.  It's more than just accounting fraud.  They underinvested in systems.  They tried to do a series of activities to weaken the agency as you know.  And it's much more than just accounting fraud in my mind.**"*  Hearing regarding OFHEO's Report of the Special Examination of Fannie Mae Before the Senate Committee on Banking, Housing and Urban Affairs, June 15, 2006 (emphasis added).

- "I think we need to send a very strong message.  We sent a strong message with the $400 million fine against Fannie Mae, but *I think we also need to send a message about the mismanagement – as the SEC says it – fraud committed by the former management.*"  Remarks of James B. Lockhart III to the American Enterprise Institute (Sept. 13, 2006) (emphasis added).

- "'The Notice of Charges details the harm to Fannie Mae resulting from the conduct of these individuals from 1998 to 2004,' said Director Lockhart.  '*The 101 charges reveal how the individuals improperly manipulated earnings to maximize their bonuses, while knowingly neglecting accounting systems and internal controls, misapplying over twenty accounting principles and misleading the regulator and the public.  The Notice explains how they submitted six years of misleading and inaccurate accounting statements and inaccurate capital reports that enabled them to grow Fannie Mae in an unsafe and unsound manner.  The misconduct cost the Enterprise and shareholders many billions of dollars and damaged the public trust,*' Lockhart said."  *Press Release: OFHEO Files Notice of Charges Against Former Fannie Mae Executives Franklin Raines, Timothy Howard and Leanne Spencer,* December 18, 2006 (emphasis added).

- "This activity was so unsafe and unsound that we have to take this action. We have no choice, really. ***We have to send a message to the management . . . , both present and previous, that this kind of activity cannot be allowed.***" Damien Paletta, *OFHEO files Notice of Charges vs. Ex-Fannie Executives*, Dow Jones Newswires (Dec. 18, 2006) (emphasis added).

- "The OFHEO Director, James B. Lockhart III, said in a conference call yesterday: '***We believed as an agency that these three individuals, separately and together, did serious harm to the company. There is a long list of charges that show they allowed this company to grow out of control.***'" Eric Dash, *Fannie Mae Ex-Officers Sued by U.S.*, New York Times, December 19, 2006 (emphasis added).[6]

Such pervasive and irreparable bias effectively has rendered the administrative process over which Director Lockhart presides unavailable for the enforcement of the Director's claims against Mr. Howard. *See Withrow*, 421 U.S. at 47 ("probability" or "risk" of actual bias or prejudgment is not "constitutionally tolerable"); *Cinderella*, 425 F.2d, 591; *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994) ("Certainly, a body that has prejudged the outcome cannot render a decision that comports with due process.").[7] It is not a close call. For this reason alone, the Court should require the Director to enforce the Notice of Charges in this Court.

**2.    Interests of Judicial Economy Warrant that the Director Be Required to Pursue the Notice of Charges in This Court.**

The derivative litigation filed in and currently pending before this Court (Civil Action No. 1:04-cv-01783) involves essentially the exact same factual allegations and nearly identical claims for relief as the Director's Notice. *See* Defendant J. Timothy Howard's Memorandum of Law in Support of His Motion to Join OFHEO as a Necessary Party, at 2-3 and Exhibits B & C thereto, filed this date in Civil Action No. 1:04-cv-01783. No less significantly, the several

---

[6] The quotations above are just a sampling of the repeated public statements by Director Lockhart demonstrating his bias.

[7] In this regard, it is significant that the Director not only has the authority to hand-pick an ALJ or "any other person" to preside over the proceedings, 12 C.F.R. § 1780.3(h), but should the Director choose – as he must – to disqualify himself from adjudicating or otherwise participating in the proceedings, it remains the Director's prerogative to decide who, within OFHEO, will assume his duties as the ultimate trier of fact and law. *See* 12 U.S.C. § 4513(d) ("The Director may delegate to officers and employees of [OFHEO] any of the functions, powers, and duties of the Director, as the Director considers appropriate.").

additional actions that comprise the multidistrict litigation consolidated before this Court (MDL No. 1668) also involve the same subject matter and essentially the same events as the OFHEO enforcement action. *See* Transfer Order at 2, Docket No. 1668, filed May 17, 2005 (J.P.M.L. 2005) ("[A]ll actions can be expected to focus on a significant number of common events, defendants, and/or witnesses.") The actions were consolidated before this Court by the Judicial Panel on Multidistrict Litigation expressly to "serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation" and "to eliminate duplicative discovery, prevent inconsistent pretrial rulings . . . , and conserve the resources of the parties, their counsel and the judiciary." *See id.* at 1-2. Given the pendency of this consolidated litigation, and its goal of providing efficient and centralized management of Fannie Mae-related proceedings, compelling the Director to bring his claims against Mr. Howard in this Court best serves the goals of judicial economy.

Indeed, there is no forum better suited to adjudicate the Director's Notice than this Court. Having presided for more than two years over several actions involving the same subject matter, this Court is intimately familiar with the facts and legal issues underlying the Notice of Charges. In stark contrast, the ALJ that eventually may be selected to preside over any administrative enforcement proceeding will have to start from scratch on both the facts and the law. Moreover, unlike in most administrative proceedings, the presiding officer will have no particular expertise regarding the subject matter or applicable law. That is because OFHEO is an agency without administrative law judges. Indeed, an ALJ from the Environmental Protection Agency is currently presiding over the only other notice of charges that a Director of OFHEO has previously initiated against former executive officers of an enterprise. *See* Order of Designation, May 25, 2006, HUDALJ 04-056-NA and HUDALJ-04-057-NA, attached hereto as Exhibit B.



Furthermore, OFHEO already is before this Court in connection with the consolidated multidistrict litigation. Not only is this Court presently overseeing OFHEO's third-party document production in the these proceedings – the same documents which will be central to the adjudication of the Notice of Charges – but OFHEO should soon be joined as a party to the shareholder derivative case. *See* Defendant J. Timothy Howard's Motion to Join OFHEO as a Necessary Party, filed this date in Civil Action No. 1:04-cv-01783.

## CONCLUSION

For the foregoing reasons, Mr. Howard respectfully requests that the Court enter an Order requiring the Director of OFHEO to pursue the Notice of Charges against Mr. Howard in this Court.

Dated: January 12, 2007                    Respectfully submitted,

Steven M. Salky (D.C. Bar No. 360175)
Eric Delinsky (D.C. Bar No. 460958)
Holly A. Pal (D.C. Bar No. 490737)
Miles Clark (D.C. Bar No. 489388)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Washington, D.C. 20036
202-778-1800 (telephone)
202-822-8106 (facsimile)

*Counsel for J. Timothy Howard*

## CERTIFICATE OF SERVICE

I certify that on this 12th day of January 2007, I filed the foregoing with the Clerk of Court. I also certify that on this same day I caused a copy of the foregoing to be served via hand-delivery on:

> James B. Lockhart, III
> Director
> Office of Federal Housing Enterprise Oversight
> 1700 G Street, NW
> 4th Floor
> Washington, DC 20552
>
> John C. Truong, Esq.
> Assistant United States Attorney
> 555 Fourth Street, NW
> Washington, DC 20530
>
> David Felt, Esq.
> Office of General Counsel
> Office of Federal Housing Enterprise Oversight
> 1700 G Street, NW
> Washington, DC  20552
>
> Jeffrey A. Taylor, Esq.
> United States Attorney for the District of Columbia
> United States Attorney's Office
> 555 Fourth Street, NW
> Washington, DC 20530

I also certify that on this same day I caused a copy of the foregoing to be served via certified U.S. mail on:

> Alberto R. Gonzalez, Esq.
> United States Attorney General
> United States Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001

_____
Eric R. Delinsky

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **J. TIMOTHY HOWARD**<br>8400 Parham Court<br>McLean, VA  22102,<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**JAMES B. LOCKHART III**, in his official<br>capacity as Director of the Office of Federal<br>Housing Enterprise Oversight, an office<br>within the United States Department of Housing<br>And Urban Development<br>1700 G Street, N.W.<br>Washington, DC 20552,<br><br>        **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Misc. No.** _____ |

**MEMORANDUM OF LAW IN SUPPORT OF J. TIMOTHY HOWARD'S
MOTION TO REQUIRE THE DIRECTOR OF OFHEO
TO PURSUE HIS NOTICE OF CHARGES AGAINST MR. HOWARD IN THIS COURT**

# <u>EXHIBIT A</u>

07-20

FILED

JAN 1 2 2007

MANCY MAYER WHITTINGTON CLERK

UNITED STATES OF AMERICA
OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

**Notice Number 2006-1**

In The Matter Of:                    )
                                     )
                                     )
FRANKLIN D. RAINES                   )
                                     )
                                     )
J. TIMOTHY HOWARD                    )
                                     )
                                     )
LEANNE G. SPENCER                    )
                                     )
                                     )

## NOTICE OF CHARGES

Take Notice that on such date and at such place as determined by the presiding officer, a hearing will commence pursuant to Title 12, United States Code, Section 4631 *et seq.* and Title 12, Code of Federal Regulations, Section 1780 *et seq.*, concerning the charges set forth herein, to determine whether an order to cease and desist, to impose a civil monetary penalty and for restitution, disgorgement and other relief should be issued against FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER, former employees of Fannie Mae (the "Enterprise").

In the course of a Special Examination into the affairs of the Enterprise, examiners of the Office of Federal Housing Enterprise Oversight ("OFHEO") found that RAINES, HOWARD and SPENCER: (a) engaged in conduct that violates the Federal

- 1 -

Housing Enterprises Financial Safety and Soundness Act of 1992 (Safety and Soundness Act of 1992), Title 12, United States Code, Section 4501 *et seq.*, regulations issued pursuant to the Safety and Soundness Act of 1992, Title 12, Code of Federal Regulations, Part 1700 *et seq.*, and the Federal National Mortgage Association Charter Act, Title 12, United States Code, Section 1716 *et seq.*; and (b) engaged in conduct that has caused or is likely to cause a loss to the Enterprise and/or depleted core capital. They further found evidence that such violations and conduct (a) resulted from a pattern of malfeasance, misfeasance, and nonfeasance; (b) involved recklessness; (c) were committed knowingly; and (d) resulted in unjust enrichment.

The Director of OFHEO (Director) has authorized the filing of the Notice of Charges contained herein. In support of this **NOTICE OF CHARGES**, the following is alleged:

### JURISDICTION

At all relevant times to the claims set forth herein:

1.      OFHEO has been an independent entity within the Department of Housing and Urban Development with the primary mission to ensure the capital adequacy and safety and soundness of the government sponsored enterprises. OFHEO was established by the Safety and Soundness Act of 1992.

2.      Pursuant to Title 12, United States Code, Section 4513, the Director is charged with ensuring that the enterprises OFHEO regulates operate safely and soundly and with adequate capital. In this regard, the Director is authorized to make such determinations, take such actions, and perform such functions as the Director determines necessary, including the institution of administrative and enforcement actions pursuant to the Safety

and Soundness Act of 1992. The Director may seek (a) cease and desist orders; (b) the imposition of civil monetary penalties; and (c) restitution, disgorgement and other relief relating to the government sponsored enterprises OFHEO regulates and the enterprises' present and former executive officers and directors.

3.      The unsafe and unsound conduct and violations of the Safety and Soundness Act of 1992 alleged herein presented an abnormal risk or threat to the financial integrity of the Enterprise.

4.      Fannie Mae is a government sponsored enterprise, Title 12, United States Code, Section 1716 *et seq.*, regulated by OFHEO under the Safety and Soundness Act of 1992.

5.      RAINES was an executive officer, who was associated with the Enterprise from 1998 until at least December 21, 2004 (alternatively, pursuant to an arbitration decision, RAINES's termination date from the Enterprise was June 21, 2005). RAINES was a director of the Enterprise from 1998 until 2004.

6.      HOWARD was an executive officer, who was associated with the Enterprise from 1982 until at least January 31, 2005. HOWARD was a director of the Enterprise from 2003 until 2005.

7.      SPENCER was an executive officer, who was associated with the Enterprise from 1991 until at least August 2005.

8.      Pursuant to 12 U.S.C. Section 4637, the "resignation, termination of employment or participation, or separation of a director or executive officer of an enterprise shall not affect the jurisdiction and authority of the Director to issue any notice and proceed...against any such director or executive officer, if such notice is served before the end of the 2-year period beginning on the date such director or executive officer ceases to

be associated with the enterprise."

## FACTS

9.      The Enterprise is one of the world's largest sources of mortgage financing. As of June 30, 2006, Fannie Mae held $2.4 trillion in its portfolio, which includes mortgage assets that the Enterprise holds in its mortgage portfolio and guarantees in its mortgage-backed securities (MBS) held by third-parties. In 2003, OFHEO's examiners initiated a Special Examination of Fannie Mae, which resulted in the *Report of Findings to Date* on September 17, 2004, and the *Report of the Special Examination of Fannie Mae* in May 2006. In addition, Fannie Mae's Board of Directors conducted its own investigation, which resulted in *A Report of the Special Review Committee of the Board of Directors of Fannie Mae* dated February 23, 2006. As a result of the accounting errors identified in the reports, the Enterprise announced on December 5, 2006, a restatement of $6.3 billion through June 30, 2004. The revised financial statements for December 31, 2004, contain additional losses in excess of $1 billion. Upon information and belief, this is the largest annual restatement ever made by a publicly traded company in the United States and was due in large part to the misconduct of RAINES, HOWARD and SPENCER.

10.     On May 23, 2006, Fannie Mae and OFHEO agreed to a consent order. Pursuant to the consent order, Fannie Mae paid a $400 million civil monetary penalty and agreed to implement costly measures to remedy the consequences of past misconduct. The misconduct of RAINES, HOWARD and SPENCER led, in large part, to the $400 million civil monetary penalty paid by the Enterprise and the need for the costly measures to remedy the consequences of their conduct.

11.     As of December 12, 2006, Fannie Mae had expended in excess of $1 billion to

recreate and correct historical financial statements. The misconduct of RAINES, HOWARD and SPENCER led, in large part, to the in excess of $1 billion spent by the Enterprise to recreate and correct its historical financial statements.

12.    During the period from 1998 through 2004, Fannie Mae compensation for executive officers involved several key components: 1) basic compensation, which included base salary and other annual compensation; 2) AIP awards ("bonuses"), the value of which were linked to meeting annual Core Business Earnings Per Share targets (Core Business Earnings Per Share is a performance measure developed by management and is referred to as "EPS" herein) for all relevant periods; 3) long-term incentive plan awards (LTIP), which included substantial amounts of "performance share" stock awards under the Performance Share Plan (PSP) to senior executives if EPS and certain non-financial goals were met over a three-year period; and 4) stock options. The second and third of these components of executive compensation included major compensation programs—AIP bonuses and PSP stock awards—that depended directly on the attainment of EPS targets, a dependency that directly encouraged improper earnings management, including manipulation of accounting rules.

13.    A further component of compensation was stock option grants. Approximately five months into his position as Chairman and CEO, RAINES announced at the May 1999 Investor/Analyst Conference the corporate challenge to double EPS to $6.46 by year-end 2003. To provide financial incentives to meet the EPS goal set by RAINES, RAINES and his management team, including HOWARD, recommended in 1999 that the Board of Directors approve a special stock option grant to provide an incentive for employees to double core business earnings per share to $6.46 by year-end 2003. The

Board implemented this recommendation. This decision resulted in the issuance of EPS Challenge Option Grants scheduled to vest in January 2004 to all full-time and part-time employees if Fannie Mae doubled EPS by year-end 2003. On January 23, 2004, the Board determined that Fannie Mae had indeed doubled its EPS. Accordingly, 4,896,542 stock options ("EPS Challenge Grants") with a grant date present value of $103,245,365 vested on that date. The option expiration date is January 10, 2010. This challenge created a financial incentive for the company to grow its portfolio and dramatically increase earnings—by increasing the potential compensation of Fannie Mae executives and employees. The restated accounts do show that the Enterprise did exceed the targeted $6.46 per share in 2003. However, the restatement also shows that the Enterprise was violating the minimum capital rule throughout 2002 and 2003.

14.    RAINES was Chairman of the Board and Chief Executive Officer (CEO) from January 1999 until December 21, 2004. He served as CEO-designate in 1998. RAINES was responsible for the day-to-day management of Fannie Mae, the country's third largest corporation in terms of assets, and the nation's largest provider of funds for home mortgages. His responsibilities included, among others, establishing company-wide goals and objectives; providing adequate business process controls to ensure business initiatives and endeavors were consistent with risk assessment and risk management; providing adequate internal controls to ensure that goals and objectives were met; ensuring resource use was consistent with laws, regulations and policies, ensuring resources were safeguarded against waste, loss and misuse; and ensuring reliable data was obtained, maintained and fairly disclosed in reports. In short, RAINES was responsible for ensuring that the company was run in a safe and sound manner.

15.    Prior to rejoining the Enterprise in 1998, RAINES was Vice-Chairman at Fannie Mae from 1991 to 1995. During that period, HOWARD reported to RAINES.

16.    From 1998 to 2004, RAINES was Chairman of the Board, the Senior Leadership Team; the Operating Committee; the External Affairs Committee; and the Assets & Liabilities Committee, among other leadership units.  In addition, he was the de-facto chair of the Quarterly Business Reviews, meetings he attended that were formally chaired by Chief Operating Officer (COO) Daniel Mudd and HOWARD.

17.    RAINES reaped large personal benefits from meeting the EPS Challenge Grant goal: his award of 213,548 EPS Challenge Grant Options had a grant date present value of approximately $4,358,415.  From 1998 through 2003, including the value of stock options that vested in 2004 as a result of the EPS Challenge Grant, RAINES received approximately $90 million in compensation.   Of that compensation, two components directly tied to meeting EPS goals—the AIP bonus and the EPS Challenge Grant— accounted for more than $20 million. In addition, three-year EPS goals played a crucial role in determining the size of Mr. RAINES approximately $32 million in Performance Share Plan (PSP) stock awards.

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Totals |
|---|---|---|---|---|---|---|---|---|
| **Franklin Raines** | | | | | | | | |
| Salary | $526,154 | $945,000 | $992,250 | $992,250 | $992,250 | $992,250 | $992,250 | $6,532,404 |
| Bonus | 1,109,589 | 1,890,000 | 2,480,625 | 3,125,650 | 3,300,000 | 4,180,365 | | $16,086,229 |
| PSP | 794,873 | 1,329,448 | 4,588,616 | 6,803,068 | 7,233,679 | 11,621,280 | | $32,270,964 |
| Options | 4,052,484 | 4,358,406 | 5,829,071 | 7,945,648 | 6,680,395 | 3,006,895 | | $31,872,899 |
| EPS Grant | | | | | | 4,358,515 | | $4,358,515 |
| Total | $6,483,100 | $8,522,854 | $13,890,562 | $18,866,616 | $18,206,324 | $24,159,305 | $992,250 | $91,121,011 |
| | | | | | | | | |

18.    HOWARD was an Executive Vice President and Chief Financial Officer (CFO) from 1990 to 2005. He was responsible for a broad range of financial activities,

including corporate financial strategy, capital markets activities, corporate accounting, investor relations, capital account management, asset acquisition, liability issuance, the single family credit business, credit finance and interest rate risk management of the company's mortgage investment portfolio. He had overall responsibility for financial reporting and management, the Controller's Office and the establishment and execution of proper accounting policies. Beginning in 2002, the Office of Audit ("Internal Audit") reported to HOWARD on a "dotted-line" basis. HOWARD reported to RAINES. He was responsible for ensuring that the Enterprise was run in a safe and sound manner.

19.    HOWARD was vested with broad responsibilities. Among other responsibilities, he served on the Senior Leadership Team, the Operating Committee, the Assets & Liabilities Committee, the Operations Transactions and Investment Committee, the Portfolio and Capital Committee, and was one of four executives in the Office of the Chairman. HOWARD, along with Daniel Mudd, served as co-chair of the Quarterly Business Review.

20.    HOWARD reaped substantial personal benefit from Fannie Mae executive compensation programs tied to the attainment of EPS targets, including the AIP bonus program, the PSP stock awards, and the EPS Challenge Grants, as the table below shows.

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Totals |
|---|---|---|---|---|---|---|---|---|
| Timothy Howard | | | | | | | | |
| Salary | $395,000 | $414,800 | $435,540 | $463,315 | $498,614 | $645,865 | $703,350[d] | $3,556,504 |
| Bonus | 493,750 | 518,500 | 544,425 | 694,983 | 781,250 | 1,176,145 | | $4,209,053 |
| PSP | 909,196 | 860,464 | 2,088,542 | 1,987,119 | 1,947,368 | 3,470,578 | | $11,263,267 |
| Options | 938,912 | 1,154,593 | 2,035,589 | 2,166,427 | 1,749,995 | 2,491,974 | | $10,537,490 |
| EPS Grant | | | | | | 1,292,085 | | $1,192,085 |
| Total | $2,736,858 | $2,948,357 | $5,104,096 | $5,311,844 | $4,977,227 | $9,046,647 | $703,350[d] | $30,858,379 |

21.    SPENCER served as Fannie Mae's Senior Vice President & Controller and reported to CFO HOWARD. She became acting Controller in 1998 and continued as the Controller until she terminated her employment in August 2005. Her principal duties and responsibilities included the preparation of financial statements and all external and internal financial reporting, the supervision of all accounting and payroll activities for the Enterprise, corporate tax, financial standards and corporate business planning. Her responsibility included ensuring the Enterprise was run in a safe and sound manner.

22.    SPENCER was vested with broad responsibilities. Among other responsibilities, she was a member of the Senior Leadership Team, attending weekly meetings with the CEO, the COO, and the CFO. She made regular presentations at the Quarterly Business Reviews and she frequently attended Portfolio Investment Committee meetings and discussed net interest income with respect to the corporate earnings forecast.

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Totals |
|---|---|---|---|---|---|---|---|---|
| Leanne Spencer | | | | | | | | |
| Salary | $159,000 | $195,000 | $205,000 | $216,000 | $260,000 | $275,210 | $361,000[d] | $1,671,210 |
| Bonus | 85,518 | 120,500 | 178,863 | 185,000 | 330,000 | 383,200 | | 1,283,081 |
| PSP | 184,802 | 240,223 | 319,805 | 325,232 | 396,018 | 488,611 | | 1,954,691 |
| Options | 184,946 | 259,967 | 320,051 | 359,844 | 396,005 | 488,749 | | 2,009,562 |
| EPS Grant | | | | | | 374,993 | | 374,993 |
| Total | $614,266 | $815,690 | $1,023,719 | $1,086,076 | $1,382,023 | $2,010,763 | $361,000[d] | $7,293,537 |

## INAPPROPRIATE EARNINGS MANAGEMENT AND MANIPULATION

From 1998 to 2004, unless more specifically alleged herein, RAINES, HOWARD and SPENCER individually and collectively committed the following misconduct:

23.    During the normal course of its portfolio investment and guarantee businesses, Fannie Mae purchases loans and mortgage-related securities at a premium or discount. These premiums and discounts are known collectively as deferred price adjustments. Deferred price adjustments are amortized into income over the life of the loans or securities. Inasmuch as the value of mortgage loans and mortgage-related securities fluctuates as interest rates change, the speed at which deferred price adjustments are amortized into income also fluctuates as interest rates change. Statement of Financial Accounting Standards No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases, effective December 1988 (FAS 91), was issued to establish consistent accounting for nonrefundable fees and costs associated with lending activities. The scope of FAS 91 includes deferred price adjustments (which were oftentimes referred to at the Enterprise as Purchase Premium/Discount Amortization ("PDA") and is herein referred to as PDA). FAS 91 prescribes rules for use by companies in estimating the rate of amortization of deferred price adjustments, adjusting the rate of amortization as interest rates fluctuate, and recording in current period earnings income or expense associated with the adjustment. This current period income or expense was known at Fannie Mae as "the catch-up amount."

24.    Fannie Mae senior management faced a critical challenge to its previous practices regarding PDA in 1998. Accelerating mortgage prepayments caused by declining interest

- 10 -

rates were part of the reason for a large FAS 91 catch-up expense for PDA. Management had wrongly decided not to record catch-up amount prior to 1998. Further, a large portion of the catch-up expense was related to REMICs (Real Estate Mortgage Investment Conduits are a form of mortgage-backed securities) that had not been modeled before 1998. Faced with the need to address the large amount of purchase premium discount amortization expense, management resorted to manipulating earnings to meet EPS and AIP targets.

25.    As described below, despite a projected breakdown in HOWARD's ability to forecast and deliver earnings in 1998, RAINES, HOWARD and SPENCER worked together to enable Fannie Mae to exceed the expectations of Wall Street stock analysts and meet 1998 EPS/AIP targets, through the following means:

a.    inappropriately deferring approximately $200 million of estimated amortization expense from 1998, as noted in the September 2004 and May 2006 OFHEO Reports. HOWARD and SPENCER proposed the deferral and RAINES agreed to the deferral. KPMG, the Enterprise's external auditor, recorded an audit difference as a result of the Enterprise's failure to realize the total of approximately $440 million in amortization expense.

b.    avoided recording impairments (impairment of an asset occurs when the market value of that asset is worth less than the book value) on interest-only securities (IOs) by inappropriately combining them with mortgage-backed securities to create "synthetic REMICs", a Fannie Mae construct designed to conceal losses on IOs and achieved a preferred, improper accounting treatment.

c.    improperly accounting for guarantee-fee buy-ups (Buy-ups and buy-downs are the premium discounts Fannie Mae pays or charges to increase or decrease, respectively, the guaranty fee rate lenders pay for Fannie Mae's guarantee of mortgages that back MBS. Buy-ups (often referred to in internal Fannie Mae communications as "buyups" or "Bus;" buy-downs are similarly referred to as "buydowns" or "BDs;" buy-ups and buy-downs are interest only-like instruments (IO securities) and are subject to the same impairment accounting as IO securities) assets with interest-only characteristics for which Fannie Mae offered "enhanced pricing" to build MBS market share. Had these been properly accounted for, Fannie Mae would have recorded several hundred million dollars of additional impairments as an expense against current period income. HOWARD and his staff deliberately avoided discussion of buy-up accounting with KPMG.

d.    inappropriately accounting for tax credits arising from the Enterprise's investment in Low-Income Housing Tax Credits (LIHTC) by effectively "double-counting" certain credits in 1998 through a selectively timed switch from cash to accrual accounting, which HOWARD misleadingly described in the earnings release as refined timing resulting from "improved systems and information."

e.    working with KPMG to convert $30 billion of mortgages on Fannie Mae's balance sheet into a multi-tranche security by selling one small piece to an investment bank to take advantage of IRS rules regarding *de minimis* original issue discount securities. The entire package was known as the STIS deal, for "short-term interest securities," some of which Fannie Mae still has on its books.

- 12 -

The process of transforming mortgage loans into "pseudo pools" for the STIS deal consumed large amounts of staff time and gave rise to many operational problems. The 1998 STIS deal reduced Fannie Mae's 1998 tax liability by $341 million. The IRS ruled in 2005 that the 1998 STIS transaction was improper, and reached a settlement with Fannie Mae disallowing 75 percent of the related 1998 tax deduction.

f.    inappropriately transferring only $3.9 million of $22.5 million from a suspense account, No. 1622-00, to meet exactly the EPS/AIP target. KPMG recorded an audit difference resulting from the Enterprise's failure to move the entirety of the suspense account into income.

26.    Mid-year estimates in 1998 of full-year earnings per share proved to be what Fannie Mae actually reported, despite the dire contrary predictions and despite unplanned and unanticipated high levels of interest rate volatility and mortgage prepayments that continued throughout the year. A draft memo dated July 24, 1998, from SPENCER to HOWARD and others stated that SPENCER "will be working closely with Tim and Rob [Levin] to develop strategies for reaching a minimum of [$3.21] for 1998, which is the analysts' consensus for the year."

27.    Throughout 1998, Fannie Mae's senior management experienced difficulty in meeting EPS and AIP targets. A reviewer wrote in HOWARD's annual performance appraisal, dated November 13, 1998, that "[there] is no question that 1998 has been a much more challenging year than any of us expected it would be." The reviewer continued that "it was obviously quite surprising to you and your colleagues to learn how significantly you had overestimated what you thought you would be able to produce this

year,...[in] essence, the forecasting bust provided you with a somewhat unexpected but needed 'wake-up' call."

28.    HOWARD and SPENCER attended a September 22, 1998, "Risk Review with the CFO" meeting in which they agreed to make the goal of meeting a $3.21 EPS target in 1998, and managing earnings to that target their top priorities.

29.    Only one week later, on September 29, 1998, HOWARD expressed concern about the possibility of not reaching the maximum $3.23 EPS/AIP target, and, consequently, not generating the maximum AIP bonus pool in 1998.   HOWARD also expressed concern about beginning the 1999 fiscal year in an undesirably weakened condition.

30.    HOWARD explained that several factors, including lower-than-forecast spreads on new business, would mean a $70 million shortfall in portfolio net income but indicated he was confident Fannie Mae could "fill the gap."

31.    Despite the forecast shortfall, the Enterprise released earnings for year's end 1998, dated January 14, 1999, in which RAINES noted that "Fannie Mae was one of the few large companies that exceeded the expectations of security analysts at the beginning of the year." Fannie Mae reported that it met both its EPS and AIP targets, which ensured that senior management, including RAINES, HOWARD and SPENCER, obtained the maximum possible compensation.

32.    RAINES, HOWARD and SPENCER transformed the forecast shortfall into the attainment of the maximum EPS/AIP bonus through improper earnings management and accounting manipulation.   RAINES was briefed on improper earnings management actions that could be used to hit EPS/AIP targets throughout the period in which RAINES was CEO-designate in 1998. For example, an August 10, 1998, memo from then COO

Lawrence Small to RAINES referred to using a "non-recurring earnings piggy bank" to achieve a $3.21 EPS figure—the then-current Wall Street consensus on earnings. In the memorandum, Small also warned RAINES that missing the 1998 maximum bonus payout number of $3.23 would be met with an adverse reaction by Fannie Mae officers and directors.

33.     HOWARD's public release of the company's 1998 earnings on January 14, 1999, culminated a series of carefully calculated steps to hit the 1998 EPS/AIP target and ensure maximum payout under the AIP program. These improper earnings management tactics were undertaken in the closing months of 1998 and early 1999 for three reasons: First, Fannie Mae was reeling from the effects of interest rate volatility and market dislocation that had caused a rapid acceleration in mortgage prepayments.  Second, Fannie Mae had a past practice of not recording catch-up adjustment amounts as required by FAS 91 because the Enterprise had underestimated catch-up expense ("catch-up" adjustments were manually prepared journal entries used to record adjustments to PDA, oftentimes entered during the process of closing the quarterly or yearly financial records). Third, the company had catch-up amortization expense related to a previously unmodeled portion of its asset portfolio.  KPMG had indicated that the Enterprise must address the large amortization catch-up in 1998.

34.     As the end of 1998 approached and the possibility of not "maxing out" the bonus pool became more certain, HOWARD and SPENCER identified potential transactions to offset the earnings shortage, and RAINES approved these improper earnings management transactions, during the January 8, 1999, "Earnings Alternatives Meeting." Below is a summary of events in December 1998 and early January that led to Fannie

Mae achieving the EPS target of $3.23 and maximizing payout under the AIP program.

a.      On or about December 7, 1998, SPENCER met with KPMG auditors and described the projections for year-end. SPENCER informed the auditors that the catch-up figure for December would be slightly greater than $150 million, but she expected to book on-top amortization at a somewhat lower figure ("on-top" adjustments are synonymous with catch-up adjustments). She was not specific about the range or level of amortization she was planning to book. SPENCER assured the auditors that Fannie Mae was aggressively managing its catch-up. SPENCER sought to alleviate any concerns from KPMG, most likely to prevent interference with Fannie Mae's year-end amortization adjustments.

b.      On or about December 13, 1998, SPENCER, HOWARD and others met to discuss year end income projections for the portfolio investment business. Previous projections had been based on long term mortgage rates that were higher than the current market rate. After discussion, they decided to lower the projected long term mortgage rate to 6.75% for income forecasting and business management purposes. The reduction represented 42 basis points from the long term rates used in the September analysis. This change required Fannie Mae to remodel all earnings components for the 6.75% rate path and develop sensitivity analyses in anticipation of the Enterprise's annual business plan. Adjustments to the model needed to be made to provide senior management with a more accurate picture of the earnings shortfall so they

- 16 -

in turn could take action to minimize it. A few weeks after this meeting, the Enterprise completed an income projection using the 6.75% rate path.

c.     In or about the week of December 28, 1998, SPENCER reviewed the income projection using this new rate path and found the new catch-up figure for PDA of $151 million. When this figure was combined with adjustments for REMICs and synthetic REMICs, total catch-up expense for the portfolio was $440 million. If the entire $440 million adjustment was realized, then RAINES, HOWARD and SPENCER would have received no AIP bonus for 1998.

d.     On or about January 4, 1999, SPENCER reviewed the results of the income analysis, including the total amount of catch-up for year-end 1998, with HOWARD. HOWARD and SPENCER planned to review these unfavorable earnings results with the Office of the Chairman.

e.     On or about January 7, 1999, SPENCER directed an employee in the Controller's Office to input numbers into three earnings alternative schedules in preparation of the "Earnings Alternatives Meeting." Those schedules showed the effects on earnings and EPS for recording the entire catch-up of $440 million and, alternatively, only $240 million of the catch-up. SPENCER provided the employee with the numbers to include on the spreadsheet and conveyed that there was a sense of urgency to get the numbers "right."

f.    On or about January 8, 1999, in the early morning, SPENCER drafted a document ("FACTS") for RAINES, detailing the earnings events over the past month. She referenced three earnings scenarios for 1998, each of which would have resulted in meeting the maximum EPS/AIP target. These scenarios were in fact the three schedules SPENCER had the Controller's Office employee prepare the day before. SPENCER also detailed an offset to the exposure from the catch-up, including a change from cash to an accrual method of accounting for LIHTC.

g.    On or about January 8, 1999, at approximately 8 a.m., SPENCER attended the "Earnings Alternative Meeting" (also referred to as "the 1999 Plan Meeting") with RAINES, HOWARD and others to discuss the PDA adjustments totaling $240 million along with the LIHTC adjustment that impacted year-end earnings. The purpose of this meeting was to make sure that all of management was approved before specific proposals were made to KPMG that afternoon.

According to SPENCER, three documents were distributed at the meeting, and HOWARD gave a presentation to RAINES and the others in the group.

During the discussion, HOWARD recommended that Fannie Mae recognize $240 million of the $440 million in catch-up through adjustments of $180 million to net interest income and $60 million to guaranty fees. There was no "piece of paper" that showed support for these adjustments. They purportedly represented HOWARD's and

- 18 -

SPENCER's subjective estimate for the 1998 catch-up amounts although they were at divergence with estimates used in business operations. The other $200 million would be deferred. SPENCER stated the full amount of catch-up had been disclosed to RAINES and he was comfortable with recording $240 million of the catch-up and leaving $200 million unrecorded. In testimony, RAINES stated he had no reason to refute SPENCER's statement that he had signed off on the $200 million deferral.

The proposal to change the method of accounting for LIHTC from a cash basis to an accrual basis was also discussed and approved. Senior management was made aware that this change in LIHTC accounting would record two years' worth of tax benefits in 1998. In the end, SPENCER and HOWARD walked away from the meeting with the necessary approval from RAINES to process these inappropriate earnings management transactions for 1998.

h.    On or about January 8, 1999, in the afternoon, SPENCER and others met with Ms. Theobald, Mr. Russell and Mr. Smith from KPMG as a follow-up to their December 7th meeting. SPENCER had informed KPMG of the 1999 Plan meeting earlier in the day and that they had reviewed the proposals for year-end adjustments with Chairman RAINES.

SPENCER opened the meeting by briefing the attendees about discussions with RAINES and HOWARD during that morning's 1999 Plan Meeting. SPENCER raised several issues about PDA with KPMG

auditors. She informed them of the December 13th meeting with Fannie Mae management, during which a decision was made to lower the interest rate path for the third quarter forecast. Then she reviewed with them the issues management faced in amortizing REMICS and synthetic REMICS. SPENCER then informed KPMG auditors of the proposal to record an adjustment of $240 million in 1998 and $135 million in 1999. She claimed that the rationale for these adjustments was based on the complicated and imprecise calculation and projection of PDA and that it represented the best estimate of management. Later in the meeting, SPENCER oversaw Fannie Mae's briefing to KPMG auditors concerning the proposal for the LIHTC change and associated year-end adjustment.

The KPMG auditors did not agree with the proposal presented by SPENCER for the PDA adjustment. Their position was that Fannie Mae should book the full amount of the adjustment in 1998.

SPENCER conveyed to Mr. Russell that HOWARD was available to talk to him about the PDA adjustments, but the imminent large audit difference with KPMG did not change management's course of action.

i.    On or about January 8, 1999, at approximately 6:35 p.m., journal entries for adjustments discussed at the 1999 Plan Meeting and the KPMG meeting were processed.

j.    On or about January 9, 1999, $3.9 million from account 1622-00 was realized as income. Prior to this journal entry, EPS was at $3.2285, $.0015 less than what was needed for the maximum EPS/AIP bonus for

1998 (for the purpose of the AIP bonus, EPS was rounded to the nearest thousandth of a cent). The after-tax EPS effect of the $3.9 million was $.0024. This brought EPS to $3.2309, which fully funded the AIP bonus pool.

35. Based on goals set in January 1998, the Compensation Committee of the Board of Directors estimated that the AIP bonus pool would be funded at $25.9 million in 1998 if Fannie Mae achieved the maximum EPS goal, $17.3 million if the Enterprise reached the target EPS, and $8.6 million if the company achieved the minimum EPS goal (without the earnings management and accounting manipulations described herein, management would not have attained the minimum AIP target for 1998). By hitting an EPS of $3.2309 Fannie Mae exceeded the maximum EPS goal for 1998 by $0.0009. The AIP bonuses actually paid for 1998 totaled $27.1 million.

36. HOWARD, in consultation with SPENCER, set the financial targets for the AIP bonus that included the target for maximum payouts as well as the minimum threshold that determined whether there would be payouts at all from the AIP bonus pool. When RAINES was Chairman, RAINES reviewed and approved the goals set by HOWARD, which were ultimately approved by the Compensation Committee of the Board of Directors.

37. HOWARD managed earnings to "hit" maximum AIP bonus payout targets. For example, based upon his analysis of the EPS impact of the monies, HOWARD improperly structured debt repurchase transactions to move monies from various periods of plentiful income into periods in which income would be scarce.

38. As with the one-year AIP targets, HOWARD monitored the PSP multi-year stock

- 21 -

payouts closely to ensure maximum payouts.

39.    For RAINES, HOWARD and SPENCER, the size of the AIP bonus pool and the AIP bonus payout depended on annual EPS performance.  This increased the incentive for senior executives to manipulate both EPS and EPS targets.  Not only did the AIP bonus structure provide for no additional payment once management achieved the maximum EPS/AIP target, but also, since the EPS/AIP bonus targets were determined by percentage increases based upon the preceding year, adding income over and above the maximum EPS/AIP target made future EPS/AIP targets more difficult to reach.  This method for determining EPS/AIP targets encouraged the shifting of income forward in years of plentiful core business earnings to meet EPS targets in future years.

40.    RAINES, HOWARD and SPENCER understood that doubling earnings in five years meant rapidly growing the amount of loans held by the company in portfolio (as opposed to selling the loans in MBS).  Their plan included estimates of the portfolio growth needed to generate sufficient net interest income to achieve the desired financial results.  The rapid portfolio growth, which increased interest rate risk, contributed mightily in meeting the financial goals established by RAINES.  RAINES, HOWARD and SPENCER did not coordinate the growth in the portfolio with establishing the requisite accounting and financial reporting infrastructure to support the increased business activity.

41.    To meet the earnings challenge goals established by RAINES, which entailed doubling the 1998 EPS of $3.23 in five years, the Enterprise had to increase risk by rapidly growing its portfolio of interest rate sensitive mortgage assets.  HOWARD, as

CFO and head of the Enterprise's financial strategy and capital markets activities, hedged only a portion of this increased interest rate risk with derivatives. This decision eventually resulted in multi-billion dollar losses from the extinguishment of pay-fixed interest rate swaps, losses that Fannie Mae ultimately realized through earnings when the Enterprise lost hedge accounting privileges under FAS 133 (Accounting for Derivative Instruments and Hedging Activities) in December 2004.

42.     RAINES, HOWARD and SPENCER improperly used stock repurchases as a method of reaching AIP/EPS targets.

43.     The volatility inherent in Fannie Mae's portfolio made it difficult, if not impossible, to predict or deliver steadily increasing earnings over the period of the EPS Challenge Grant Program. To increase their chance to meet EPS/AIP targets annually, RAINES, HOWARD and SPENCER needed to reduce or eliminate this volatility. To that end, HOWARD and SPENCER, without the participation of the Director of Financial Accounting or KPMG, crafted a FAS 91 policy to reduce volatility, in contravention of Generally Accepted Accounting Principles (GAAP). RAINES was apprised of the FAS 91 PDA policy during the process the Enterprise employed to close its financial records for its fiscal year ("closing process") in or around 2000. By implementing its FAS 91 Policy in December 2000, Fannie Mae, as a matter of corporate policy, was no longer making amortization adjustments to improve the accuracy of its financial results, but rather was making preemptive adjustments for the sole purpose of managing prospective earnings.

44.     Fannie Mae's practice of capitalizing and amortizing reconciliation differences provides a further example of how accounting applications were manipulated to minimize

- 23 -

earnings volatility and to meet desired results at any given time. Limitations in systems integration and application level controls undermined the integrity of information used to estimate amortization. These limitations necessitated periodic reconciliations between information on transaction sub-ledgers (i.e. STATS, LASER) and the information on the amortization sub-ledger (iPDI). Differences arising from these reconciliations were known to Fannie Mae personnel as "realignments." On some occasions, these differences were recorded as adjustments in the period in which they became known. On other occasions, these differences were capitalized as "phantom" assets or liabilities and amortized over a period of time using the life of a proxy security. Amounts capitalized in this manner were placed in a separate account in the PDI sub-ledger that was commonly referred to as the "deferred pool bucket" or "bucket." There is no justification in GAAP for capitalizing and deferring differences resulting from reconciliation differences. This methodology reflects management's intent to manage earnings rather than accounting appropriately for amortization.

45.    RAINES, HOWARD, and SPENCER were responsible for transactions in December 2001 and March 2002 that created a $20 billion REMIC and a $10 billion REMIC, which they used to shift $107 million of earnings into future years. The transactions increased costs in 2001 and 2002, years in which EPS/AIP targets were more easily obtained, and shifted income into out years, in which management was projected to be less likely to obtain EPS/AIP targets. These two REMIC transactions had no economic purpose. Entering into transactions that have no economic purpose but simply to shift income, even when otherwise GAAP-compliant, contravenes GAAP. RAINES, HOWARD, and SPENCER did not make the appropriate disclosures about the

transactions in the associated prospectus supplements or financial statements and did not have the appropriate internal control systems to account properly for these REMIC transactions.

46.    RAINES, HOWARD and SPENCER were responsible for the inappropriate manner in which the Enterprise accounted for the results of the Security Master project. Although the purpose of the Security Master project was to redesignate improperly designated securities, which should have resulted in expenses to the Enterprise, RAINES, HOWARD and SPENCER, as detailed further below, caused the expenses to be reduced or eliminated through the use of inapplicable accounting principles.

47.    Fannie Mae erroneously treated accounting errors in a manner that provided flexibility to manage income targets. One such error related to a systemic problem in handling dollar roll transactions, common transactions in the mortgage market. In a dollar roll transaction, securities are lent out of the portfolio in secured financing arrangements. The error occurred when, upon return of the collateral, the original acquisition date of the security was overwritten with the date the security was returned to the portfolio. Such a date change caused issues with the accounting for amortization since the original acquisition date was needed to estimate the period of amortization. Moreover, Fannie Mae had no system to determine if it received securities equivalent to that which it lent out in dollar roll transactions. RAINES, HOWARD and SPENCER were responsible for the inappropriate manner in which the Enterprise accounted for dollar roll transactions.

48.    The volatility inherent in Fannie Mae's portfolio made it difficult, if not impossible, to predict or deliver steadily increasing earnings. Much of the volatility arose

from a large volume of derivatives, primarily interest rate swaps, the value of which can vary widely as interest rates fluctuate. RAINES, HOWARD and SPENCER were responsible for the Enterprise's implementation of a non-GAAP treatment of derivatives, which violated FAS 133 and reduced earnings volatility. RAINES, HOWARD and SPENCER also developed the concept of the Core Business Earnings Per Share that did not include FAS 133 accounting.

49.     The Enterprise did not correctly apply FAS 133 hedge accounting to its derivative portfolio. The FAS 133 hedge accounting failure ranged from the Enterprise's hedge accounting implementation policy to the system used to apply the accounting standard (which was called the "FAS 133 system"). Both the policy and the system incorrectly assumed perfect hedge effectiveness for each derivative in a hedged relationship. FAS 133 provided a source of earnings volatility for Fannie Mae that may be related to the returns on the Enterprise's portfolio investment business. In the December 2004 meeting with representatives of Fannie Mae and OFHEO, the SEC's Chief Accountant explained that Fannie Mae's accounting for FAS 133 was "not even on the page" of the outer bounds of GAAP compliance. HOWARD, in his 2001 self-assessment, took credit for the FAS 133 policy adopted and implemented by the Enterprise.

50.     HOWARD and SPENCER, with RAINES' knowledge and approval, actively participated in earnings management related to debt buybacks designed to fine tune financial results in order to meet EPS/AIP targets. This fine tuning was accomplished by repurchasing debt in years in which the maximum EPS/AIP target would be met, thereby increasing current expense, but reducing expenses in later years when the maximum EPS/AIP target would be difficult to meet. RAINES, HOWARD and SPENCER failed

to document any economic or other justification for the debt buybacks.

51.    HOWARD, with RAINES' knowledge and approval, maintained the Enterprise's allowance for loan loss at a level not commensurate with the risk of Fannie Mae's credit portfolio. RAINES and HOWARD maintained the level inappropriately high in order to create a hidden cushion that could be used to reduce volatility so that they could manage earnings to hit AIP/EPS targets.

52.    In 2002, HOWARD and SPENCER, with the knowledge and approval of RAINES, inappropriately accounted for Low Income Housing Tax Credits for the purpose of creating a cushion for volatility in order to manage earnings to AIP/EPS targets.

53.    RAINES, HOWARD and SPENCER approved two small finite insurance policies that the Enterprise entered into for which it inappropriately applied insurance accounting. The purpose of the transactions was to postpone earnings from a year when Fannie Mae expected to exceed earnings targets to a year in which Fannie Mae would have difficulty reaching earnings targets. One of those policies was a pool insurance policy covering a higher-risk loan purchase program—Expanded Approval/Timely Payment Rewards ("EATPR")—purchased from Radian Insurance. The Radian policy shifted income from 2002 to 2003 and 2004.

54.    SPENCER, with the knowledge and approval of RAINES and HOWARD, obscured the accounting effect of decreasing interest rates on IOs by avoiding recording impairments on the IOs. This was done by inappropriately combining them with mortgage-backed securities to create "synthetic REMICs," a Fannie Mae construct designed to conceal the existence of the IOs so that Fannie Mae could avoid impairment

losses. SPENCER, with the approval of RAINES and HOWARD, did the same thing for its net buy-up portfolio. Although Fannie Mae continued to amortize its net buy-ups inappropriately under FAS 91, the Enterprise continued to assess the potential impairments on its buy-up portfolio under FAS 125.

55.    Until the Securities and Exchange Commission (SEC) determination on December 15, 2004, necessitating a restatement of Fannie Mae earnings, RAINES, HOWARD and SPENCER directed efforts to meet earnings targets for 2004, which, in terms of earnings per share growth, were significantly lower than in previous years. Those efforts were tied directly to meeting AIP bonus goals for that year.

## MISLEADING FINANCIAL REPORTING AND DISCLOSURES THAT FLOWED FROM MANIPULATIVE CONDUCT

56.    Pursuant to Title 12, United States Code, Section 1723a(k), financial statements in Fannie Mae's annual reports to the Director of OFHEO are to be prepared in accordance with GAAP.

57.    RAINES, HOWARD and SPENCER were responsible for reviewing and ensuring the accuracy of Fannie Mae's annual reports.

58.    The Enterprise's 1998 annual report indicated that "[t]he accounting and reporting policies of Fannie Mae conform with generally accepted accounting principles."

59.    The Enterprise's 1999 annual report indicated that "[t]he accounting and reporting policies of Fannie Mae conform with generally accepted accounting principles."

60.    The Enterprise's 2000 annual report indicated that "[t]he accounting and reporting policies of Fannie Mae conform with accounting principles generally accepted in the

United States of America."

61.    The Enterprise's 2001 annual report indicated that "[t]he accounting and reporting policies of Fannie Mae conform with accounting principles generally accepted in the United States of America."

62.    The Enterprise's 2002 annual report indicated that "[w]e prepare our financial statements in conformity with accounting principles generally accepted in the United States of America."

63.    The Enterprise submitted a 2003 annual report, which included financial information that was required to conform to GAAP.

64.    Pursuant to the *Examination Handbook* (Dec. 1998), the *Risk-Based Examinations—Evaluation Criteria* (Dec. 1998), the Policy Guidance (2000), and Title 12, Code of Federal Regulations, Section 1750.3(a)(promulgated July 8, 1996), the Enterprise was required to file with the Director a minimum capital report each quarter or at such other times as the Director requires, such report to contain the information that responds to all of the items required by OFHEO in written instructions to the Enterprise, including, without limitation: (1) estimates of the minimum capital requirements; (2) estimates of core capital overage or shortfall relative to the estimated minimum capital requirements; and (3) such other information as may be required by the Director.

65.    Pursuant to Title 12, Code of Federal Regulations, Sections 1750.3(b) and (e), each minimum capital report or amended minimum capital report shall be submitted in writing, and "shall contain a declaration by an officer authorized by the board of directors of the Enterprise to make such a declaration, including, but not limited to, a president, vice president, or treasurer, that the report is true and correct to the best of such officer's

knowledge and belief."

66.    During the relevant time period, RAINES was on actual or constructive notice that the minimum capital reports the Enterprise was required to submit to the Director were required to be submitted with accompanying declarations of truth and accuracy executed by RAINES and HOWARD.

67.    From 1999 to 2004, on or about April 30, July 30, October 30 and January 30 in each year, the minimum capital reports the Enterprise was required to submit to the Director were submitted by RAINES and HOWARD, with accompanying declarations of truth and accuracy executed by HOWARD.

68.    RAINES and HOWARD knew or should have known that the information contained in the minimum capital reports, of which HOWARD attested to the truth and accuracy, were inaccurate or misleading.

69.    The Enterprise submitted to OFHEO quarterly minimum capital reports, which asserted GAAP-compliance.  OFHEO relied on the information in these quarterly minimum capital reports in determining the capitalization classification for the Enterprise in each quarter.  Because RAINES and HOWARD misleadingly asserted GAAP compliance in these quarterly minimum capital reports to OFHEO, the Enterprise was allowed to grow rapidly.  This growth allowed RAINES, HOWARD and SPENCER to meet their EPS/AIP targets, PSP targets and the 2003 EPS challenge grant target.

70.    Fannie Mae's restatement process has identified errors in its accounting in regard to almost all of the Enterprise's significant accounting policies, including: FAS 5 (Accounting for Contingencies), FIN 46 (Consolidation of Variable Interest Entities), SAB No. 59 (Accounting for Noncurrent Marketable Equity Securities), FAS 66

(Accounting for Sales of Real Estate), FAS 91 (Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases), the EITF consensus on Issue No. 93-18 (Recognition of Impairment for an Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest-Only Certificate), EITF 99-20 (Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets), FAS 113 (Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts), FAS 115 (Accounting for Certain Investments in Debt and Equity), FAS 125 (Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities), FAS 133 (Accounting for Derivative Instruments and Hedging Activities), FAS 140 (Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-a replacement of FASB Statement No. 125) and FAS 149 (Amendment of Statement 133 on Derivative Instruments and Hedging Activities). The restatement process cost in excess of $1.billion.

71.    RAINES, HOWARD and SPENCER were aware that the Enterprise's accounting in regard to FAS 91, FAS 133 and other accounting standards was not GAAP compliant and, nevertheless, they authorized financial disclosures that falsely asserted GAAP-compliance.

## FAILURE TO ESTABLISH AND MAINTAIN A SOUND INTERNAL CONTROLS SYSTEM

72.    The internal control systems of the Enterprise were inadequate to address an increasingly complex accounting environment, the vast increase in business demands and the heightened regulatory environment highlighted by SEC registration and Sarbanes-

Oxley implementation. RAINES, HOWARD and SPENCER shared responsibility for the internal control systems at the Enterprise. Each contravened in his or her particular responsibility to maintain a safe and sound internal control system.

### Dysfunctional and Ineffective Process for Developing Accounting Policies

73.    RAINES, HOWARD and SPENCER failed to ensure that accounting policy at the Enterprise was (1) created as the result of a written, deliberative policy; (2) determined by persons qualified to make accounting policy; (3) based upon accepted accounting standards, such as GAAP; and (4) memorialized in writing. The development of accounting policy at Fannie Mae failed in the following ways.

### Lack Of Competence To Formulate Accounting Policy

74.    RAINES, HOWARD and SPENCER failed to ensure that written policies regarding the formulation of accounting policy were established.

75.    HOWARD and SPENCER, with the knowledge and approval of RAINES, developed the Enterprise's FAS 91 policy despite the fact that neither HOWARD nor SPENCER were accountants or otherwise competent to create accounting policy. HOWARD and SPENCER created the policy without consultation with the Director of Financial Reporting or KPMG.

76.    Senior management deviated from GAAP compliance in order to accommodate the accounting systems the Enterprise had in place. This methodology is contrary to the proper formulation of policy, which should call for the formulation of a GAAP-compliant policy followed by implementation of changes needed to allow the Enterprise's systems to execute the policy. For example, in relation to the implementation of FAS 149, Fannie

Mae's commitment system did not have sufficient rigor to be the kind of accounting system necessary for FAS 149 commitment accounting. Fannie Mae would enter commitments into the system, but then change the nature of the commitments at a later time. The Controller's Office, which reported to SPENCER, did not have the detailed knowledge needed to quickly implement the necessary system changes. The Controller's Office did not fully understand the settlement process. In the commitment process, there were a number of market events, i.e. market fails and fails-to-Fannie, which would create complications, adding to the complexity in implementing FAS 149. Nevertheless, the Enterprise attempted to implement a non-GAAP FAS 149 policy that masked systemic problems rather than implementing a GAAP-compliant policy and addressing those problems.

77.    RAINES, HOWARD and SPENCER failed to ensure that the Enterprise maintained appropriate skill sets or staffing levels to conduct appropriate reviews and audits of accounting policy.

### Failure To Promulgate Written Policies

78.    The Enterprise's accounting policy also failed because it oftentimes was not reduced to writing for communication to those persons who were to execute the policy. For example, after experiencing significant audit differences related to the amortization of discounts and premiums in both 1998 and 1999, and after being told by KPMG that a written policy was an absolute necessity, the Enterprise developed a formal policy for the application of FAS 91 in December 2000—over a decade after FAS 91 became effective. In another example, Internal Audit noted the lack of a written policy with respect to realignments in the Amortization Audit report of July 9, 2003. These were core

accounting principles central to the Enterprise's day-to-day operations. The employees tasked with applying many of the Enterprise's accounting standards had little or no concept of what they were to be doing, how they were to do it, or the manner in which their actions interfaced with others in the Enterprise. RAINES, HOWARD and SPENCER were responsible for communicating accounting policy throughout the Enterprise.

### Centralization Of Risk And Control

79.    The formulation of accounting policy also suffered from a structural defect central to the principles identified by GAAP—namely, the lack of a system of checks and balances. A basic element of sound corporate risk oversight is a strong internal control environment supported by a system of "checks and balances" between the risk taking and control functions of an organization. Necessary components of such a system are independent risk management and audit function. The system that the Enterprise used in the formulation of accounting policy, as identified by HOWARD, centralizes the risk taking and control functions of the organization in one person—HOWARD. RAINES was responsible for the inappropriate centralization of responsibility in HOWARD.

### Conflicts of Interest, Incompetent Personnel, Key Person Dependencies and Failure to Appropriately Segregate Duties

80.    RAINES, for example, made HOWARD responsible for both risk management and financial reporting. RAINES consolidated HOWARD's authority and responsibility—making him both the Credit Risk Officer (CRO) and the CFO—despite being advised that Enterprise research had found that no other companies had one person

serving as both CRO and CFO. RAINES further consolidated accounting, on-balance sheet mortgage portfolio, business planning, tax, investor relations and internal audit under HOWARD. RAINES also was responsible for HOWARD's appointment to the Board of Directors.

81.     HOWARD reported to RAINES, and RAINES had a duty to supervise him. RAINES accepted all substantive accounting-related action developed or undertaken by HOWARD. However, HOWARD failed to provide adequate oversight to key control and reporting functions within Fannie Mae. HOWARD, who was directly responsible for overseeing the Treasury and Portfolio Management functions, oversaw the Controller's Office, which possessed neither the skills required to ensure appropriate accounting policies, the resources to appropriately implement such policies, nor an effective system of internal controls.     The combination of these functions did not provide the independence necessary for an effective CRO function. Moreover, the combination of these functions in tandem with his position as Vice Chairman permitted HOWARD to play a significant role in setting financial targets, and the authority to determine how and when the Enterprise met these targets, which is an inherent conflict of interest.

82.     HOWARD also significantly influenced the evaluation of the head of the Office of Audit, made compensation recommendations affecting him, and restricted his access to the Audit Committee. By linking the internal auditor's compensation to the work done by those he audited, and by forcing him to report to the CFO whose area the auditor reviewed, RAINES and HOWARD inappropriately decreased the independence and effectiveness of the internal audit function.

83.     SPENCER failed to provide adequate oversight of the Controller's Office, which

contributed to a weak control environment, inadequate staffing, and poor implementation of accounting standards. HOWARD, to whom SPENCER directly reported, was intimately involved in the structure and operations of the Controller's Office. RAINES, with whom SPENCER met on a weekly basis and to whom she reported at each Quarterly Business Review (QBR), was also knowledgeable and responsible for the poor operation of the Controller's Office.

84.    The centralization of duties in SPENCER seriously undermined Fannie Mae's internal control system and the integrity of the Enterprise's financial reporting. SPENCER played a key role in the development of the Enterprise's FAS 91 policy, effectively substituting for the Financial Standards group, which was responsible for developing accounting policies. SPENCER also approved financial forecasts, participated in the communication of financial results both internally and externally, and supervised the Financial Standards group that developed and implemented accounting policy. Such a broad range of responsibilities does not provide the appropriate segregation of duties, which is a necessary component of a sound control environment.

85.    HOWARD and SPENCER also caused key person dependencies, most notably in the person of Jonathan Boyles, then Vice President (and later SVP), Financial Standards and Tax, regarding the implementation of all accounting policies, including FAS 133 and FAS 149, which further exacerbated the strain on resources. As a result of SPENCER's inaccurate assessment of staffing needs in the Controller's Office and her inadequate oversight of that Office, Fannie Mae spent in excess of a billion dollars to restate its financial condition.

86.    HOWARD and SPENCER created a key person dependency and poorly

segregated duties by consolidating power in Jonathan Boyles. Mr. Boyles failed to provide adequate oversight to key control and reporting functions within the Financial Accounting Standards business unit. He failed to ensure that accounting policies were developed and reviewed appropriately; failed to staff the Financial Standards group adequately with the technical accounting expertise necessary to comply with regulatory requirements for implementing new FASB standards; and failed to report his knowledge of accounting and the improper application of FAS 133 to external auditors or the Audit Committee of the Board of Directors. He also did not possess the skills to enforce appropriate accounting policies or the resources to implement such policies. Moreover, he did not implement an effective system of internal controls. These issues were known by HOWARD and SPENCER, but they took no action to correct the key person dependency regarding Mr. Boyles.

87.    HOWARD and SPENCER centralized the business planning/income forecasting and financial reporting responsibilities under Janet Pennewell. This dual role presents a significant conflict of interest. Because of HOWARD's and SPENCER's actions, Ms. Pennewell, in her role as VP, and later as SVP, of Financial Reporting and Planning, was able to manipulate the amounts of reported net income in order to achieve the planned results she forecast. Moreover, vesting the dual responsibility of modeling the amortization and reporting amortization results to the financial statements under the authority of a single individual was a major control weakness that undermined the integrity of the financial reporting process.

88.    Because of the conflict of interest HOWARD and SPENCER created in Ms. Pennewell, HOWARD and SPENCER were responsible for creating conflicts of interest

in personnel under Ms. Pennewell. For example, Jeffrey Juliane's conflict of interest and the key person dependency upon him was similar to Ms. Pennewell's. Although Mr. Juliane reported directly to Mary Lewers, Mr. Juliane alternatively reported to Ms. Pennewell in regard to his conflicting financial forecasting and financial reporting roles. Mr. Juliane shared responsibility for these functions, particularly in regard to amortization. In the closing process for the Enterprise's financial reporting, the effects of the conflict of interest and dependency issues caused internal controls to break down and the Enterprise's financial condition to be obscured or misstated.

89.    Regarding adjustments to PDA during the closing process, Ms. Pennewell and Mr. Juliane conducted analyses and were responsible for the creation of journal entries pursuant to the analyses, and then had other Fannie Mae employees sign the journal entries as the preparer and approver. This obfuscated the purpose of the journal entries by circumventing internal controls and preventing accurate audit trails. One reason such an internal control failure occurred was the lack of appropriate segregation of duties. In the iPDI system (Purchase Discount Integration Re-engineering), employees had the capacity to change manually an individual factor previously passed from the AIMS system (Amortization Integrated Modeling System). If a manual change was necessary (oftentimes late in the closing process), then the AIMS modeling team would relay the message to the iPDI team to process the change. Only the AIMS team was responsible for validating the analysis behind the change. Mr. Juliane was responsible for both the AIMS and the iPDI teams and systems. HOWARD and SPENCER created this conflict of interest between forecasting and the authority to create journal entries and financial reporting, and knew or should have known about the resulting conduct by Ms. Pennewell

and Mr. Juliane.

90.    RAINES appointed Sampath Rajappa as the SVP of Operations Risk and Internal Audit in 1999 even though Mr. Rajappa had not previously performed any auditing functions and was neither a Certified Internal Auditor (CIA) nor a Certified Public Accountant (CPA).  The appointment of Mr. Rajappa, the former Controller, to head Internal Audit was inconsistent with independence standards.  As the head of internal audit, Mr. Rajappa was responsible for auditing the Controller's area—an area he had run for several years.  This undermined the independence of Internal Audit because Mr. Rajappa was placed in the position of having to audit work he had done himself.  In addition, RAINES allowed Mr. Rajappa and other Internal Audit employees to earn compensation based substantially on EPS—the same metric used to compensate other managers whose departments the Office of Audit reviewed.  These actions departed from industry best practices, contravened Fannie Mae's audit charter, impaired Internal Audit's independence and violated OFHEO's safety and soundness standards.

91.    In his initial years as the head of Internal Audit, Mr. Rajappa reported on a "dotted line" basis first to COO Small and then to COO Mudd, who participated in writing Mr. Rajappa's annual performance evaluation and made compensation recommendations affecting him, which apparently were never questioned by the Audit Committee.  Mr. Rajappa reported directly to the Chairman of the Audit Committee of the Board of Directors, consistent with the requirement of Fannie Mae's Audit Charter and industry best practice. However, in 2002 RAINES changed Mr. Rajappa's "dotted line" reporting relationship from COO Mudd to CFO HOWARD, the officer to whom Mr. Rajappa had previously reported as Controller.  This change interfered with the

independence of the internal audit function at the Enterprise.

92.    HOWARD could and did exert considerable control over Mr. Rajappa's actions as the head of Internal Audit, in part because HOWARD participated in the annual performance evaluation and made compensation recommendations affecting Mr. Rajappa, which apparently were always accepted, and in part because of HOWARD's key role at Fannie Mae.

93.    By inserting himself between Mr. Rajappa and the Audit Committee, HOWARD undermined the independence of Fannie Mae's audit function and the effectiveness of the Enterprise's internal control system.  An important role of the Internal Audit is to test the compliance of Enterprise policies and procedures in departments that report to the CFO and to inform the Audit Committee of control weaknesses revealed by that testing.  By preventing the head of Internal Audit from engaging in unfettered communication with the Audit Committee, HOWARD undermined the independence, objectivity and effectiveness of Fannie Mae's internal audit program.

94.    While it is generally unnecessary for a CFO to be a CPA, HOWARD claims to have implemented accounting procedures that required him either to be a CPA or possess a significant accounting background (neither of which he possessed).  HOWARD created an accounting policy development process at the Enterprise such that: Jonathan Boyles, the SVP for Financial Standards, had the authority to recommend a specific policy; SPENCER, the Controller, had the responsibility and authority to approve accounting policy (SPENCER was neither a CPA nor otherwise competent to render accounting policy); and the CFO had responsibility for all adopted accounting policies.  It was unsafe and unsound for HOWARD or SPENCER to approve and promulgate accounting policy

without being a CPA.

95.     HOWARD, who was not competent to advise others on the formulation of accounting policy, was not competent to create accounting policy.  Nevertheless, the PDA Policy was created by HOWARD and SPENCER without input from Financial Standards and Mr. Boyles.  HOWARD was not competent to create such a policy.

96.     SPENCER executed the accounting policies created by Financial Standards. SPENCER indicated through testimony that questions regarding certain accounting policies, *i.e.* relating to FAS 133 and FAS 91, could be answered only by Mr. Boyles. This acknowledgement identifies a key control weakness and demonstrates that SPENCER lacked competence to perform the duties required of the Controller at the Enterprise.

97.     The staff in the Controller's Office that was in place during the relevant time frame did not have the requisite experience and expertise to handle either complex or routine accounting issues in the mortgage industry (*e.g.* FAS 91) to ensure compliance with GAAP.  From SPENCER down through the ranks, the Controller's Office had limited knowledge of accounting standards.  As noted above, critical shortages of qualified accounting specialists existed in the Controller's Office, especially in the area of FAS 133 accounting.  As a result of those shortages, the Enterprise relied heavily on a few individuals, especially Vice President for Financial Standards and Tax, Mr. Boyles, to make most key decisions related to accounting policy development, and did not have an independent accounting policy review function, since Mr. Boyles reported directly to SPENCER.  HOWARD was responsible for those key person dependencies, and RAINES was aware of the problems and did nothing to resolve them.

98.    The issues in the Controller's Office ranged the gamut of critical accounting policies for the Enterprise. For example, during 1999, Fannie Mae began to formulate a policy to manage amortization and deferred price adjustments. This effort, overseen by HOWARD, involved SPENCER, Mr. Lawler, Ms. Pennewell and Mr. Juliane. During the process, certain themes consistently reflected the policy recommendations sought by the Enterprise: (1) to not recognize estimated income or expense up to certain thresholds; and (2) to defer the recognition of income or expense that exceeded recommended thresholds over a multiple year planning horizon. Such accounting methods are supported neither by FAS 91 nor GAAP. However, provisions of this nature were ultimately adopted as policy by the Enterprise in December 2000.

99.    A memorandum written by Ms. Pennewell to HOWARD, dated September 23, 1999, proposed that estimated income be treated differently than estimated expense. In the case of estimated income, no adjustment to income would be taken if interest rates were no more than one standard deviation above the five-year historical average. Ms. Pennewell recommended that the Enterprise assume that interest rates would likely move back toward a historical average. In the case of estimated expense, she recommended that the Enterprise recognize the catch-up in a manner that would bring the balance down to zero over the forecast horizon (i.e., bleed the expense into the financial statements over multiple periods to minimize earnings volatility). Other memoranda dated May 4, 2000, and May 8, 2000, proposed that adjustments be determined by comparing the estimated catch-up to the calculated annual on-top adjustment. Both memoranda recommend that the estimate of quarterly catch-up be given different treatment depending on whether the calculated estimate was positive (income) or negative (expense). The objectives of these

policy recommendations was to keep the catch-up in a positive net interest position within the threshold range to provide a cushion against having to book catch-up expense, to not recognize estimated income or expense up to the threshold, and to have the flexibility to recognize the calculated income or expense that exceeded the threshold over multiple financial reporting periods. There is no basis in FAS 91, or in any promulgated accounting standard, to support any of these accounting treatments recommended by management.

100.    In December 2000, the Enterprise established a PDA Policy that had two provisions addressing the recognition of larger variances in catch-up over multiple reporting periods. These provisions were:

> i. If our catch-up moves beyond one, but within two percent of combined portfolio net interest and guarantee fee income, we will book monthly "on-top" adjustments that bring us back to within the plus or minus one percent range within our three year planning period.

> ii. Should our catch-up ever exceed two percent of the combined portfolio and interest guarantee fee income, however, we will bring it back to within the one to two percent range within a six-month period. After that time, we will continue our monthly "on-tops" to return the catch-up to the plus or minus one year range within the three year horizon.

The policy as proposed and as approved did not comport with FAS 91 or any other provision of GAAP.

101.    The Enterprise also failed to implement a FAS 149 policy that was GAAP-compliant. Fannie Mae's commitment system did not have the rigor necessary for FAS 149 commitment accounting. Fannie Mae would enter commitments into the system, but there would be changes/fixes entered later on. The process for tracking the changes/fixes

was not as robust as required. The staff in the Controller's Office did not have the detailed knowledge needed to implement the necessary system changes quickly. The Controller's Office did not fully understand the settlement process, and only 80-90 percent of commitments flowed through the system as expected. However, in the commitment process, there were a number of market events, *i.e.* market fails and fails-to-Fannie, which added to the complexity in implementing FAS 149.

102.    Perhaps the most fundamental problem in the Controller's Office was that personnel were overworked and persistently lacked resources. Keeping Fannie Mae's administrative and other infrastructure-related expenses as low as possible during a time of rapid growth was a recurring topic of communications, especially during QBRs, at which budget issues were discussed. SPENCER reinforced the message to senior vice presidents to hold down divisional and system costs for 2004 in a memo to the Strategic Leadership Team, which memo was sent as a follow-up to a QBR session in the summer of 2003. The memo also references two years of high revenue and core business EPS growth and the need to "tighten our belts." That attitude led Fannie Mae, and particularly the Controller's Office, to operate with insufficient resources and inadequate systems.

103.    Although the responsibilities within the Controller's Office significantly increased between 1999 and 2004, especially in 2003 and 2004, SPENCER did not correlate the corresponding increase in workload with the need to substantially increase her staff until after increased OFHEO scrutiny of Fannie Mae accounting in late 2003. As SPENCER communicated to her staff in April of 2004, "Our workload has quadrupled for many of our areas in a very short time." Examples of increased responsibilities include implementation or application of FAS 5, FIN 46, SAB No. 59, FAS 66, FAS 91, the EITF

consensus on Issue No. 93-18, EITF 99-20, FAS 113, FAS 115, FAS 125, FAS 133, FAS 140 and FAS 149, meeting requirements for becoming an SEC registrant, analyzing and comparing accounting issues at Freddie Mac, and responding to OFHEO concerns.

104.    A review of the staffing levels for the Controller's Office showed that staffing only increased by 38 from 1999 to 2004. This represented a 4 percent increase in staff per year. During SPENCER'S tenure as Controller, the Controller's Office assumed substantial new responsibilities. It absorbed a number of functions from other areas of the Company, including e-business billing, processing of accounts receivable, and securities arising from the Enterprise's registration with the SEC. Moreover, the Controller's office had to accommodate Fannie Mae's growing business and the introduction of such complex new accounting standards as FAS 133, FAS 149, and others. The Controller's Office staff levels were below budget every year from 1999 to 2004--by as much as 19 percent by 2004. As noted above, SPENCER fully supported efforts to keep costs down, even when it was detrimental to her own department.

105.    The deficiencies within the Controller's Office were noted in SPENCER's performance evaluations. In SPENCER's performance reviews, HOWARD commented regarding the workload management and staff development within the Controller's Department.

106.    These deficiencies had real consequences in the day-to-day operations in the Controller's Office. For example, as a result of the deficiencies, the FAS 133 systems were recognized as "in crisis" on February 2, 2004. However, there is no evidence that substantive changes were made to the FAS 133 systems until after the December 15, 2004, SEC statement regarding Fannie Mae's accounting.

107.    Despite these warnings, SPENCER failed to reveal to the Board of Directors resource problems and system implementation challenges relative to the implementation of new accounting standards. For example, in February 2004 she attempted to play down the $1 billion computation error related to FAS 149 to the Audit Committee of the Board, instead indicating that automated processes were under way and that a more permanent system was being developed. Later that month, OFHEO expressed concerns about Fannie Mae's reliance on end-user computing systems and the lack of strong controls that led to the $1 billion computational error and directed the Enterprise to take remedial action. An independent review of the Controller's Office also concluded that legacy systems were too stressed to handle new product processes and changes to accounting rules.

108.    SPENCER also did not seek to remedy longstanding issues regarding the limitations of other systems, including those for securities accounting, in a timely manner. Instead of developing systems appropriate to the accounting requirements facing the Enterprise, SPENCER employed temporary "workarounds" because Fannie Mae's systems were not designed to handle the complexity of many of the transactions in which the Enterprise engaged.

109.    The failure to invest adequately led to critical resource shortages and a lack of technical accounting expertise within the Financial Standards group, which was responsible for understanding new accounting standards and developing Fannie Mae's accounting policies. SPENCER and various staff of the Controller's Office indicated that questions relating to the accounting for derivatives could only be answered by Mr. Boyles. The failure to invest adequate resources also led to a shortage of accounting

expertise among the accounting and treasury operations staff in the Controller's Office. For example, individuals with responsibility for key aspects of the FAS 133 accounting process (such as ensuring proper hedge designations or matching critical terms) were not knowledgeable about how such activities met the requirements of GAAP. That lack of understanding led to those individuals relying heavily on the Financial Standards group, which itself was understaffed and lacked technical expertise.

110.    Mr. Rajappa was neither a CPA, nor a CIA, and had not served in any prior auditing function. Moreover, despite his prior experience as Controller, Mr. Rajappa did not consider himself competent to render an opinion regarding GAAP compliance. Nevertheless, Internal Audit, the function over which Mr. Rajappa presided, issued reports purporting to audit the Enterprise's systems to GAAP. Mr. Rajappa lacked not only competence to render such an opinion, but also to head the internal audit function at the Enterprise. RAINES and HOWARD were responsible for placing Mr. Rajappa in charge of the Enterprise's internal audit function.

111.    The problems with Internal Audit ranged from inappropriate audit priorities to inadequate staffing and deficient skill sets, from incomplete and incorrect disclosures to the Board to failing to complete basic auditing functions. RAINES and HOWARD were aware of these issues, which stemmed from the nature of Mr. Rajappa's compensation as determined by RAINES and HOWARD; from HOWARD's interference with Mr. Rajappa's direct reporting line to the Audit Committee; and from Mr. Rajappa's known lack of competence regarding the internal audit function. Despite tremendous growth in the Enterprise's business from 1999 through 2004, including greater complexity in workload and increased demands resulting from new and enhanced accounting standards,

as well as SEC and Sarbanes-Oxley Act of 2002 (SOX) requirements, internal audit personnel counts remained essentially unchanged through 2002 with *de minimis* changes in 2003 and 2004.  Furthermore, especially during the implementation of SOX policies and procedures, training was downgraded and turnover was high.

112.    As Internal Audit experienced resource limitations and new responsibilities, such as the task of preparing the Enterprise for SOX compliance, the quantity and quality of audits diminished.   Nevertheless, no resource problems were communicated by Mr. Rajappa to the Audit Committee during periods of critical accounting policy implementation.   Only after audits were being postponed or cancelled was a modest increase requested.  The first evidence of a request by Mr. Rajappa for more than modest additional resources is documented in a memorandum from Mr. Rajappa to HOWARD, Mr. Mudd and SPENCER on June 18, 2004.  Prior to August 2004, there were no requests from Mr. Rajappa for additional resources presented to the Audit Committee.

113.    Internal Audit did not prioritize its reviews with regard to the significant accounting policies of the Enterprise.  After experiencing significant audit differences related to the amortization of discounts and premiums in both 1998 and 1999, and after being told by KPMG that a written policy was an absolute necessity, the Enterprise developed a formal policy for the application of FAS 91 in December 2000.  Because FAS 91 was a critical accounting estimate, Internal Audit should have made auditing for compliance with FAS 91 a top priority.  Nonetheless, a substantive audit was not done until 2003, more than two years after issuance of the policy, more than four years after the unprecedented 1998 catch-up of $440 million and more than 10 years after the effective date of FAS 91.  Further, FAS 91 audits were not addressed in either the 2001

or 2002 Audit Plans.

114.    Internal Audit failed to conduct its audits with sufficient rigor.  For example, Internal Audit identified a questionable $20 million guarantee fee adjustment recorded in May 2003.  Since one of Internal Audit's assigned responsibilities under the Charter was to insure the reliability and integrity of financial and operating information, Mr. Rajappa had a duty to investigate further.  Having discovered an undocumented, unsupported policy departure, and potential GAAP violation, Mr. Rajappa elected to forego further investigation and not report the finding to the Audit Committee. Despite the fact that Internal Audit concluded that "management judgment was used in applying the amount of $20 million," Internal Audit included this item on the final audit report of July 9, 2003, only as part of a broader discussion of the need for enhanced documentation and minimization of key-person dependencies, and relied on management's commitment to implement improved procedures.  Mr. Rajappa was insensitive to the EPS impact (approximately 1.5 cents, which was material even by the Enterprise's own standards of materiality) since the adjustment enabled Fannie Mae to meet analyst expectations for the quarter.  RAINES, HOWARD and SPENCER also knew or should have known about the audit results, but did not report the results to the Audit Committee.

115.    Another example of Internal Audit's failure to audit the Enterprise's accounting policies and practices rigorously involved FAS 133 accounting.  The Board of Directors considered derivatives controls to be a critical policy, prompting management to request that Internal Audit perform an annual audit and provide the Audit Committee with an audit opinion regarding internal controls over non-mortgage derivatives.  During the course of its 2003 audit, Internal Audit identified several documentation errors within the

Enterprise's application of FAS 133. Work papers revealed that Internal Audit tested a sample of 20 derivatives transactions. Out of the sample of 20, Internal Audit identified four transactions with incomplete or insufficient documentation, which represented a 20% error rate. Although the sampling methodology is questionable and the sample size insufficient, the results of this test were nonetheless alarming. Rather than highlight these errors, Mr. Rajappa misleadingly reported that controls were well-balanced. RAINES, HOWARD and SPENCER also knew or should have known about the audit results, but did not report the results to the Audit Committee.

116.    Additionally, the audit report concluded that re-linkages of termed-out transactions, which is a term used by Fannie Mae generally to describe the replacement of discount notes (short term borrowings) with fixed rate notes or different floating rate borrowings, did not conform to FAS 133 standards. Documentation must be kept contemporaneously with the hedged transactions in order to qualify for hedge accounting under FAS 133. Any documentation errors should have been deemed significant and not simply problems to be fixed in the ordinary course of business. Mr. Rajappa compounded this failure by failing to inform the Audit Committee of the findings. RAINES, HOWARD and SPENCER also knew or should have known about the audit results, but did not report the results to the Audit Committee.

117.    Mr. Rajappa had a duty to communicate any significant concerns directly to the Audit Committee, yet his communications to the Audit Committee were often incomplete or misleading. Internal Audit was required to provide the Audit Committee with periodic reports detailing significant findings. Pursuant to the Fannie Mae Office of Audit Manual, in order to fulfill this duty, Mr. Rajappa was to report any audit items which

"substantially prevent[ed] Fannie Mae from meeting its primary financial, operational, and compliance goals." HOWARD interfered with Mr. Rajappa's direct reporting line to the Audit Committee.

118.   The primary vehicle for this communication was a monthly "Audit Tracking List" ("ATL"). Based on the guidance provided within the Internal Audit Manual, audit issues meeting the following criteria, for example, were to be included within the ATL and communicated to the Audit Committee:

- Items equal to or greater than $1 million;

- Weaknesses in primary control;

- Systemic weaknesses in controls;

- Items that require Audit Committee or external agency notification.

119.   On several occasions, Internal Audit failed to include certain items that, based on the guidance provided, should have been added to the ATL. Despite the Amortization Audit report's conclusion that "[c]ontrols need strengthening...," references to a need for better documentation or written policies related to the realignments or guarantee fee adjustments described above are notably absent from the ATL. These items exceeded the $1 million threshold established by the manual.

120.   The lack of documentation and key-person dependencies were systemic weaknesses in control. For example, Internal Audit concluded that the change in the organizational structure associated with Mr. Juliane's promotion in the Controller's Office potentially further weakened "the segregation of functions...." The derivatives control audit also identified violations of GAAP that were in clear violation of compliance goals. Mr. Rajappa never deemed any of these items important enough to

merit inclusion on the ATL.  As a result of Mr. Rajappa's decision to downplay the significance of these weaknesses, the Audit Committee was not informed and thus not in a position either to ensure that the appropriate corrective actions were taken to remedy audit issues or to evaluate the length of time that key items remained unresolved. RAINES, HOWARD and SPENCER were aware of the audit and its results.  There is no evidence that RAINES, HOWARD or SPENCER questioned Mr. Rajappa regarding why the audit results were not reported listed on the ATL or otherwise communicated to the Audit Committee.

### Misleading Reports from Internal Audit

121.   As discussed in more detail below, reports from Internal Audit were misleading in regard to the nature, extent and purpose of Internal Audit's work.  Despite claims that Internal Audit did not audit for GAAP compliance, numerous reports from Internal Audit misled the Audit Committee and caused its chairman Thomas Gerrity to believe that Internal Audit ensured GAAP compliance at the Enterprise.  Moreover, Internal Audit misled the Audit Committee regarding the extent of its audit work in other areas, such as in connection with the investigation of Roger Barnes' allegations of accounting improprieties.

122.   RAINES', HOWARD's and SPENCER's drive to formulate accounting policy in 1999 and 2000 was fueled by management's surprise at the magnitude of the approximately $440 million estimated expense at the end of 1998, by a determination to avoid audit differences, and by the insistence of KPMG that a policy be developed. Management was also driven to create policies that fostered a smooth, predictable growth pattern, which, although the policies did not in all instances directly help achieve

particular EPS/AIP targets, would increase management's chances to hit EPS/AIP targets. Management was also driven to keep cost for internal controls low so as to further its EPS/AIP objectives. Consequently, RAINES, HOWARD and SPENCER established high materiality thresholds, extended the life of the Enterprise's legacy accounting systems, and avoided the expense of developing new systems that could handle the increasingly complex accounting required by Fannie Mae's business.

123.    More often then not, however, Internal Audit's reports were simply misleading. The following examples identify how Internal Audit caused the Audit Committee to believe Internal Audit audited to GAAP. Mr. HOWARD knew that Internal Audit did not audit to GAAP, but he did not refute Internal Audit's representations to the contrary. Because this key failure of the Internal Audit derived from the lack of independence and the lack of competence of Mr. Rajappa, RAINES and HOWARD breached their duty to ensure that reports from the Office of Audit were not materially misleading.

124.    The objectives and scope section of the Audit Report dated July 9, 2003, related to the Amortization Audit indicated that "our audit was performed to determine the adequacy of controls...including policies and procedures, compliance with financial accounting standards...." In the Significant Accounting Policies section of the same audit report, a detailed discussion is presented outlining the provisions of FAS 91, including the required accounting and reporting, and the method for calculating constant effective yield. In performing audit work to comply with the above-stated objectives and policies, Internal Audit did not obtain sufficient evidence to show compliance with GAAP. For example, in performing its FAS 91 audit, there is no evidence that the Internal Audit staff independently verified the Enterprise's compliance with the standard regarding the

acceptability of the three alternative treatments for handling reconciliation differences under GAAP. Rather, Internal Audit relied on an oral confirmation from the Financial Standards Group VP, Mr. Boyles, that the accounting was acceptable.

125. Internal Audit also made several representations related to the Enterprise's compliance with GAAP as it pertained to FAS 133. Mr. Rajappa signed an annual certification for the Audit Committee that represented that Internal Audit's work included, "testing for compliance with FAS 133 requirements to determine whether transactions reported as qualifying for hedge accounting treatment have been properly classified and accurately recognized in the Income Statement and Balance Sheet." The March 31, 2003, Derivatives Control Audit Report contained an observation that "retroactive relinkages do not conform to FAS 133 requirements." Additionally, work papers for the same audit state that the documentation produced at inception was not consistent with the required accounting treatment. RAINES and HOWARD knew or should have known that Mr. Rajappa did not test for GAAP and should not have relied or accepted any certification from Mr. Rajappa indicating GAAP-compliance in any financial disclosure.

126. The "Purposes and Scope" section of the Loan Losses Audit Report represents that Internal Audit "reviewed the overall methodology used by the Enterprise to ensure compliance with Generally Accepted Accounting Principles including Statement of Financial Accounting Standards No. 5...."

127. Internal Audit also failed in its investigation of the serious allegations of earnings management within the Controller's Office regarding PDA, both from an auditing

perspective and from a reporting standpoint. In August 2003, approximately one month after the issuance of the FAS 91 audit report, Roger Barnes approached Mr. Rajappa to voice his concerns regarding the Enterprise's FAS 91 accounting practices. By this time, an outside, independent report had been released detailing accounting manipulations at Freddie Mac and OFHEO had announced plans to commence a special investigation of the Enterprise's accounting practices.

128.    Against this backdrop, Mr. Barnes questioned the appropriateness of a $6.5 million manual factor change, and indicated that "it appeared that the factor change was used to make [the iPDI subledger] 'agree' with forecasted amortization expense." Mr. Rajappa did not conduct any investigation into whether the adjustment was correctly or incorrectly made.    Instead, Mr. Rajappa concluded that the documentation was inconclusive.    Rather than perform follow-up work, Internal Audit inappropriately accepted the assertion of Mr. Juliane that the adjustment, for which he was personally responsible, was correct.

129.    Within one month of the Barnes allegations and "investigation," another employee in the Controller's Office, Michelle Skinner, raised allegations of accounting irregularities involving FAS 91 during an "unplugged" meeting Mr. Mudd held with members of the Controller's Office. In her email to Mr. Mudd following the meeting, Ms. Skinner referred to an independent report regarding allegations of similar accounting misconduct at Freddie Mac (which Ms. Skinner indicated "sure sounds familiar" to accounting at Fannie Mae). Mr. Rajappa and Ann Kapler, then General Counsel, were tasked to investigate Ms. Skinner's concerns and report back to Mr. Mudd. Internal Audit issued a report that validated some of Ms. Skinner's concerns. Nonetheless, the

Audit Committee was not contemporaneously informed of Ms. Skinner's concerns.

130.    On September 26, 2003, Mr. Mudd distributed a single response to the participants of the "unplugged" meeting.    Anthony Lloyd, another attendee of the "unplugged" meeting, challenged the factual accuracy of Mr. Mudd's response and suggested that Mr. Mudd's explanation for the accuracy of the Enterprise's accounting practices was untrue.  The Audit Committee was not contemporaneously informed of Mr. Lloyd's allegations.

131.    Mr. Rajappa also had a duty to communicate his concerns directly to the Audit Committee.    In August, 2003, just after completing the Barnes investigation and certifying the Q2 2003 financial statements, Mr. Rajappa instead communicated several concerns regarding the state of affairs at the Enterprise directly to RAINES, including the following:

- "some frustration with lack of robust operational systems and adequate staff."

- "[m]ore money needs to be spent on beefing up finance staff & systems."

- "[g]ive them robust operational tools (not endless workarounds and spreadsheets)..."

- "data security needs to be strengthened significantly."

- "[i]nsufficient access controls to critical applications combined with some of the other frustrations cited above can lead to unfortunate outcomes."

There is no evidence that either RAINES or Mr. Rajappa ever communicated these concerns about control weaknesses to the Audit Committee or commenced deliberate and voluntary corrective measures prior to the Ernst & Young reported findings and

recommendations in 2005 (Upon publication of OFHEO's Report of Findings to Date of the Special Examination of Fannie Mae, the Audit Committee of the Board hired Ernst & Young to review the activities of the Office of Auditing).

132.    Mr. Rajappa's failures regarding the Barnes investigation were compounded by his certification of the financial statements.  Mr. Rajappa's certification of the Q2 2003 financials addresses the investigation, and represented:

> I have therefore concluded that the 2nd quarter financials were prepared in conformance with the company's accounting policies.

and that those policies

> are in compliance with GAAP.

RAINES and HOWARD knew or should have known that Mr. Rajappa did not test for GAAP and should not have relied upon or accepted any certification from Mr. Rajappa indicating GAAP compliance in any financial disclosure.

## Deficient Systems

133.    RAINES, HOWARD and SPENCER were aware of the errors involving accounting policy, practices and systems.  They were further aware that correcting the problem would require expenditures on internal controls and increased earnings volatility.  Because RAINES, HOWARD and SPENCER desired neither additional expenditures nor increased volatility, corrections were not made to accounting policy,

practices and systems. In this way, RAINES, HOWARD and SPENCER were able to manage earnings by allowing known errors and antiquated systems to continue in a way that reduced earnings volatility.

134.    In order to meet EPS/AIP targets for the 1998 fiscal year, senior management elected to recognize only $240 million of $440 million in amortization costs. At the time, the Enterprise had no policy and no prior practice (other than to ignore it) concerning the amortization.

135.    The AIMS system was built by Enterprise System Operations (ESO) under the direction of and to the specifications of Mr. Juliane. The system permitted earnings manipulation. In particular, the system was developed so that Mr. Juliane could input the amortization number he wished to arrive at in order to determine the inputs, such as amortization factors, that would generate that end number.

136.    The active modeling and management of both current and forecasted catch-up required systems applications more robust than the Enterprise previously had before the implementation of the AIMS system. Prior to the AIMS system, the Enterprise attempted to compensate for this weakness by acquiring the BancWare program. Mr. Juliane, who managed the amortization catch-ups, commented on the need for specific additional enhancement that would allow BancWare to produce modeling reports in dollars, and therefore bypass PDAMS, the system then used to model the catch-up. Specifically, Mr. Juliane stated a need to model multiple scenarios quickly.

137.    Commenting on needs beyond speed, Mr. Juliane further indicated that BancWare would give management the "flexibility to manipulate the factors to produce an array of recognition streams." Mr. Juliane also indicated that the system, if built, would provide

further flexibility and control over the recognition of the catch-up.

138.     While the Enterprise eventually dropped the Bancware system, it integrated the flexibility Mr. Juliane sought to include in the Bancware system into the AIMS system, which facilitated improper earnings management.

139.     In addition to the technological "flexibility" installed into the AIMS system, there existed a systemic problem: no one at the Enterprise took responsibility for the data in the system. This failure to designate authority and responsibility destroyed any possibility of an appropriate audit trail and permitted the AIMS system to provide another avenue through which earnings could be manipulated. This was another key internal control failure.

140.     As previously discussed, the Enterprise lacked the capacity to conduct dollar roll accounting. When Fannie Mae lent out a security overnight in a dollar roll transaction, its systems lacked the ability to determine if the security returned to the portfolio was identical to the security lent or an equivalent like-security, which would permit dollar roll accounting. Moreover, upon the return of dollar roll securities lent out of the portfolio, the original acquisition date was overwritten with the date the securities were returned to the portfolio; thus causing problems regarding the amortization of those securities. As a result, the Enterprise mislabeled numerous securities and, as a result, was unable to account appropriately for its dollar roll transactions.

141.     In 2003, SPENCER commissioned the Financial Standards group to investigate an audit difference KPMG recorded as a result of the failed dollar roll accounting. The audit difference was communicated to the Board of Directors, which included RAINES and HOWARD.

- 59 -

142. RAINES, HOWARD and SPENCER failed to establish appropriate internal controls over the company's amortization process. RAINES, HOWARD, AND SPENCER reorganized functions within the Controller's Division and removed segregations of duties that separated responsibility for estimating projected income and recording actual income. This change directly affected RAINES', HOWARD'S, and SPENCER'S ability to manage income to meet EPS targets. RAINES, HOWARD, and SPENCER established the AIMS that allows the user to evaluate results generated under a variety of interest rate scenarios before determining which assumptions to use to calculate amortization amounts for quarterly reporting purposes. In addition, data differences between some of the company's sub-ledgers (*e.g.*, STATs, LASER, and iPDI) were not corrected. Reconciliation of these differences created income and expense amounts that the company was required to record, but did not always record, in current period earnings from time to time. RAINES, HOWARD, and SPENCER, did not establish a consistent or GAAP-compliant process accounting for reconciliation differences or for correcting illogical and anomalous results from its AIMS system.

143. Senior management implemented the Security Master project to address two significant issues: (1) certain securities purchased at a premium had been combined for modeling purposes with securities purchased at par or at a discount. This was not appropriate because prepayments on securities purchased at a premium were not affected by changes in interest rates in a similar manner to securities purchased at a discount. (2) Certain REMIC tranches were inappropriately grouped together for modeling purposes. The process of correcting the security designations was expected and should have resulted in large catch-up adjustments to reflect appropriate accounting of properly

designated securities.

144.    For the first quarter of 2003, two internal control failures tainted the execution of the Security Master project's results. First, the Enterprise inappropriately subjected the results to two different modeling analyses. The disparity between the two analyses was approximately $275 million. Management relied on the analysis using the older factors, which resulted in a lesser amount of calculated amortization expense that fell within the Enterprise's +/- 1 percent materiality threshold. There was no internal control system to regulate which analysis the Enterprise should have relied.

145.    The second internal control failure was the imposition of the +/- 1% materiality threshold on the Security Master project's results. The results of the Security Master project were not subject to dispute. The purpose of the program was to correct inappropriately designated securities and to adjust the Enterprise's books and records (specifically in its sub-ledger accounts) to reflect the proper designation. In contrast, the +/- 1% materiality threshold was (inappropriately) used by management to cope with the vagaries of the AIMS modeling processes. The use of the materiality threshold for the Security Master project results was inappropriate, and another example of RAINES, HOWARD, and SPENCER managing earnings.

146.    Limitations in systems integration and application level controls undermined the integrity of information used to estimate amortization. This problem necessitated periodic reconciliations between information on transaction sub-ledgers (i.e. STATS, LASER) and the information on the amortization sub-ledger (iPDI). Differences from these reconciliations were known as realignments. The reconciliation process was inconsistently and arbitrarily performed. Sometimes differences were recorded as

adjustments in the period in which they became known, at other times they were capitalized as made-up assets or liabilities and amortized over a period of time using the life of the made-up security. Amounts capitalized in this latter manner were placed into a separate account in the iPDI sub-ledger that was commonly referred to as the "deferred pool bucket."

147.    In its July 9, 2003, audit report, Internal Audit criticized the disparate practices by indicating that "Management's practice has been to expense smaller differences, to book and amortize larger differences as new acquisitions, or incorporate the differences into the overall catch-up balance." There is no justification under GAAP for capitalizing and deferring differences resulting from reconciliations. This was a non-GAAP practice at the Enterprise.

148.    The July 9, 2003, Internal Audit report also indicated that there were no standards specifying which reconciliation items should be included in catch-ups. The reconciling amounts at issue were related to certain realignments arising from the STATS system. Reconciliation differences from the LASER system were ignored in the process. The failure to create a standard for which realignments should be calculated into the reconciliation amounts created the opportunity for management to manage earnings.

149.    For example, senior management employed three different levels of inclusion in its realignment practices in 2003. In the first quarter of 2003, the Enterprise included only the effect of the projected impact of the Security Master project in its realignment. In the second quarter of that year, the Enterprise included the Security Master project and certain other STATS in the realignments. Finally, in the third quarter of 2003, the Enterprise included all the realignments. There was no accounting reason to have

disparate realignments in these three successive quarters. Moreover, the audit report appears to reveal disarray in the Controller's Office and a lack of appropriate controls to prevent the opportunity to manage earnings through various accounting instruments.

150. The use of the amortization system to effect adjustments to the financial statements provided a means to contravene the internal controls that would otherwise be necessary when making adjustments to the general ledger. Internal controls for the general ledger create transparency by maintaining a history and an audit trail for any adjustments so as to facilitate inquiry and critical review. The amortization system, on the other hand was not subject to these same internal controls. A diminished transaction trail, key person dependencies, as well as accounting effects obscured within sub-ledgers containing hundreds of thousands of records, were all manifestations of the process of amortization at Fannie Mae. Transactions that should have been routine could not be processed easily. HOWARD and SPENCER were well aware of the systems' shortcomings and used them to maneuver adjustments to financial statements without having to connect them to a paper trail.

151. SPENCER was responsible for ensuring adequate internal controls over financial accounting and reporting. In a sound internal control environment, journal entries for financial records should be prepared by personnel with knowledge of the transactions being recorded. SPENCER did not ensure that journal entries were independently reviewed, validated, authorized, and properly recorded. Fannie Mae used manually prepared journal entries to record adjustments, called "catch-up adjustments," to alter premium and discount amortization balances. Those catch-up adjustment entries were almost always recorded post-closing in what the Enterprise referred to as "on-top"

adjustments.

152.    OFHEO's review of journal entries relating to amortization adjustments revealed several significant problems, including: people signing others' names on journal entries; the failure to require and ensure that journal entry preparers understood the purpose for which the journal entry was being made; the failure to require and ensure that the individual responsible for reviewing and approving journal entries determined that each entry was valid and appropriate; the failure to require supporting documentation for journal entries; the lack of an independent review of journal entries; and the absence of written policy guidance concerning journal entry procedures.  Often oral instructions regarding the entries sufficed at the Enterprise, which led to the lack of an appropriate audit trail.  In a properly controlled accounting system, adjustments would normally be the result of an analysis based upon formal policy guidance, which leaves an appropriate audit trail to ensure accountability and reliability.

153.    There are numerous examples of how poor journal controls had a real impact on Fannie Mae's financial performance and reporting.   For example, the lack of documentation, policies, and processes allowed RAINES, HOWARD and SPENCER to use Account 1622-00 as a "cookie jar" to meet the EPS/AIP bonus for the 1998 fiscal year.  In another example, obtaining supporting documentation was difficult—support for journal entries was sometimes "lost."  Those making entries typically would not be given the supporting documentation at the time an entry was made and the expectation was that the employee would find such documentation on his/her own.  As a result, RAINES, HOWARD and SPENCER avoided the creation of an audit trail, which might be used to ensure that such entries were accurate and appropriately executed.

154.    Appropriate audit trails were also inhibited by improper signature practices at the Enterprise.  For example, Fannie Mae employees reported that, for the period of 1999 through 2002, some did not actually prepare the journal entries related to amortization that bore his/her name.  Those entries were created after the closing process, a time when journal entries should require a higher level of scrutiny than usual.

155.    There were also more fundamental issues regarding having people who understood the rationale for a journal entry take responsibility for the journal entry and his or her substantive analysis behind the journal entry.  SPENCER did not adequately communicate and ensure that journal preparers were responsible for determining that journal entries were correct.

156.    Without this key control there was no method to ensure accountability—a significant breakdown in controls.  Regarding adjustments to PDA, Fannie Mae employees indicated that sometimes amortization entries showing their signature as preparer and signature as approver were made at the direction of Ms. Pennewell, based upon analysis performed by Mr. Juliane.

157.    Weak controls within the Controller's Office allowed violations of the most fundamental principles for closing processes.  Entries created after the closing process require a higher level of scrutiny than usual, but at Fannie Mae, post-closing adjustments were the norm.  For example, during the 2003 yearly closing process in January 2004, Ms. Pennewell and Mr. Juliane ran numerous sensitivity reports for catch-ups.  As a result, the Enterprise took a $50.1 million adjustment on January 7, 2004, and a $6.5 million adjustment on January 10, 2004.  These adjustments were inconsistent with management's position that considered +/- $110.2 million to be equivalent to zero for

- 65 -

materiality purposes. Hence, both catch-ups should not have occurred pursuant to the Enterprise's own accounting policy. Instead, this is another example of the arbitrary use of accounting policies and practices to manage earnings.

158.    RAINES, HOWARD, and SPENCER discussed the implications of the financial numbers in relation to EPS during the closing process. For example, on April 15, 2004, SPENCER spearheaded the effort to reopen Fannie Mae's books to make an adjusting entry that had the coincidental effect of increasing the company's EPS and margin. SPENCER reported on her progress that day to HOWARD.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Engage in Improper Earnings Management

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

159.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

160.    From at least May 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5) and (8); 12 U.S.C. § 4518; 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5.

161.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations That Involved Recklessness and/or Was a Pattern of Misconduct and Material Loss)**

162.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 160 involved recklessness, and/or was part of a pattern of misconduct, and caused or would be likely to cause a material loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(A) and (B).

- 67 -

## SECOND CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Engage in Improper Earnings Management

#### (C&D for Violations and Conduct Based on CMP Tier 3 Standard)

163.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above

164.   From at least May 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation.  *See* 12 U.S.C. § 4513(b)(5) and (8); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5.

165.   The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

## THIRD CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Engage in Improper Earnings Management

#### (C&D for Conduct and Violations Based on Unjust Enrichment)

166.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above

167.    From at least May 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD, LEANNE G. SPENCER, and others at Fannie Mae, did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5) and (8); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5.

168.    The above individuals were unjustly enriched in connection with such conduct for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A).   12 U.S.C. § 4631(a)(2), (3).

### FOURTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure Proper Documentation for Debt Buybacks

#### (Tier 2 CMP for Conduct and Violations that Involved Recklessness and Material Loss)

169.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

170.    From at least January 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to document any economic justification for debt buybacks. *See* 12 U.S.C. § 4513(b)(5); 12

- 69 -

C.F.R. § 1720 app. A.

171.    This conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### FIFTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Manipulated Insurance Accounting

### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

172.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

173.    From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's insurance accounting for two Finite Insurance transactions, engaged in improper earnings management. *See* 12 U.S.C. § 4513(b)(5).

174.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

### (Tier 2 CMP for Conduct and Violations that Involved Recklessness and Material )

175.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 173 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Manipulated Insurance Accounting

### (C&D for Conduct and Violations Based on CMP Tier Three Standard)

176.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

177.    From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's insurance accounting for two Finite Insurance transactions engaged in improper earnings management. *See* 12 U.S.C. § 4513(b)(5).

178.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B).   *See* 12 U.S.C. § 4631(a)(2), (3).

## SEVENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Manipulated Insurance Accounting

### (C&D for Conduct and Violations Based on Unjust Enrichment)

179.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

180.    From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD, LEANNE G. SPENCER, and others did individually and collectively engage in unsafe and unsound conduct and violations that contravened the

Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by manipulating Fannie Mae's insurance accounting for two Finite Insurance transactions and thus engaging in improper earnings management. *See* 12 U.S.C. § 4513(b)(5).

181.    The above individuals were unjustly enriched in connection with such conduct for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(I)(A).    12 U.S.C. § 4631(a)(2), (3).

### EIGHTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Enter Into REMIC Transactions In Order to Shift Income

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

182.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

183.    From at least December 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by entering into transactions that created REMICs which they used to shift income into future years, thus engaging in improper earnings management. *See* 12 U.S.C. § 4513(b)(5).    These REMIC transactions had no other economic purpose than shifting income, and were not appropriately disclosed, nor accounted for properly.

184.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations that Involved Recklessness and Material Loss)**

185.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 183 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

<u>**NINTH CLAIM**</u>

<u>**Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Enter Into REMIC Transactions In Order to Shift Income**</u>

**(C&D for Conduct and Violations Based on CMP Tier Three Standard)**

186.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

187.    From at least December 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by entering into transactions that created REMICs which they used to shift income into future years, thus engaging in improper earnings management. *See* 12 U.S.C. § 4513(b)(5). These REMIC transactions had no other economic purpose than shifting income, and were not appropriately disclosed, nor accounted for properly.

188.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## TENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Enter Into REMIC Transactions In Order to Shift Income

#### (C&D for Conduct and Violations Based on Unjust Enrichment)

189.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

190.    From at least December 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD, LEANNE G. SPENCER and others did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by entering into transactions that created REMICs which they used to shift income into future years, thus engaging in improper earnings management. *See* 12 U.S.C. § 4513(b)(5). These REMIC transactions had no other economic purpose than shifting income, and were not appropriately disclosed, nor accounted for properly.

191.    The above individuals were unjustly enriched in connection with such conduct for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A). 12 U.S.C. § 4631(a)(2), (3).

### ELEVENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 1998 Annual Report

#### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

192.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

193.    From at least January 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1998 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

194.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

195.    In the alternative, the conduct and violations alleged above in paragraph 1 through 158 and 193 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### TWELFTH CLAIM

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to
Make False and Misleading Disclosures to OFHEO in
Its 1998 Annual Report**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

196.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

197.    From at least January 1998 through December 2006, FRANKLIN D. RAINES, J.

TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1998 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

198.   The above individuals engaged in a violation and conduct that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).   *See* 12 U.S.C. § 4631(a)(2), (3).

### THIRTEENTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 1998 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

199.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

200.   From at least January 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1998 annual report.   *See*   12 U.S.C. §

4513(b)(5).

201.    This violation and conduct was knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

202.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 200 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## FOURTEENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 1998 Annual Report

**(C&D for Conduct and Violations Based on CMP Tier Three Standard)**

203.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

204.    From at least January 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1998 annual report. *See* 12 U.S.C. § 4513(b)(5).

205.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

### FIFTEENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 1999 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

206.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

207.    From at least January 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1999 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

208.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

- 78 -

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

209.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 207 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SIXTEENTH CLAIM

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to
Make False and Misleading Disclosures to OFHEO in
Its 1999 Annual Report**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

210.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

211.    From at least January 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as common engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1999 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

212.    The above individuals engaged in violations and conduct that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B). *See* 12 U.S.C. §

4631(a)(2), (3).

## SEVENTEENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 1999 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial LossTier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

213.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

214.    From at least January 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1999 annual report. *See* 12 U.S.C. § 4513(b)(5).

215.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

216.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 214 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant

to 12 U.S.C. § 4636(b)(2)(B).

## EIGHTEENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 1999 Annual Report

**(C&D for Violations and Conduct Based on CMP Tier 3 Standard)**

217.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

218.   From at least January 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 1999 annual report.  *See* 12 U.S.C. § 4513(b)(5).

219.   The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

## NINETEENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2000 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

220.   OFHEO alleges and hereby incorporates by reference herein the allegations set

forth in paragraphs 1 through 158 above.

221.    From at least January 2000 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2000 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

222.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

223.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 221 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## TWENTIETH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2000 Annual Report

**(C&D for Violations and Conduct Based on CMP Tier Three Standard)**

224.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

225.    From at least January 2000 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2000 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

226.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).   *See* 12 U.S.C. § 4631(a)(2), (3).

## TWENTY-FIRST CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2000 Annual Report

**((Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss**

227.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

228.    From at least January 2000 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be

made in the financial report of Fannie Mae's 2000 annual report. *See* 12 U.S.C. §
4513(b)(5).

229.    These violations and conduct were knowing and caused or would be likely to
cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed
pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

230.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 228
involved recklessness and caused or would be likely to cause a material loss to the
Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. §
4636(b)(2)(B).

**TWENTY-SECOND CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to
Make False and Misleading Disclosures to the Public in
Its 2000 Annual Report**

**(C&D for Violations and Conduct Based on CMP Tier 3 Standard)**

231.    OFHEO alleges and hereby incorporates by reference herein the allegations set
forth in paragraphs 1 through 158 above.

232.    From at least January 2000 through December 2006, FRANKLIN D. RAINES, J.
TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively
violate engage in unsafe and unsound conduct and violations that contravened the Safety
and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by
causing false and misleading disclosures regarding the Enterprise's GAAP compliance to
be made in the financial report of Fannie Mae's 2000 annual report. *See* 12 U.S.C. §
4513(b)(5).

233.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

### TWENTY-THIRD CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2001 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

234.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

235.    From at least January 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2001 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

236.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

237.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 235

involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### TWENTY-FOURTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2001 Annual Report

### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

238.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

239.   From at least January 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2001 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

240.   The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

## TWENTY-FIFTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2001 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

241.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

242.   From at least January 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2001 annual report.  *See* 12 U.S.C. § 4513(b)(5).

243.   These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

244.   In the alternative, the conduct alleged above in paragraphs 1 through 158 and 242 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## TWENTY-SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2001 Annual Report

#### (C&D for Violations and Conduct Based on CMP Tier 3 Standard)

245.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

246.    From at least January 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2001 annual report. *See* 12 U.S.C. § 4513(b)(5).

247.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### TWENTY-SEVENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2002 Annual Report

#### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

248.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

249.   From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2002 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

250.   These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

251.   In the alternative, the conduct alleged above in paragraphs 1 through 158 and 249 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## TWENTY-EIGHTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2002 Annual Report

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

252.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

253.   From at least January 2002 through December 2006, FRANKLIN D. RAINES, J.

- 89 -

TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2002 annual report to OFHEO. *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

254.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

### TWENTY-NINTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2002 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

255.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

256.    From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2002 annual report.  *See* 12 U.S.C. §

4513(b)(5).

257.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

258.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 256 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## THIRTIETH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2002 Annual Report

**(C&D for Violations and Conduct Based on CMP Tier 3 Standard)**

259.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

260.    From at least January 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2002 annual report. *See* 12 U.S.C. § 4513(b)(5).

261.    The above individuals engaged in conduct and violations that may result in the

issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

### THIRTY-FIRST CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2003 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

262.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

263.   From at least January 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2003 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

264.   These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

265.   In the alternative, the conduct alleged above in paragraphs 1 through 158 and 263 involved recklessness and caused or would be likely to cause a material loss to the

Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### THIRTY-SECOND CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to OFHEO in Its 2003 Annual Report

#### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

266.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

267.    From at least January 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 U.S.C. § 1723a(k), as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2003 annual report to OFHEO.  *See* 12 U.S.C. § 1723a(k); 12 U.S.C. § 1456(c); 12 U.S.C. § 4514; 12 U.S.C. § 4513(b)(5).

268.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

## THIRTY-THIRD CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2003 Annual Report

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

269.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

270.    From at least January 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2003 annual report. *See* 12 U.S.C. § 4513(b)(5).

271.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

272.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 270 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## THIRTY-FOURTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Fannie Mae to Make False and Misleading Disclosures to the Public in Its 2003 Annual Report

#### (C&D for Violations and Conduct Based on CMP Tier 3 Standard)

273.  OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

274.  From at least January 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false and misleading disclosures regarding the Enterprise's GAAP compliance to be made in the financial report of Fannie Mae's 2003 annual report. *See* 12 U.S.C. § 4513(b)(5).

275.  The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

## THIRTY-FIFTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 1998

#### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

276.  OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

277.  From at least April 1998 through December 2006, FRANKLIN D. RAINES, J.

TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO including but not limited to the report sent on or around January 30, 1999. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5).

278.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

279.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 277 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## THIRTY-SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 1998

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

280.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

281.    From at least April 1998 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and

violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO including but not limited to the report sent on or around January 30, 1999. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5).

282.   RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### THIRTY-SEVENTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 1999

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

283.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

284.   From at least April 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 1999 and January 30 of 2000. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5).

285.   These violations and conduct were knowing and caused or would be likely to

cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

286.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 284 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

**THIRTY-EIGHTH CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 1999**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

287.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

288.    From at least April 1999 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 1999 and January 30 of 2000. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5).

289.    RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### THIRTY-NINTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2000

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

290.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

291.    From at least April 2000 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2000 and January 30 of 2001. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

292.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

293.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 291 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

**FORTIETH CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate
Minimum Capital Reports to be Submitted to OFHEO in 2000**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

294.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

295.    From at least April 2000 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2000 and January 30 of 2001. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

296.    RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12

U.S.C. § 4631(a)(2), (3).

### FORTY-FIRST CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2001

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

297.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

298.    From at least April 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2001 and January of 2002. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

299.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

300.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 298 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. §

4636(b)(2)(B).

## FORTY-SECOND CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2001

#### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

301.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

302.    From at least April 2001 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2001 and January 30, 2002. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

303.    RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## FORTY-THIRD CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2002

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

304.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

305.    From at least April 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2002 and January 30 of 2003.  *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5).  Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors.  *See* 12 C.F.R. § 1750.3.

306.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

307.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 305 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## FORTY-FOURTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2002

### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

308.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

309.   From at least April 2002 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2002 and January 30 of 2003. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

310.   RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

**FORTY-FIFTH CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate
Minimum Capital Reports to be Submitted to OFHEO in 2003**

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

311.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

312.    From at least April 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2003 and January 30 of 2004. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

313.    These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

314.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 312 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

- 105 -

## FORTY-SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2003

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

315.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

316.    From at least April 2003 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2003 and January 30 of 2004. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

317.    RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## FORTY-SEVENTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate
### Minimum Capital Reports to be Submitted to OFHEO in 2004

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

318.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

319.   From at least April 2004 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2004 and January 30, 2005. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

320.   These violations and conduct were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

321.   In the alternative, the conduct alleged above in paragraphs 1 through 158 and 319 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## FORTY-EIGHTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Caused Inaccurate Minimum Capital Reports to be Submitted to OFHEO in 2004

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

322.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

323.    From at least April 2004 through December 2006, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively violate 12 C.F.R. § 1750.3, as well as engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by causing false, inaccurate or misleading minimum capital reports to be submitted to OFHEO on or around April 30, July 30 and October 30 of 2004 and January 30, 2005. *See* 12 C.F.R. §§ 1750.3, 1750.3; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(5). Fannie Mae was required to submit minimum capital reports to the Director of OFHEO, with accompanying declarations of truth and accuracy made by an officer authorized by the Board of Directors. *See* 12 C.F.R. § 1750.3.

324.    RAINES, HOWARD and SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### FORTY-NINTH CLAIM

### Mr. Howard Submitted False Declarations Regarding the
### Truth and Accuracy of Minimum Capital Reports in 2000

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

325.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

326.   From at least 2000 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct that violated the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the October 30, 2000, and January 30, 2001 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

327.   These violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

328.   In the alternative, the conduct alleged above in paragraphs 1 through 158 and 326 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## FIFTIETH CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2000

### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

329.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

330.    From at least 2000 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the October 30, 2000 and January 30, 2001 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

331.    HOWARD engaged in a violation that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## FIFTY-FIRST CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2001

### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

332.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

333.    From at least 2001 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations

under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2001, July 30, 2001, and January 30, 2002 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

334. These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

335. In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and paragraph 333 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### FIFTY-SECOND CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2001

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

336. OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

337. From at least 2001 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2001, July 30, 2001, and January 30, 2002 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

338. HOWARD engaged in conduct and violations that may result in the issuance of

orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### FIFTY-THIRD CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2002

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

339.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

340.    From at least 2002 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2002, July 30, 2002, and October 30, 2002 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

341.    This conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

342.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 340 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## FIFTY-FOURTH CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2002

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

343.     OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

344.     From at least 2002 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2002, July 30, 2002, and October 30, 2002 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

345.     HOWARD engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## FIFTY-FIFTH CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2003

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

346.     OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

347.     From at least 2003 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that

- 113 -

contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2003, July 30, 2003 and January 30, 2004 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

348.    These conduct and violations were knowing and caused or would be likely to *cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed* pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

349.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 347 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### FIFTY-SIXTH CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2003

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

350.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

351.    From at least 2003 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2003, July 30, 2003 and January 30, 2004 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

- 114 -

352.    HOWARD engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### FIFTY-SEVENTH CLAIM

### Mr. Howard Submitted False Declarations Regarding the Truth and Accuracy of Minimum Capital Reports in 2004

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

353.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

354.    From at least 2004 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2004, July 30, 2004, and October 30, 2004 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

355.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

356.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 354 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### FIFTY-EIGHTH CLAIM

#### Mr. Howard Submitted False Declarations Regarding the
#### Truth and Accuracy of Minimum Capital Reports in 2004

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

357.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

358.    From at least 2004 through December 2006, J. TIMOTHY HOWARD did violate 12 C.F.R. § 1750.3(e), and/or engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by submitting false declarations to OFHEO regarding the truth and accuracy of the April 30, 2004, July 30, 2004, and October 30, 2004 minimum capital reports. *See* 12 C.F.R. §§ 1750.3, 1750.4; 12 U.S.C. § 4612; 12 U.S.C. § 4513(b)(3).

359.    HOWARD engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### FIFTY-NINTH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure that Fannie Mae's
#### Accounting Policies were Created as the Result of a Written, Deliberative Process

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

360.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

361.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively

engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to ensure that Fannie Mae's accounting policy was created as the result of a written, deliberative policy. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

362.    This conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SIXTIETH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Develop and Implement Fannie Mae's Accounting Policies in a Safe and Sound Manner

#### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

363.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

364.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to develop and implement accounting policy in a safe and sound manner likely to result in GAAP-compliant accounting policies and practices. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

365.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

366.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 364 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

SIXTY-FIRST CLAIM

**Mr. Raines, Mr. Howard and Ms. Spencer Failed to Develop and Implement Fannie Mae's Accounting Policies in a Safe and Sound Manner**

**(C&D for Conduct and Violations Based on CMP Tier 3 Standard)**

367.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

368.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to develop and implement accounting policy in a safe and sound manner likely to result in GAAP-compliant accounting policies and practices.  *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

369.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B).  *See* 12 U.S.C. § 4631(a)(2), (3).

- 118 -

### SIXTY-SECOND CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure that Fannie Mae's Accounting Policies were Determined by Qualified Individuals

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

370.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

371.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to ensure that Fannie Mae's accounting policy was determined by persons qualified to make accounting policy. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

372.    This conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SIXTY-THIRD CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure that Fannie Mae's Accounting Policies were Based Upon Known and Accepted Accounting Standards

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

373.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

374.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and

Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to ensure that Fannie Mae's accounting policy was based upon known and accepted accounting standards, such as GAAP.  *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A

375.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

**SIXTY-FOURTH CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure that Fannie Mae's Accounting Policies were Memorialized in Writing**

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

376.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

377.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to ensure that Fannie Mae's accounting policy was memorialized in writing.  12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

378.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SIXTY-FIFTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Establish Appropriate Internal Controls over the Company's Amortization Process

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

379.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

380.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to establish appropriate internal controls over the company's amortization process.  12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

381.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SIXTY-SIXTH CLAIM

### Mr. Raines Improperly Consolidated Authority Within the Position Held by Mr. Howard

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

382.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

383.    From at least January 2002 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority within the position held by J. TIMOTHY HOWARD at Fannie

Mae. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14. This consolidation created known conflicts of interest, a key person dependency in the person of J. TIMOTHY HOWARD.

384.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

385.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 383 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

**SIXTY-SEVENTH CLAIM**

**Mr. Raines Improperly Consolidated Authority
Within the Position Held by Mr. Howard**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

386.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

387.    From at least January 2002 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority within the position held by J. TIMOTHY HOWARD at Fannie Mae. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14. This consolidation created known conflicts of interest, a key person dependency in the person of J. TIMOTHY HOWARD.

388.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

## SIXTY-EIGHTH CLAIM

### Mr. Raines and Mr. Howard Improperly Consolidated Authority Within the Position Held by Ms. Spencer

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

389.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

390.    From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority in the person of LEANNE G. SPENCER. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14. This consolidation created known conflicts of interest, a key person dependency in the person of LEANNE G. SPENCER.

391.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SIXTY-NINTH CLAIM

### Mr. Howard and Ms. Spencer Improperly Consolidated Authority Within the Position Held by Ms. Pennewell

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

392.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

- 123 -

393.   From at least January 1998 through December 2004, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority in the person of Janet Pennewell. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14.   This consolidation created known conflicts of interest, a key person dependency in the person of Janet Pennewell.

394.   These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

SEVENTIETH CLAIM

Mr. Howard and Ms. Spencer Improperly Consolidated Authority
Within the Position Held by Mr. Juliane

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

395.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

396.   From at least January 1998 through December 2004, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority in the person of Jeffrey Juliane. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14.  This consolidation created known conflicts of interest, a key person dependency in the person of Jeffrey Juliane.

397.   These conduct and violations involved recklessness and caused or would be likely

to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SEVENTY-FIRST CLAIM

### Mr. Howard and Ms. Spencer Improperly Consolidated Authority Within the Position Held by Mr. Boyles

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

398.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

399.    From at least January 1998 through December 2004, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by consolidating authority in the person of Jonathan Boyles. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14. This consolidation created known conflicts of interest, a key person dependency in the person of Jonathan Boyles.

400.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SEVENTY-SECOND CLAIM

### Mr. Raines and Mr. Howard Improperly Created a Conflict of Interest in the Person of Mr. Rajappa

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

401.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

402.   From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating a conflict of interest in the person of Sampath Rajappa. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14. The conflict of interest hindered the appropriate operation of the internal audit function at the Enterprise.

403.   These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SEVENTY-THIRD CLAIM

### Mr. Raines Improperly Tasked Mr. Howard, Who Was Unqualified for the Task, With Assisting in the Creation of Fannie Mae Accounting Policy

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

404.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

405.   From at least January 1998 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by tasking J. TIMOTHY HOWARD to assume a role in the creation of accounting policy for which he was not competent. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A. Despite his lack of qualifications to render a competent opinion on accounting policy, J. TIMOTHY HOWARD created and advised the creation of accounting policy at the Enterprise. The

Enterprise's FAS 91 and FAS 133 policies, for which J. TIMOTHY HOWARD took credit and responsibility, failed to conform to GAAP.

406.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SEVENTY-FOURTH CLAIM

#### Mr. Raines and Mr. Howard Improperly Tasked Ms. Spencer, Who was Unqualified for the Task, With Assisting in the Creation of Fannie Mae Accounting Policy

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

407.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

408.    From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by tasking LEANNE G. SPENCER to assume a role in the creation of accounting policy for which she was not competent. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14; 12 C.F.R. § 1720 app. A. Despite her lack of qualifications to render a competent opinion on accounting policy, LEANNE G. SPENCER created and advised the creation of accounting policy at the Enterprise. The Enterprise's FAS 91 policy, for which LEANNE G. SPENCER took credit and responsibility, failed to conform to GAAP.

409.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed

pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SEVENTY-FIFTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Improperly Tasked the Controller's Office With Functions For Which It Lacked Competence and Capacity

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

410.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

411.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by tasking the Controller's Office to assume functions, such as accounting for transactions in a manner that was GAAP compliant, for which it lacked competence and capacity.  *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14; 12 C.F.R. § 1720 app. A.

412.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SEVENTY-SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure the Competence and Capacity of the Controller's Office

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

413.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

414.    From at least January 1998 through December 2004, FRANKLIN D. RAINES, J.

TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating a Controller's Office that lacked the competence and capacity to account for transactions in a manner that was GAAP compliant. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

415.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## SEVENTY-SEVENTH CLAIM

### Mr. Raines and Mr. Howard Improperly Tasked and Maintained Mr. Rajappa, Who was Unqualified for the Task, With Internal Audit Functions

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

416.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

417.    From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by tasking and maintaining Sampath Rajappa in the internal audit role in the Enterprise, for which he was not competent. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14; 12 C.F.R. § 1720 app. A. Despite his lack of qualifications to render a competent opinion on the Enterprise's compliance with GAAP, Sampath Rajappa consistently opined that the Enterprise's accounting was GAAP-compliant. Moreover, Sampath Rajappa's lack of competence also led to

- 129 -

miscommunications and the lack of communication with the Audit Committee of the Board of Directors concerning the nature and extent of work done by the Office of Audit.

418.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SEVENTY-EIGHTH CLAIM

**Mr. Raines and Mr. Howard Improperly Tasked the Office of Audit With Functions For Which It Lacked Competence and Capacity**

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

419.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

420.    From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by tasking the Office of Audit to assume functions, such as auditing the accounting for transactions in a manner that was in compliance with Generally Accepted Auditing Standards (GAAS), for which it lacked competence and capacity.  *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1710.14; 12 C.F.R. § 1720 app. A.

421.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### SEVENTY-NINTH CLAIM

#### Mr. Raines and Mr. Howard Failed to Ensure the Competence and Capacity of the Office of Audit

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

422.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

423.    From at least January 1998 through December 2004, FRANKLIN D. RAINES and J. TIMOTHY HOWARD did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating an Office of Audit that lacked the competence and capacity to audit the accounting for transactions in a manner that was GAAS compliant. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

424.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### EIGHTIETH CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure the Integrity of Fannie Mae's System of Internal Controls

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

425.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

426.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and

Soundness Act of 1992, and the orders, rules, and regulations under that Act, by circumventing internal controls designed to ensure Fannie Mae's appropriate accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

427.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

428.    In the alternative, the conduct alleged above in paragraphs 1 through 158 and 426 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### EIGHTY-FIRST CLAIM

#### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure the Integrity of Fannie Mae's System of Internal Controls

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

429.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

430.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by

circumventing internal controls designed to ensure Fannie Mae's appropriate accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

431.    The above individuals engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C.§ 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

**EIGHTY-SECOND CLAIM**

**Mr. Raines, Mr. Howard and Ms. Spencer Failed to Ensure the
Integrity of Fannie Mae's System of Internal Controls**

**(C&D for Conduct and Violations Based on Unjust Enrichment)**

432.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

433.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by circumventing internal controls designed to ensure Fannie Mae's appropriate accounting for amortization expenses, Low Income Housing Tax Credits, and account number 1622-00 for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

434.   The above individuals were unjustly enriched in connection with such conduct and violations for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A).  12 U.S.C. § 4631(a)(2), (3).

## EIGHTY-THIRD CLAIM

### Ms. Spencer Created a Flawed System of Internal Controls

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

435.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

436.   From at least January 1999 through December 2004, LEANNE G. SPENCER engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating internal control systems designed to permit flexibility to manipulate earnings and amortization data for the purpose of attaining financial targets linked to the compensation of senior management, including SPENCER.  *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

437.   These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

438.   In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 436 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### EIGHTY-FOURTH CLAIM

### Ms. Spencer Created a Flawed System of Internal Controls

#### (C&D for Violation and Conduct Based on CMP Tier Three Standard)

439.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

440.    From at least January 1999 through December 2004, LEANNE G. SPENCER engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating internal control systems designed to permit flexibility to manipulate earnings and amortization data for the purpose of attaining financial targets linked to the compensation of senior management, including SPENCER. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

441.    MS. SPENCER engaged in conduct and violations that may result in the issuance of orders under 12 U.S.C. § 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### EIGHTY-FIFTH CLAIM

### Ms. Spencer Created a Flawed System of Internal Controls

#### (C&D for Conduct and Violations Based on Unjust Enrichment)

442.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

443.    From at least January 1999 through December 2004, LEANNE G. SPENCER and others engaged in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by creating internal control systems designed to permit flexibility to manipulate earnings and

amortization data for the purpose of attaining financial targets linked to the compensation of senior management, including SPENCER. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

444.   MS. SPENCER was unjustly enriched in connection with such conduct and violations for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A).  12 U.S.C. § 4631(a)(2), (3).

## EIGHTY-SIXTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's Accounting Policies, Practices and Systems With Respect to Dollar Roll Accounting

### (Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)

445.   OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

446.   From at least January 2002 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct the Enterprise's accounting policies, practices and systems in regard to dollar roll accounting for the purpose of causing earnings volatility to be inappropriately low. This facilitated RAINES', HOWARD's and SPENCER's efforts to manipulate Fannie Mae's accounting for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

447.   These conduct and violations were knowing and caused or would be likely to

cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

448.    In the alternative, the conduct and violations alleged above in paragraphs 1 through 158 and 446 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### EIGHTY-SEVENTH CLAIM

**Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's Accounting Policies, Practices and Systems With Respect to Dollar Roll Accounting**

**(C&D for Violation and Conduct Based on CMP Tier Three Standard)**

449.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

450.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct the Enterprise's accounting policies, practices and systems in regard to dollar roll accounting for the purpose of causing earnings volatility to be inappropriately low. This facilitated RAINES', HOWARD's and SPENCER's efforts to manipulate Fannie Mae's accounting for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

451.    MR. RAINES, MR. HOWARD and MS. SPENCER engaged in conduct and

violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

### EIGHTY-EIGHTH CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's Accounting Policies, Practices and Systems With Respect to Dollar Roll Accounting

### (C&D for Conduct and Violations Based on Unjust Enrichment)

452.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

453.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD, LEANNE G. SPENCER and others did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct the Enterprise's accounting policies, practices and systems in regard to dollar roll accounting for the purpose of causing earnings volatility to be inappropriately low. This facilitated RAINES', HOWARD's and SPENCER's efforts to manipulate Fannie Mae's accounting for the purpose of attaining financial targets linked to their own compensation. *See* 12 U.S.C. § 4513(b)(5); 12 U.S.C. § 4518, 12 C.F.R. § 1710.12; 12 C.F.R. §§ 1770.4-1770.5; 12 C.F.R. § 1720 app. A.

454.    MR. RAINES, MR. HOWARD and MS. SPENCER were unjustly enriched in connection with such conduct and violations for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A). 12 U.S.C. § 4631(a)(2), (3).

### EIGHTY-NINTH CLAIM

### Mr. Howard and Ms. Spencer Failed to Create and Maintain a Method of Ensuring the Integrity of Fannie Mae's Accounting With Respect to the Journal Entry Process

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

455.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

456.    From at least January 1999 through December 2004, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to create and maintain a safe and sound method of ensuring the accuracy and integrity of the journal entry process. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

457.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### NINETIETH CLAIM

### Mr. Howard and Ms. Spencer Failed to Create and Maintain a Method of Ensuring the Integrity of Fannie Mae's Closing Process With Respect to the Journal Entry Process

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

458.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

459.    From at least May 1998 through December 2004, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the

orders, rules, and regulations under that Act, by failing to create and maintain a safe and sound method of ensuring the accuracy and integrity of the journal entry process during the closing process for the Enterprise's financial records each quarter and year. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

460.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### NINETY-FIRST CLAIM

**Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's
Accounting Policies, Practices and Systems**

**(Tier 3 CMP Based on Knowing Violation and Conduct and Substantial Loss)**

461.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

462.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct inaccurate, inappropriate and non-GAAP accounting policies and practices. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

463.    These conduct and violations were knowing and caused or would be likely to cause a substantial loss to Fannie Mae for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(3).

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

464.    In the alternative, the conduct and violations alleged above in paragraphs 1

through 158 and 462 involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

## NINETY-SECOND CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's Accounting Policies, Practices and Systems

#### (C&D for Conduct and Violations of Tier 3 Standard)

465.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

466.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct inaccurate, inappropriate and non-GAAP accounting policies and practices. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

467.    MR. RAINES, MR. HOWARD and MS. SPENCER engaged in conduct and violations that may result in the issuance of orders to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(B). *See* 12 U.S.C. § 4631(a)(2), (3).

## NINETY-THIRD CLAIM

### Mr. Raines, Mr. Howard and Ms. Spencer Failed to Correct Fannie Mae's Accounting Policies, Practices and Systems

#### (C&D for Conduct and Violations Based on Unjust Enrichment)

468.    OFHEO alleges and hereby incorporates by reference herein the allegations set

- 141 -

forth in paragraphs 1 through 158 above.

469.    From at least May 1998 through December 2004, FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER did individually and collectively engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by failing to correct inaccurate, inappropriate and non-GAAP accounting policies and practices. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

470.    MR. RAINES, MR. HOWARD and MS. SPENCER were unjustly enriched in connection with such conduct and violations for which orders may be issued to cease and desist and for restitution, reimbursement, indemnification or guarantee against loss pursuant to 12 U.S.C. § 4631(d)(1)(A). 12 U.S.C. § 4631(a)(2), (3).

## NINETY-FOURTH CLAIM

### Mr. Raines Failed to Ensure a Proper Tone at the Top

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

471.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

472.    From at least September 1998 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules and regulations under the Act, by establishing, implementing and overseeing financial objectives and incentives that promoted and resulted in earnings management; setting a tone at the top that led to unsafe and unsound practices; sacrificing appropriate risk management by ignoring operational risk challenges; pursuing transactions and strategies with minimal or no business or economic purpose; and relying on inappropriate materiality standards in financial

statements and reporting. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

473.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### NINETY-FIFTH CLAIM

#### Mr. Raines Failed to Ensure the Integrity of and Independence of Fannie Mae's System of Internal Audit

**(Tier 2 CMP for Conduct and Violations Involving Recklessness and Material Loss)**

474.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

475.    From at least September 1998 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules and regulations under the Act, by implementing compensation programs and reporting lines that compromised the independence of the internal auditors.    *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

476.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(B).

### NINETY-SIXTH CLAIM

#### Mr. Raines Failed to Ensure the Integrity of the Condition, Activities and Operations of Fannie Mae

**(Tier 2 CMP for Violations and Conduct Based on Pattern of Misconduct)**

477.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

478.    From at least May 1998 through December 2004, FRANKLIN D. RAINES did engage in a pattern of conduct and/or in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992 and the orders, rules, and regulations under the Act. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

479.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(A).

### NINETY-SEVENTH CLAIM

#### Mr. Howard Failed to Ensure the Integrity of the
#### Condition, Activities and Operations of Fannie Mae

**(Tier 2 CMP for Violations and Conduct Based on Pattern of Misconduct)**

480.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

481.    From at least May 1998 through December 2004, J. TIMOTHY HOWARD did engage in a pattern of conduct and/or in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992 and the orders, rules, and regulations under the Act. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

482.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(A).

### NINETY-EIGHTH CLAIM

#### Ms. Spencer Failed to Ensure the Integrity of the
#### Condition, Activities and Operations of Fannie Mae

**(Tier 2 CMP for Violations and Conduct Based on Pattern of Misconduct)**

483.    OFHEO alleges and hereby incorporates by reference herein the allegations set

forth in paragraphs 1 through 158 above.

484.    From at least May 1998 through December 2004, LEANNE G. SPENCER did engage in a pattern of conduct and/or in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992 and the orders, rules, and regulations under the Act. *See* 12 U.S.C. § 4513(b)(5); 12 C.F.R. § 1720 app. A.

485.    These conduct and violations involved recklessness and caused or would be likely to cause a material loss to the Enterprise for which a civil money penalty may be imposed pursuant to 12 U.S.C. § 4636(b)(2)(A).

### NINETY-NINTH CLAIM

### Mr. Raines Failed to Ensure the Integrity of the Condition, Activities and Operations of Fannie Mae

### (C&D for Violations and Conduct that Violates 12 U.S.C. § 4631(a))

486.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158 above.

487.    From at least May 1998 through December 2004, FRANKLIN D. RAINES did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by engaging in malfeasance, misfeasance and nonfeasance that caused and would be likely to cause a significant loss to the Enterprise in violation of Title 12, United States Code, Section 4631(a).

### ONE HUNDREDTH CLAIM

### Mr. Howard Failed to Ensure the Integrity of the Condition, Activities and Operations of Fannie Mae

### (C&D for Violations and Conduct that Violates 12 U.S.C. § 4631(a))

488.    OFHEO alleges and hereby incorporates by reference herein the allegations set

forth in paragraphs 1 through 158 above.

489.    From at least May 1998 through December 2004, J. TIMOTHY HOWARD did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by engaging in malfeasance, misfeasance and nonfeasance that caused and would be likely to cause a significant loss to the Enterprise in violation of Title 12, United States Code, Section 4631(a).

### ONE HUNDRED FIRST CLAIM

#### Ms. Spencer Failed to Ensure the Integrity of the Condition, Activities and Operations of Fannie Mae

##### (C&D for Violations and Conduct that Violates 12 U.S.C. § 4631(a))

490.    OFHEO alleges and hereby incorporates by reference herein the allegations set forth in paragraphs 1 through 158.

491.    From at least May 1998 through December 2004, LEANNE G. SPENCER did engage in unsafe and unsound conduct and violations that contravened the Safety and Soundness Act of 1992, and the orders, rules, and regulations under that Act, by engaging in malfeasance, misfeasance and nonfeasance that caused and would be likely to cause a significant loss to the Enterprise in violation of Title 12, United States Code, Section 4631(a).

## PRAYER FOR RELIEF

**A.    Prayer for Civil Money Penalty (12 U.S.C. § 4636(b)(2))**

492.    OFHEO hereby incorporates and re-alleges all of the foregoing allegations of this Notice of Charges as if expressly set forth herein.

493.    FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER have engaged in violations, unsafe and unsound practices, and other actionable conduct that violated the Safety and Soundness Act, and the orders, rules, and regulations under that Act.

494.    The above-alleged unsafe and unsound practices, other actionable conduct and violations of law, rules and regulations, various combinations thereof, and each of them, constituted part of a pattern of misconduct dating from at least May 1998 through December 2004. *See* 12 U.S.C. § 4636(b)(2)(A).

495.    The above-alleged unsafe and unsound practices, other actionable conduct and violations of law, rules and regulations, various combinations thereof, and each of them, involved recklessness and caused or would be likely to cause a material loss to the Enterprise. *See* 12 U.S.C. § 4636(b)(2)(B).

496.    WHEREFORE, final orders should issue pursuant to 12 U.S.C. § 4636(b)(2) requiring that MR. RAINES, MR. HOWARD and MS. SPENCER pay a penalty of $10,000 for each day it is determined that the above-alleged unsafe and unsound practices, other actionable conduct, violations of law, rules and regulations continued in *connection with each of them.*

**B.    Prayer for Civil Money Penalty (12 U.S.C. § 4636(b)(3))**

497.    OFHEO hereby incorporates and re-alleges all of the foregoing allegations of this Notice of Charges as if expressly set forth herein.

498.    FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER have engaged in violations, unsafe and unsound practices, and other actionable conduct in that violated the Safety and Soundness Act, and the orders, rules, and regulations under that Act.

499.    The above-alleged unsafe and unsound practices, other actionable conduct and violations of law, rules and regulations, various combinations thereof, and each of them, was knowing and caused or would be likely to cause a substantial loss to the Enterprise. *See* 12 U.S.C. § 4636(b)(3).

500.    WHEREFORE, final orders should issue pursuant to 12 U.S.C. § 4636(b)(3) requiring that MR. RAINES, MR. HOWARD and MS. SPENCER pay a penalty of $100,000 for each day it is determined that the above-alleged unsafe and unsound practices, other actionable conduct, violations of law, rules and regulations continued in connection with each of them.

**C.    Prayer for Affirmative Relief (12 U.S.C. § 4631)**

501.    OFHEO hereby incorporates and re-alleges all of the foregoing allegations of this Notice of Charges as if expressly set forth herein.

502.    FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER have engaged in violations, unsafe and unsound practices, and other actionable conduct that violated the Safety and Soundness Act, and the orders, rules, and regulations under that Act. *See* 12 U.S.C. § 4631(a).

503.    MR. RAINES, MR. HOWARD and MS. SPENCER have engaged in conduct and

violations of law that may result in the issuance of an order pursuant to 12 U.S.C. § 4631(d)(1) by:

    (1)    engaging in conduct and violations in connection with which each was unjustly enriched, *see* 12 U.S.C. § 4631(d)(1)(A); and

    (2)    engaging in conduct and violations that would subject each to a civil money penalty pursuant to 12 U.S.C. § 4636(b)(3), *see* 12 U.S.C. § 4631(d)(1)(B).

504.    WHEREFORE, final orders should issue pursuant to 12 U.S.C. § 4631 requiring that MR. RAINES, MR. HOWARD and MS. SPENCER cease and desist from the conduct and violations alleged in this Notice of Charges and to take affirmative action to correct and remedy the conditions that caused the conduct and violations of law, rules, regulations, and safety and soundness practices, including without limitation:

    a.    FRANKLIN D. RAINES, J. TIMOTHY HOWARD and LEANNE G. SPENCER shall not in the future, without the prior written consent of the Director, and upon such terms as the Director deems appropriate, participate in any manner in the conduct of the affairs of Freddie Mac or Fannie Mae or in any activity that would cause him or her to be considered an institution-affiliated party of Freddie Mac or Fannie Mae, as defined by 12 U.S.C. § 1813(u) as if either of these enterprises were insured institutions. In addition, RAINES, HOWARD and SPENCER shall disclose and provide a copy of this Order to any financial institution and its primary regulator and insurer if, and at the time, he or she seeks to be employed by or participate in any manner in the affairs of: (1) any federally insured depository institution; (ii) any institution treated as an insured bank under

12 U.S.C. § 1818 (b)(3) or (b)(4), or as a savings association under 12 U.S.C. § 1818 (b)(9); (iii) any insured credit union under the Federal Credit Union Act [12 U.S.C. § 1781 et seq.]; (iv) any institution chartered under the Farm Credit Act of 1971 [12 U.S.C. § 2001 et seq.]; (v) any Federal depository institution regulatory agency and; (vi) the Federal Housing Finance Board and any Federal home loan bank.

b.    RAINES, HOWARD and SPENCER shall waive any contractual or other non-statutory right or claim he or she may have to restitution, reimbursement, indemnity, guaranty against loss, civil money penalty, or other payment for any affirmative monetary relief awarded against him or her in this action pursuant to 12 U.S.C. §§ 4631 or 4636, and to repay any such restitution, reimbursement, indemnity, civil money penalty, or other payments (excluding legal fees and costs), that he or she may already have received (*see* 12 C.F.R. § 1710.20(a)).

c.    RAINES shall remit and disgorge to the Enterprise all monies paid and to be paid to him as part of the Annual Incentive Plan, Performance Share Plan, the 2003 Challenge Grant program and other stock options relating to RAINES' employment with Fannie Mae from 1998 to 2004.

d.    HOWARD shall remit and disgorge to the Enterprise all monies paid and to be paid to him as part of the Annual Incentive Plan, Performance Share Plan, the 2003 Challenge Grant program and other stock options relating to HOWARD's employment with Fannie Mae from 1998 to 2004.

e.    SPENCER shall remit and disgorge to the Enterprise all monies paid and to be paid to her as part of the Annual Incentive Plan, Performance Share Plan,

the 2003 Challenge Grant program and other stock options relating to SPENCER's employment with Fannie Mae from 1998 to 2004.

f.    RAINES, HOWARD and SPENCER shall make restitution to, or provide reimbursement and indemnification to the Enterprise any monies paid to him/her by the Enterprise that constituted unjust enrichment, to the extent to which he/she was unjustly enriched. *See* 12 U.S.C. § 4631(d)(1)(A).

g.    RAINES, HOWARD and SPENCER shall make restitution to, or provide reimbursement and indemnification to the Enterprise any monies paid by the Enterprise in connection with any conduct or violation that would subject him/her to a civil money penalty pursuant to 12 U.S.C. § 4636(b)(3), including, but not limited to:

> (i)    the civil money penalty paid by Fannie Mae on May 23, 2006; and

> (ii)    amounts expended by Fannie Mae to recreate and correct historical financial statements.

h.    RAINES, HOWARD and SPENCER shall make restitution to, or provide reimbursement and indemnification to the Enterprise any monies paid to him/her by the Enterprise to the extent in which he/she engaged in conduct or a violation that would subject him/her to a civil money penalty pursuant to 12 U.S.C. § 4636(b)(3). *See* 12 U.S.C. § 4631(d)(1)(B).

505.    OFHEO prays for any other and further relief as the presiding officer deems just and appropriate under the Safety and Soundness Act of 1992.

# PROCEDURE

506.   Notice of Hearing:  Notice is hereby given that, pursuant to Title 12, United States Code, Section 4633, and in accordance with OFHEO's Rules of Practice and Procedure in Adjudicatory Proceedings, Title 12, Code of Federal Regulations, Section 1780.1 et seq. ("Adjudicatory Rules"), an administrative hearing will be held to determine whether final orders should be issued against RAINES, HOWARD and SPENCER obtaining the relief requested above, or such other and further relief that the Director determines appropriate.

507.   Location and Date:  The hearing will be held within the federal judicial district for the district of Washington, D.C. before an appropriately designated Presiding Officer ("ALJ").  The exact time of day and location will be announced by the ALJ, and will be conducted before the ALJ in accordance with the adjudicatory provisions of the Administrative Procedure Act, 5 USC Sections 554-557, as made applicable by relevant statutes and the Adjudicatory Rules.

508.   Answer Required:  RAINES, HOWARD and SPENCER are directed to file individual Answers in response to the charges set forth in the preceding Notice within twenty (20) days after receiving service thereof, as required by Title 12, Code of Federal Regulations, Section 1780.22, or as otherwise ordered by the ALJ.  The requirements for the Answer and the consequences of failure to file an Answer are set forth in Title 12, Code of Federal Regulations, Section 1780.21.  The original and one copy of any answer shall be filed with the Office of the Director, Office of Federal Housing Enterprise Oversight, 1700 G Street, N.W., Washington, D.C. 20552.  A copy of any answer shall also be served with the Office of the General Counsel, Office of Federal Housing Enterprise Oversight, 1700 G Street, N.W., Washington, D.C. 20552, and with the

OFHEO attorney whose name appears on the accompanying certificate of service.

*James B. Lockhart III*

James B. Lockhart III
Director
Office of Federal Housing Enterprise Oversight
1700 G Street N.W.
Washington, D.C. 20552

Date:   December 18, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **J. TIMOTHY HOWARD**<br>8400 Parham Court<br>McLean, VA 22102,<br><br>          **Plaintiff,**<br><br>          **v.**<br><br>**JAMES B. LOCKHART III**, in his official<br>capacity as Director of the Office of Federal<br>Housing Enterprise Oversight, an office<br>within the United States Department of Housing<br>And Urban Development<br>1700 G Street, N.W.<br>Washington, DC 20552,<br><br>          **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Misc. No.** _____ |

**MEMORANDUM OF LAW IN SUPPORT OF J. TIMOTHY HOWARD'S
MOTION TO REQUIRE THE DIRECTOR OF OFHEO
TO PURSUE HIS NOTICE OF CHARGES AGAINST MR. HOWARD IN THIS COURT**

# **EXHIBIT B**

UNITED STATES OF AMERICA
OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Leland C. Brendsel ) | HUDALJ 04-056-NA |
| ) | |
| Respondent ) | Notice No. 2003-2 |
| ) | |

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Vaughn A. Clarke ) | HUDALJ 04-057-NA |
| ) | |
| Respondent ) | Notice No. 2003-3 |
| ) | |

## ORDER OF DESIGNATION

Administrative Law Judge William B. Moran of the United States Environmental Protection Agency, is hereby designated to serve as the Administrative Law Judge to preside over this proceeding pursuant to Title 12, Code of Federal Regulations, Section 1780.72.[1]

Susan L. Biro
Chief Administrative Law Judge

Dated: May 25, 2006
    Washington, D.C.

---

[1] The Administrative Law Judges of the United States Environmental Protection Agency are authorized to hear cases pending before the Office of Federal Housing Enterprise Oversight, pursuant to an Interagency Agreement effective for a period beginning April 6, 2006.

<u>In the Matter of Leland C. Brendsel & Vaughn A. Clarke</u>
HUDALJ 04-056-NA & 04-057-NA, Notice Nos. 2003-2 & 2003-3


<u>CERTIFICATE OF SERVICE</u>


I certify that the foregoing **Order of Designation**, dated May 25, 2006, was sent this day in the following manner to the addressees listed below.


*Maria Whiting-Beale*
Maria Whiting-Beale
Legal Staff Assistant


Dated: May 25, 2006


Copy by Regular Mail to:

Jeneen Y. Ramos, Esquire
Office of General Counsel
Office of Federal Housing Enterprise
    Oversight
1700 G Street, NW, 4th Floor
Washington, DC 20552


Kevin M. Downey, Esquire
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005

Adam L. Rosman, Esquire
Steven M. Salky, Esquire
Zuckerman Spaeder LLP
1800 M Street, NW
Washington, DC 20036