**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
**J. TIMOTHY HOWARD,**               )
                                    )
           **Plaintiff**,            )
                                    )
              **v.**                 )        **Case No. 1:07-ms-0020 (RJL)**
                                    )
**JAMES B. LOCKHART III**,           )
Director, Office of Federal          )
Housing Enterprise Oversight         )
                                    )
           **Defendant.**            )
_____)

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF J. TIMOTHY HOWARD'S MOTION TO REQUIRE THE DIRECTOR OF OFHEO TO PURSUE HIS NOTICE OF CHARGES AGAINST MR. HOWARD IN THIS COURT

As directed by the Court at the March 15, 2007 hearing in the above-referenced matter, J. Timothy Howard, through counsel, hereby submits this supplemental memorandum in support of his motion to require the Director of OFHEO to pursue his notice of charges against Mr. Howard in this forum. This memorandum explains (1) the D.C. Circuit's recent ruling on mandamus petitions filed by Mr. Howard's co-respondents in the administrative proceeding; (2) developments in that proceeding, which underscore the need to remove the proceeding to this Court; and (3) a constitutional flaw in OFHEO's enabling statute that further requires such relief.

**A.     The D.C. Circuit's Denial of the Mandamus Petitions Gives This Court a Clean Slate to Decide the Issues Presented in Mr. Howard's Motion.**

As this Court knows, in January of this year, Franklin D. Raines and Leanne G. Spencer filed in the D.C. Circuit petitions for a writ of mandamus to disqualify James B. Lockhart III, the Director of OFHEO, from adjudicating the notice of charges that OFHEO has brought against Messrs. Raines and Howard and Ms. Spencer. The grounds for the petitions were an extensive

set of public remarks by Director Lockhart, which demonstrated that he had predetermined that the respondents committed the violations charged in the notice.[1]

On April 27, 2007, in identical two-sentence orders, the D.C. Circuit denied the petitions on jurisidcitonal grounds. Without reaching, or even commenting upon, the merits of petitioners' claims regarding the Director's bias, the Court of Appeals stated that petitioners had not satisfied the jurisdictional standard for invoking the court's mandamus jurisdiction – that is, they had "not shown a clear and indisputable right to the requested relief." *See Banks v. Office of Senate Sergeant-At-Arms*, 471 F.3d 1341, 1350 (D.C. Cir. 2006) (mandamus jurisdiction lies only if "(1) the plaintiff has a clear right to relief, (2) the defendant has a clear duty to act, and (3) there is no other adequate remedy available to plaintiff"). Confirming that its ruling was merely jurisdictional, the Court of Appeals included pinpoint cites to two cases, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988) and *Power v. Barnhart*, 292 F.3d 781, 788 (D.C. Cir. 2002), which set forth the contours of mandamus jurisdiction. Neither case involved claims of a biased adjudicator.[2]

Nothing in the D.C. Circuit's disposition preludes the relief requested by Mr. Howard in this action or even suggests that such relief is not warranted. In summarily denying the petitions on jurisdictional grounds, the Court of Appeals expressed no opinion whatsoever about the Director's impartiality, or lack thereof. Such a threshold determination – short of the merits – was precisely the result OFHEO sought in opposing the petitions. Indeed, OFHEO's principal argument was that the Court of Appeals should refrain from considering "the substance of

---

[1] Although the parties to the D.C. Circuit proceeding referenced in passing the separate remedy sought by Mr. Howard here, the mandamus petitions did not ask the Court of Appeals to grant this remedy, it was not before the Court of Appeals, and the Court of Appeals did not pass on it.

[2] The two cases cited by the D.C. Circuit emphasize that mandamus is an extraordinary writ that is used sparingly. *See Gulfstream Aerospace Corp.*, 485 U.S. at 289 (1988) ("[t]he writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations."); *Power*, 292 F.3d at 784 ("The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances.") (internal quotations omitted).

petitioners' claims," because the Court of Appeals' "mandamus jurisdiction does not properly encompass either of the orders sought by the petitions." Brief of OFHEO at 1, 3, *In Re Franklin D. Raines*, No. 07-1011, *In Re Leanne G. Spencer*, No. 07-1024 (D.C. Cir. 2007). Furthermore, among the many arguments advanced by OFHEO to support its contention that mandamus jurisdiction was lacking was the availability of alternative, adequate remedies to vindicate petitioners' interests with respect their claims regarding the Director's bias. The relief sought by Mr. Howard's motion in this action – an order requiring the Director to pursue the notice of charges against Mr. Howard (and necessarily the other respondents as well) in this forum – is precisely such an alternative and immediately available remedy.

Thus, by accepting OFHEO's request to postpone consideration of the merits and deny the petition for want of jurisdiction, the D.C. Circuit has given this Court a clean slate to decide the issues before it.

**B.     Recent Developments in the Administrative Proceeding Demonstrate Why This Court is the Proper Forum for the Charges Against Mr. Howard to be Heard.**

Two events have occurred since the March 15 hearing on Mr. Howard's motion that give further indication of the Director's irreparable bias and the need to compel the Director to pursue his charges against Mr. Howard in this forum.

The first occurred on April 5, 2007, when the Director formally declined to recuse himself from serving as the ultimate trier of fact and law in the administrative proceeding. In a 20-page memorandum, attached at Exhibit A, the Director concluded that respondents had failed to show that he has prejudged the matter or is otherwise predisposed to rule against them. His reasoning, however, is so contrived and result-oriented that it underscores his incapacity to fairly judge the case. To list just a few examples of his analysis:

- The Director attempted to explain away his Senate testimony that management committed "much more than just accounting fraud," on the grounds that he was "obliged to appear before Congress," "bound to tell the truth," and "seated next to SEC Chairman Christopher Cox." Exhibit A at 9.

- The Director attempted to explain away his statement in a speech to the American Enterprise Institute regarding "fraud committed by the former management" on the ground that it was a mere "reference to the SEC's label for the behavior." *Id.* at 10.

- The Director attempted to explain away his statement to the press that "we believed as an agency that these three individuals, separately and together, did serious harm to the company" on the ground that it was not a statement of fact, but merely "a statement of belief in fact." *Id.* at 13.

These "explanations" strain credulity. They most certainly are not sufficient to satisfy the constitutional standard for an unbiased decisionmaker – that is, to persuade "a disinterested observer" that the Director has not "in some measure adjudged the facts as well as the law of [the] case in advance of hearing it." *Cinderella Career and Finishing Schools, Inc., v. Fed. Trade Comm'n*, 425 F.2d 583, 591 (D.C. Cir. 1970).

Tellingly, absent from the decision is an affirmative statement that the Director has not, in fact, prejudged the charges against Mr. Howard and the other respondents. The closest the Director comes to such a statement appears on page 19 of the decision, where the Director states that "having reflected on my statements regarding Respondents' management of Fannie Mae I believe that I have acted and spoken . . . without any animus towards Respondents or prejudgment of the legal and factual questions which ALJ Moran will eventually forward to me." Exhibit A at 19. The ambiguity of this carefully crafted statement is palpable – it speaks in terms of what the Director "believe[s]" he meant rather that what he in fact meant, and it speaks about whether his actions and words reflect prejudgment, rather than whether he in fact has prejudged. This only underscores why this Court should assume jurisdiction over this proceeding.

The second event involves ALJ Moran's entry of the pretrial protective order proposed by OFHEO – and to which Mr. Howard objected – in the administrative proceeding.[3]  The protective order, which the ALJ entered on April 11, contains language proposed by OFHEO that this Court squarely rejected previously – namely, language that conflates confidentiality with OFHEO's theory of a so-called OFHEO examination privilege.  The ALJ rejected the protective order proposed by Mr. Howard and his co-respondents, notwithstanding that it was identical in substance to the Amended Stipulated Pretrial Order entered by this Court in the Fannie Mae proceedings.[4]

In addition to the unnecessary burdens and inefficiencies caused by the operation of competing protective orders, this episode provides a glimpse of the inconsistent determinations that will inevitably occur between this Court's rulings and rulings in an administrative proceeding presided over by an ALJ hand-picked by an irreparably biased Director.  This is yet another reason why this Court should exercise its discretion under 12 U.S.C. § 4635(a) to remove the proceedings to this Court.

**C.    The Doctrine of Constitutional Avoidance Compels the Relief Requested in Mr. Howard's Motion.**

Finally, in reviewing the Director's recusal decision and the briefs filed in the D.C. Circuit in connection the mandamus petitions, we have come across yet another canon of statutory construction compelling our reading of 12 U.S.C. § 4635(a): constitutional avoidance. This established canon holds that "[w]hen the validity of an act of the Congress is drawn in question, and . . . a serious doubt of constitutionality is raised, it is a cardinal principle that [courts] will first ascertain whether a construction of the statute is fairly possible by which the

---

[3] Attached as Exhibit B is a copy of ALJ Moran's order.

[4] In rejecting the language adopted by this Court, the ALJ called Mr. Howard and his co-respondents "pedantic" for advocating for it.  Exhibit B at 3.

question may be avoided." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 180 (2003); *see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems."). It "reflects the prudential concern that constitutional issues [should] not be needlessly confronted." *DeBartolo Corp.*, 485 U.S. at 575 (1988); *see also Taucher v. Brown-Hruska*, 396 F.3d 1168, 1176 (D.C. Cir. 2005) ("point of constitutional avoidance . . . is to *avoid* deciding the constitutional question"). The canon applies here. OFHEO's enabling statute contains a flaw that raises serious due process concerns. The Court, however, can avoid this by construing section 4635(a) in the fashion advanced by Mr. Howard – to permit the Court to compel the Director to proceed in this forum.

The constitutional problem is as follows. Under section 4631(a), the Director is authorized to issue a notice of charges upon an enterprise, executive officer, or director "if *in the determination of the Director*, the enterprise, executive officer, or director is engaging or has engaged, or the Director has reasonable cause to believe that the enterprise, executive officer, or director is about to engage" in specified unlawful conduct. 12 U.S.C. § 4631(a) (emphasis added). Therefore, when the Director wishes to bring an enforcement action to address potential future conduct by (for example) an executive officer of a regulated enterprise, he may issue a notice of charges if he has "reason to believe" that the individual is about to engage in unlawful conduct. Administrative schemes that permit an agency adjudicator to authorize the initiation of enforcement actions upon a finding of reasonable or probable cause are common. The Federal Trade Commission, for example, is statutorily authorized to initiate enforcement actions when it has "reason to believe" that a violation of law has occurred. 15 U.S.C. § 45(b). Such schemes

have also withstood constitutional challenge. *See Withrow v. Larkin*, 421 U.S. 35, 56 (1975) (recognizing that no due process violation occurs where member of administrative body approves filing of charges upon finding of probable cause and then participates in the ensuing hearing).

But as the language of section 4631(a) further shows, in order to issue a notice of charges upon an executive officer for ongoing or, as here, past conduct, the Director needs more than reasonable cause to believe that the conduct in question is unlawful. Prior to issuing the notice of charges, the Director must first make a "determination" that the executive officer is "engaging or has engaged" in prohibited conduct. 12 U.S.C. § 4631(a). That is to say, by simply issuing the notice of charges upon Mr. Howard, the statute required the Director to have determined that Mr. Howard's conduct violated the law. As a result, because the Director retains exclusive statutory authority to render the final decision on the merits of the proceeding, *see* 12 U.S.C. § 4633(b)(1), Mr. Howard, by statute, is guilty until proven innocent under OFHEO's administrative enforcement scheme.

To say that such a process raises serious constitutional problems is understatement. "The requirement of an unbiased tribunal is fundamental to due process." *Rosen v. NLRB*, 735 F.2d 564, 571 (D.C. Cir. 1984); *see also Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[A]n impartial decision maker is essential."). The right to an impartial decisionmaker applies with equal force to agency adjudications. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."); *Withrow*, 421 U.S. at 46 ("[A] fair trial in a fair tribunal is a basic requirement of due process. This applies to administrative agencies which adjudicate as well as to courts.") (internal quotation marks and citation omitted).

The applicable test in this Circuit for assessing the impartiality of an agency decisionmaker is whether "a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella*, 425 F.2d at 591.  "This standard guarantees that the adjudicative hearing of a person facing administrative prosecution for past behavior is before a decisionmaker who has not prejudged facts concerning the events under review." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1158 (D.C. Cir. 1979).  It strains credulity to suggest that a disinterested observer could reasonably conclude that an agency decisionmaker, after making a statutorily required determination that an individual has engaged in unlawful conduct, has not "in some measure" prejudged the facts and the law of the case.  In other words, "the probability for actual bias on the part of the [Director]" resulting from OFHEO's enabling statute "is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47.[5]

By construing section 4635(a) as OFHEO suggests, whereby the enforcement of any notice of charges can occur only in an administrative forum, the Court would be compelled to address the serious due process issues described above.  In order to avoid reaching these questions, this Court can, and indeed must, interpret section 4635(a) in the manner advanced by Mr. Howard in his motion.  *See Chamber of Commerce v. Fed. Election Comm'n.*, 69 F.3d 600, 605 (D.C. Cir. 1995) ("We are obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress."); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1340-41 (D.C. Cir. 2002) (recognizing that "constitutional avoidance canon of statutory interpretation trumps *Chevron* deference").  That interpretation would permit

---

[5] The Supreme Court has not hesitated to find due process violations in statutory schemes that result in a probability of actual bias on the part of a judge or decisionmaker.  *See, e.g., In re Murchison*, 349 U.S. 133, (1955) (due process violation for judge, who conducted a so-called one-man grand jury pursuant to state statute, to preside over contempt proceeding arising from the same grand jury matter).

the Court to assume jurisdiction over the administrative proceeding against Mr. Howard and thereby avoid the serious constitutional issues created by the language of the enabling statute that requires prejudgment by the Director.

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Mr. Howard's opening memorandum and reply, Mr. Howard respectfully requests that the Court enter an Order requiring the Director of OFHEO to pursue the Notice of Charges against Mr. Howard in this Court.

Dated:  May 11, 2007                          Respectfully submitted,

                                              /s/ Eric R. Delinsky
                                              Steven M. Salky (D.C. Bar No. 360175)
                                              Eric Delinsky (D.C. Bar No. 460958)
                                              Miles Clark (D.C. Bar No. 489388)
                                              ZUCKERMAN SPAEDER LLP
                                              1800 M Street, N.W.
                                              Washington, D.C. 20036
                                              202-778-1800 (telephone)
                                              202-822-8106 (facsimile)

                                              *Counsel for J. Timothy Howard*

**CERTIFICATE OF SERVICE**

I certify that on this 11th day of May 2007, I filed the foregoing with the Clerk of Court via the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.


/s/ Miles Clark_____
Miles Clark

☑006/025

# UNITED STATES OF AMERICA
## OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

### Notice Number 2006-1

| | |
|---|---|
| In The Matter Of: | ) |
| | ) |
| FRANKLIN D. RAINES | ) |
| | ) |
| J. TIMOTHY HOWARD | ) |
| | ) |
| LEANNE G. SPENCER | ) |
| | ) |

### DECISION OF DIRECTOR JAMES B. LOCKHART III IN RESPONSE TO RESPONDENTS' REQUESTS FOR RECUSAL

In response to Respondents' requests for my recusal, which requests were referred

to me by United States Administrative Law Judge Moran, I have fully considered the

requests and the following sets out my decision.

### BACKGROUND

On July 17, 2003, the Office of Federal Housing Enterprise Oversight (OFHEO)

opened a Special Examination (Special Exam) of the government sponsored enterprise

known as Fannie Mae pursuant to its authority under the Federal Housing Enterprises

Financial Safety and Soundness Act of 1992, 12 U.S.C § 4501 et seq. On September 17,

2004, OFHEO issued a preliminary report on the findings of that Special Exam. OFHEO

released the final Special Exam Report on Fannie Mae (Special Exam Report) on May

23, 2006.

I, the undersigned, James B. Lockhart III, Director of OFHEO, was appointed

Acting Director of OFHEO on April 29, 2006, and nominated by the President to be

Director.  Following my U.S. Senate confirmation on June 15, 2006 and appointment by

the President on June 23, 2006, I was sworn in as Director of OFHEO on June 26, 2006.

On December 18, 2006, OFHEO filed a Notice of Charges against Mr. Franklin

D. Raines, Mr. J. Timothy Howard, and Ms. Leanne G. Spencer in the above captioned

matter.  The same day OFHEO requested the Office of Personnel Management (OPM) to

assign an Administrative Law Judge (ALJ) to preside in this matter.  OPM assigned ALJ

William B. Moran from the Environmental Protection Agency.  ALJ Moran has set the

hearing for the Notice of Charges for March 18, 2008.

By letter dated December 18, 2006 (Downey December 18 letter), Mr. Kevin M.

Downey of Williams & Connolly LLP wrote to me on behalf of his client, Respondent

Raines.  In that letter Mr. Downey demanded that I remove myself immediately and

completely from any further regulatory action affecting Mr. Raines.  He also asked that I

enter a temporary order effecting the remedies sought so that Mr. Raines and the other

Respondents may challenge that order in U.S. District Court for the District of Columbia,

under 12 U.S.C. § 4632.  Mr. Downey followed the Downey December 18 letter with

another letter dated January 12, 2007 (Downey January 12 letter)  in which he submitted

an affidavit (Downey Aff.) and accompanying exhibits regarding my alleged bias and

why I should recuse myself from the role of deciding official in this enforcement

proceeding.

By letter dated January 12, 2007 (Krakoff January 12 letter), Mr. David S.

Krakoff of Mayer, Brown, Rowe & Maw LLP, on behalf of Respondent Spencer,

demanded that I remove myself from this matter.  Next, Mr. Steven M. Salky of

Zuckerman Spaeder LLP, on behalf of Respondent Howard by letter of January 18, 2007

2

(Salky January 18 letter) requested that I recuse myself from any proceeding against Mr.

Howard. The Salky January 18 letter also adopts arguments submitted by the Downey

December 18 letter and the Downey and Krakoff January 12 letters as well as Mr.

Howard's Motion to Require the Director of OFHEO to Pursue His Notice of Charges

against Mr. Howard in the United States District Court for the District of Columbia

(Howard Motion).

Mr. Krakoff submitted an affidavit dated January 24, 2007 (Krakoff Aff.) with

exhibits pursuant to The Administrative Procedure Act, (APA) 5 U.S.C. 556(b), in

support of his demand that I recuse myself and also stated in a cover letter of the same

date that he intended to petition the U.S. Court of Appeals for the District of Columbia

for a writ of mandamus disqualifying me if I did not recuse myself by January 29, 2007.

Neither Mr. Salky nor Mr. Howard have submitted an affidavit on behalf of Mr. Howard.

OFHEO has not filed in this forum any substantive response to the letters and affidavits

seeking my recusal.

On February 7, 2007, OFHEO filed a Motion for Referral to the Director moving

to refer the Downey Aff. on behalf of Mr. Raines and the Krakoff Aff. on behalf of Ms.

Spencer to me for consideration. ALJ Moran signed an order on February 13, 2007,

directing that the letters from Respondents Raines and Spencer seeking my recusal be

referred to me.

Both Mr. Raines and Ms. Spencer have filed writs of mandamus with the Court of

Appeals for the D.C. Circuit to which OFHEO through counsel has responded. As of this

writing, the Court of Appeals has not issued a decision.

3

# DISCUSSION

## Procedural Prerequisite

Under the APA, the proper procedure to request the presiding employee to disqualify himself is to submit a timely and sufficient affidavit of personal bias or other disqualification. 5 U.S.C. § 556(b). I find that Respondents Raines and Spencer have met this procedural requirement.

Neither Respondent Howard nor his counsel has submitted the required affidavit. Instead, Mr. Howard's counsel requested in the Salky January 18 letter to adopt the arguments of Respondents Raines and Spencer as well as the arguments made in the Howard Motion. Mr. Howard raises several arguments in that motion, in addition to arguments regarding my alleged bias. Because Mr. Howard did not submit an affidavit in the administrative matter as required by the APA at 5 U.S.C. § 556(b), and because I do not find that the adoption of facts and arguments constitutes a sufficient affidavit under the APA, I am not obliged to address any of the arguments he made in a motion before the U.S. District Court. Nevertheless, for the sake of equity and completeness, I have addressed the facts and arguments in the Howard Motion with regard to my alleged bias.

## Legal Standards for Recusal of Decision Maker

Respondents allege that statements I made in the course of performing my duties prior to the hearing of this matter show that I have prejudged the outcome. They allege that I am therefore unfit to perform my role as an unbiased decision maker after the hearing. The Respondents further allege that my failure to recuse myself is tantamount to an unconstitutional denial of due process of law.

4

The ostensible conflict Respondents claim disqualifies me as decision maker is simply the nature of administrative law. Respondents have the burden to prove their claims of unconstitutional bias. Withrow v. Larkin, 421 U.S. 35, 47, 52 (1975). "The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication . . . must overcome a presumption of honesty and integrity in those serving as adjudicators . . . ." Id. at 47. The burden of proof in establishing a disqualifying interest lies with the party making the assertion. Schweiker v. McClure, 456 U.S. 188, 196 (1982). Courts have recognized situations in which there is a significant risk of bias in the decision maker such as where he has a pecuniary interest in the outcome, or where the decision maker has been the target of personal abuse or criticism from a party before him. Withrow, 421 U.S. at 47. See also, Amos Treat & Co. v. SEC, 306 F.2d 260, 267 (D.C. Cir. 1962) (member of an investigative or prosecuting staff may not participate in decision making as well); Trans World Airlines v. Civil Aeronautics Board, 254 F.2d 90, 91 (D.C. Cir. 1958) (one who has appeared on behalf of a party to the litigation cannot later participate in decision making process). However, Respondents do not raise the kind of allegations recognized by these cases. Rather, Respondents claim that I am biased because I have prejudged this case. For evidence Respondents rely primarily on statements I have made to Congress and to the press.

The test for disqualification of a decision maker is to determine whether the decision maker was "not capable of judging a particular controversy fairly on the basis of its own circumstances." Hortonville Joint School District v. Hortonville Educational Association, 426 U.S. 482, 493 (1976)(citations omitted); United States v. Morgan, 313

5

U.S. 409, 421 (1941); <u>NEC Corp. v. United States</u>, 151 F.3d 1361, 1373 (Fed. Cir. 1998);

<u>Bender v. Dudas</u>, 2006 WL 89831, *15 (D.D.C. Jan. 13, 2006) (No. Civ. A. 04-1301).

The Supreme Court has stated this test can be met by showing the decision maker's mind

is "irrevocably closed." <u>FTC v. Cement Institute</u>, 333 U.S. 683, 701 (1948); <u>see</u> <u>also</u>

<u>Bender v. Dudas</u>, 2006 WL 89831 at *15 (citing <u>FTC v. Cement Institute</u>). While agency

officials are required to consider objectively all evidence in good faith, they need not be

subjectively impartial. <u>Carolina Environmental Study Group v. United States Atomic</u>

<u>Energy Comm'n</u>, 510 F.2d 796, 801 (D.C. Cir. 1975).

    In <u>Cinderella Career and Finishing Schools Inc. v. FTC</u>, 425 F.2d 583 (D.C. Cir.

1970) the Court of Appeals for the District of Columbia Circuit described the test as

whether a "disinterested observer may conclude that the decision maker has in some

measure adjudged the facts as well as the law of a particular case in advance of hearing

it."[1] <u>Id.</u> at 591.

    All three Respondents cite <u>Cinderella</u>, in which the Court decided the decision

maker should have recused himself based in part, on a speech he made, as precedent for

my own recusal. However, the facts in that case bear no resemblance to the record in this

matter and merit some discussion. In <u>Cinderella</u>, the Federal Trade Commission (FTC)

brought an action against the Cinderella School for claims of unfair and deceptive

advertising. A full record was developed and a hearing examiner held a series of

---

[1] The standard of review in the Court of Appeals for the District of Columbia Circuit is significantly
higher. The Court of Appeals will overturn an adjudicator's decision not to recuse "only where he has
demonstrably made up his mind about important and specific factual questions and is impervious to
contrary evidence." <u>Power v. Federal Labor Relations Authority</u>, 146 F.3d 995, 1001-1002 (D.C. Cir.
1998) <u>quoting</u> <u>Metropolitan Counsel of NAACP Branches v. FCC</u>, 466 F.3d 1154, 1164-65 (D.C. Cir.
1995). The Court of Appeals reviews such a decision under the deferential abuse of discretion standard.
<u>Metropolitan Counsel</u>, 466 F.3d at 1165. <u>See also</u> 32 Charles Alan Wright and Arthur R. Miller <u>Federal
Practice and Procedure</u> § 8258 (2007) (citing <u>Power</u> and noting that courts are loath to review decisions of
the agency and therefore the standard is substantial).

hearings and wrote a lengthy opinion dismissing the charges. Complaint counsel appealed the decision to the full Commission, which reversed the hearing examiner in large part and entered an order against the Cinderella school. The Cinderella school appealed to the Court of Appeals. Cinderella, 425 F.2d at 584.

The first distinction between Cinderella and the circumstances before me is the timing of the allegations of bias. The Court of Appeals reviewed the record developed and compared the merits of the case to the actual decision of the allegedly biased official. It is certainly easier to identify bias after a decision has been made. In the above captioned matter, the parties have not yet developed a full record, nor is there any preliminary decision by the ALJ as hearing examiner. The allegations of bias at this juncture in the proceeding are merely speculation about what I might do, unlike in Cinderella, where the decision was based on what the decision maker did do.

The second distinction is that the decision makers in Cinderella made it clear that they were defying the procedural requirements of their review of the hearing examiner's decision by stating that they would not even consider certain evidence, and that they were reviewing other evidence de novo rather than evaluating whether the hearing examiner's decision was supported by the record. Id. at 585.

The third distinction is that the FTC chairman in Cinderella made the speech at issue at the exact time the decision was before him. In this matter, the decision will not be before me until 2008. In the interim, the Respondents will no doubt present evidence in their defense for the ALJ and then for me to consider.

The last and most significant distinction is the troublesome history of the chairman in Cinderella. In addition to the decision in Cinderella, the Court of Appeals

7

for the District of Columbia Circuit previously ruled that the chairman should have

recused himself in another matter, Texaco v. FTC, 336 F.2d 754 (D.C. Cir. 1964). Two

years later the Court of Appeals for the Sixth Circuit also ruled that the same chairman

should have recused himself in yet another matter. American Cyanamid Co. v. FTC, 363

F.2d 757 (6th Cir. 1966). Thus, before the Cinderella decision, the same chairman had

disregarded the standards and decisions of two different courts. Cinderella, 425 F.2d at

591 (expressing the hope that this is the last time the Court has to "travel this wearisome

road"). Therefore, the Cinderella case is an example of the extreme circumstances

necessary to justify disqualifying a decision maker based on bias. Such circumstances do

not exist in this matter.

     I note that the Respondents also claim that I was able to "hand-pick" the ALJ who

will preside over the hearing. Krakoff Aff. ¶ 12; Howard Motion n. 7. This is a

misunderstanding of my power. OFHEO requested OPM to assign an ALJ for this

enforcement proceeding. As the request letter that is part of the record in this matter

shows, OFHEO did not ask for any particular ALJ. I had no influence whatsoever over

which ALJ OPM assigned.


**Response to Alleged Bias Presented by Respondents**

     The Respondents have raised several different statements I have made to support

their allegations of bias. I have considered all of the arguments raised. A discussion of

the allegations follow.

<u>Statements to Congress</u>

All three Respondents cite a June 6, 2006 prepared statement to Congress in which I was called to describe the results of the Special Exam. Downey Aff. ¶ 17.c.; Krakoff Aff. ¶ 14; Howard Motion at 6. The prepared statement was a description of what the Special Exam uncovered at Fannie Mae based on the information I knew at the time. That statement did not reflect a prejudging of the above captioned case, which had not yet been filed.

Mr. Howard also includes a quote from my testimony before the Senate Committee on Banking, Housing and Urban Affairs on June 15, 2006, to show that I am biased: " '[t]o me, it's not just accounting fraud here. This is mismanagement of the company.' " Howard Motion at 6. In response, first, in connection with both statements I was obliged to appear before Congress. Second, as a witness at a Congressional hearing I was also bound to tell the truth when asked by Senator Martinez about management at Fannie Mae. <u>See</u> OFHEO's Report of the Special Examination of Fannie Mae: Hearing Before the S. Committee on Banking, Housing and Urban Affairs, 109th Cong. 82-84 (2006) (providing the full context for the remark). Third, I qualified the statements as my opinion which shows that I do not consider it to be irrefutable truth, merely what I had reason to believe based on the findings of the Special Exam Report. Last, at that hearing I was seated next to SEC Chairman Christopher Cox and made this remark after Chairman Cox testified about Fannie Mae's accounting fraud. In addition, Senator Martinez used the term "accounting fraud" in his questions to me at that hearing. Taken in this context, my use of the term fraud is neither remarkable nor evidence of bias.

9

04/05/2007 THU 15:43 FAX 2024143823    ☑015/025

The fact that I expressed an opinion prior to the hearing and presentation of evidence by both sides does not disqualify me as decision maker. FTC v. Cement Institute, 333 U.S. at 700-701; Carolina Environmental Study Group, 510 F.2d at 801. The Supreme Court has expressly stated that the fact that decision makers have entertained views as a result of ex parte investigations that preceded the hearing of a matter does not mean that their minds are irrevocably closed on the subject. FTC v. Cement Institute, at 701. The Court went on to note that if opinions expressed in Congressionally mandated reports disqualified agency officials from acting on prohibited practices, then the purpose of Congress in creating the agency and its laws would be frustrated. Id. at 702.

Public Speech

The Krakoff Affidavit and the Howard Motion also reference my remarks to the American Enterprise Institute, a private, non-partisan, not-for-profit organization, on September 13, 2006. Krakoff Aff. ¶ 16; Howard Motion at 6. I said that we need to send a strong message about mismanagement and, as the SEC says it — fraud committed by the former management.' " It is very clear from the quote that my use of the word "fraud" is a reference to the SEC's label for the behavior. As with the other instances cited by Respondents in their affidavits, I do not believe my statement overcomes the presumption that I will be able to consider all the evidence in the matter before me, or that it shows that my mind is irrevocably closed to evidence that will be presented. As the District of Columbia Circuit has noted, "contacts between agencies and the public are the 'bread and butter' of the process of administration and are completely appropriate so long as they do

10

04/05/2007 THU 15:43 FAX 2024143825    ☒016/025

not frustrate judicial review or raise serious questions of fairness." <u>Louisiana Assoc. of</u>

<u>Independent Producers and Royalty Owners v. FERC</u>, 958 F.2d 1101, 1113 (D.C. Cir.

1992).


### Statements to the Press

The Respondents point to various statements I have made to the press regarding

the Special Exam Report and Notice of Charges as evidence of prejudgment and bias

throughout their affidavits. Many of the statements quoted by Respondents represent

only my descriptions of the charges, not my opinion. They are not examples of

prejudgment, but examples of factual recitations of agency findings which gave OFHEO

reason to believe further action was necessary. In <u>Cinderella</u> the court noted that

agencies acting in the public interest have a duty to alert the public when they have

reason to believe respondents have violated the law and that these types of press releases

do not justify disqualifying the decision maker. <u>Cinderella</u>, 425 F.2d at 590. In those

statements where I expressed an opinion or position, such statements are not enough to

disqualify me as decision maker. <u>Withrow</u>, 421 U.S. at 50 ("We cannot say that the mere

fact that a tribunal has . . . taken a public position on the facts, is enough to place that

tribunal under a constitutional inhibition to pass upon the facts in a subsequent hearing.").

Indeed,

> officers charged by Congress with adjudicatory functions are not assumed
> to be flabby creatures any more than judges are. Both may have an
> underlying philosophy in approaching a specific case. But both are
> assumed to be men of conscience and intellectual discipline, capable of
> judging a particular controversy fairly on the basis of its own
> circumstances.

04/05/2007 THU 15:42 [TX/RX NO 8718] ☒016

04/05/2007  THU 15:43  FAX 2024143823                                    ☒017/025

United States v. Morgan, 313 U.S. 409, 421 (1941).   Specific examples of the

Respondent's arguments with respect to statements that I have made follow.

The Downey and Krakoff Affidavits point to two different May 23, 2006 press

releases accompanying the Special Exam Report in which I described its contents.

Downey Aff. Ex. 8; Krakoff ¶ 8. The Special Exam Report did make the findings

described in those OFHEO press releases. As Director, the law allows me to express the

opinion that Fannie Mae management undermined internal controls and manipulated

earnings. Cement Inst., 333 U.S. at 702-703 (observing that judges express opinions

about what conduct is and is not lawful before sitting in judgment and often decide the

same case more than once).

The Downey Affidavit and the Howard Motion use a December 18, 2006 press

release as an example of my alleged bias by quoting paragraphs of the press release

starting with, " '[t]he Notice of Charges details the harm to Fannie Mae resulting from

the conduct of these individuals from 1998 to 2004. The 101 charges reveal how the

individuals improperly manipulated earnings to maximize bonuses . . . . The Notice

explains how they submitted six years of misleading and inaccurate accounting

statements . . . .' " Krakoff Aff. ¶ 17; Downey Aff. ¶ 17.d; Howard Motion at 6.

However, it is evident from the wording of the press release that it is meant as a summary

of the charges, not necessarily my own opinion. It is in the nature of running a federal

regulatory agency that one must sometimes litigate suspected infringement of the laws

one is charged to enforce. If the head of the agency did not believe there was good cause

to bring the charges, he or she would be acting in bad faith. Whether there is a good faith

belief at the onset of enforcement proceedings is a very different question from the one

04/05/2007 THU 15:42 [TX/RX NO 8718]  ☒017

that will be before me in a year's time. The nature of a notice of charges is that the

charges have not yet been proven. Many documents will change hands between OFHEO

and the Respondents and evidence will be presented to ALJ Moran before I am asked to

review his decision. The fact that I allowed the enforcement action to go forward does

not mean that I have prejudged the outcome and will not be able to review the evidence

presented without bias.

　　Similarly, a quote from an article in the New York Times, December 19, 2006,

used in the Howard Motion and the Krakoff Affidavit, is that, "we believed as an agency

that these three individuals, separately and together, did serious harm . . . ." and that there

is a long list of charges that show harm done. Krakoff Aff. ¶ 18; Howard Motion at 7.

The statement is not one of fact, but a statement of belief in fact. Without a good faith

belief in some wrong doing there would be no reason for OFHEO to have brought

charges. This statement, like the others, does not foreclose the possibility of fairly

considering contrary evidence.

　　The Krakoff Affidavit cites a December 7, 2006 article in the Washington Post

that appeared shortly after OFHEO announced that it would be filing an enforcement

action against the Respondents. I was quoted in the article as saying that the

Respondents, " 'grossly mismanaged' Fannie Mae, 'underspent dramatically on systems,

internal controls, risk management – all the good building blocks of a good corporation'

and went 'beyond mismanagement to manipulate earnings.' " Krakoff Aff. ¶ 13. The

quoted words represent an explanation of why OFHEO chose to file charges. As Director

of OFHEO, I am responsible for enforcing the law regarding the safety and soundness of

the government sponsored enterprises that OFHEO regulates. 12 U.S.C. § 4513. I am

therefore called upon to express opinions about whether certain activities violate that law or not.  Expressing such an opinion does not disqualify me from my role as decision maker after a hearing of the matter.  The Supreme Court has noted that even a federal judge would not be disqualified in such an instance and that heads of agencies have a lower burden to meet than federal judges.  Withrow, 421 U.S. at 48;  Carolina Environmental Study Group, 510 F.2d at 801.

Mr. Krakoff also relies on stories in the press that quote me from a conference call with the press on the day OFHEO filed the charges.  Krakoff Aff. ¶¶ 19-20.  In one instance I am describing the charges that were filed including OFHEO's allegation that the Respondents knowingly neglected accounting systems and internal controls, and in the other I am describing the role of OFHEO as a regulator, that we had no choice but to file these charges and that we have to send a message that the kind of activities alleged in the charges will not be tolerated.  See Cement Inst., 333 U.S. at 702-703 (finding that expressions of what behavior is not legal is not a bar to decision making in the adjudicatory process).  Neither of these statements proves that I would be unable to judge this case fairly after being presented with a complete record.

The Downey Affidavit posits that statements I made during my appearance on the Jim Lehrer Online News Hour are examples of my prejudgment and bias.  I stated that the $52 million dollars in bonuses that Mr. Raines received was fraudulently attained; but as my words make clear, I was quoting the SEC: " 'they were basically fraudulently attained, as the SEC said today.' "  Downey Aff. ¶ 17.a.  In that same example I stated regarding disgorgement of that salary: " 'If the company fails, we will do it.' "  Id.  That

14

04/05/2007 THU 15:44 FAX 2024143823                                                    ☒020/025

factual statement of OFHEO's intent does not overcome the presumption that I will be able to review the ALJ decision with honesty and integrity and with an open mind.

Exhibit 20 to the Downey Affidavit is an article from <u>Mortgage Banking</u> titled "The New OFHEO Chief." I was quoted from an interview as expressing my preliminary opinion that " 'in my view,' " Fannie was mismanaged to be able to maximize bonuses. As noted above, the law does not prohibit me from expressing an opinion. A decision maker can both hold and publicly express strong views and those views do not make him unfit as a decision maker. <u>Morgan</u> 313 U.S. at 421. In addition, the fact that I added the qualifier "in my view" means that I recognized then, as I do now, that my opinion is not an absolute truth. My mind is not irrevocably closed. Mr. Downey does not include the hypothetical question that preceded the second part of the excerpt he used. I was asked "[i]f it proves true, that's criminal, right?" That question preceded my answer, " '[t]he SEC says its [sic] fraud and I cannot disagree with them.' " Downey Aff. Ex. 20 at 2. The interviewer was seeking the expertise of a regulator and I provided it. Because my statement was a response to a hypothetical question, the statement does not speak directly to the prejudgment and bias alleged by Respondents.

The Howard Motion uses three examples from my appearance on C-SPAN, May 23, 2006, the day of the press conference announcing the final Special Exam Report.[2] Each of these three examples represents my description of the content of the report, or evidence uncovered during the examination. However, even if these remarks did

---

[2] " 'When things went bad they did some accounting t[r]icks .... But the whole story here was there was incredible arrogance, unethical activity, by the senior management and in particular this report talks about Franklin Raines and the CFO but also many other people in the organization.' " Howard Motion at 5. " 'As you will read in the Special Examination Report, senior Fannie Mae executives were precisely managing earnings ....' " Howard Motion at 5. " 'Actually their actions were much more much worse than foolish, they were flat-out wrong. Or to use the proper regulatory phrase, they were managing Fannie Mae in an unsafe and unsound manner.' " Howard Motion at 6.

04/05/2007 THU 15:42 [TX/RX NO 8718] ☒020

04/05/2007 THU 15:44  FAX 2024143825                                    ☒021/025

represent my opinion, that does not show that my mind is closed to any new evidence.

Withrow, 421 U.S. at 47.

A quote from the day the Notice of Charges was issued, December 18, 2006, cited by the Howard Motion and the Krakoff Affidavit, contains my statement that we have no choice but to send a message to management that this kind of activity cannot be allowed.[3] The import of this quote actually contradicts the assertion of bias. Implied in this quote is that whether or not "this kind of activity" did actually take place, OFHEO as a regulator needs to send a message that it cannot be allowed. This quote specifically leaves open the possibility that this kind of activity did not take place.

### Other Allegations

The Respondents make other allegations that, upon my full consideration, are not relevant to their request that I recuse myself. Examples follow.

The Downey Affidavit stated that the Notice of Charges in this matter contradict the 2003 OFHEO Report to Congress, Downey Aff. ¶ 4, and that the Special Exam Report mentioned Mr. Raines only eight times compared to others who were mentioned more extensively but not named in the Notice of Charges. Downey Aff. ¶ 5. The Downey Affidavit also claims that the consent decree entered into between OFHEO and Fannie Mae is unfair because Mr. Raines did not get notice that Fannie Mae was agreeing that Mr. Raines would no longer work for Fannie. Downey Aff. ¶¶ 15-16. None of these points is relevant to whether I have prejudged the outcome of the matter or am biased.

---

[3] " 'This activity was so unsafe and unsound that we have to take this action. We have no choice, really. We have to send a message to the management . . . both present and previous, that this kind of activity cannot be allowed.' " Krakoff Aff. ¶ 20; Howard Motion at 7.

04/05/2007 THU 15:42 [TX/RX NO 8718] ☒021

Mr. Downey argues that differences in the Special Exam Report and the report commissioned by Fannie Mae and authored by Warren Rudman (Rudman Report) prove my inability to fairly decide this matter. Downey Aff. ¶¶ 7-11, 14. The differences do not prove that I have prejudged the facts and law in this case. First, the Special Exam was completed before I started as Acting Director of OFHEO in April 2006. I did not draft the Special Exam Report. Rather, the OFHEO staff members who were familiar with the evidence drafted it. The substance of the report was also completed before I began at OFHEO. Only editing remained to be done before its release in May. Second, using the same evidence of differences between the Rudman Report and the OFHEO Report, one could just as easily conclude that the authors of the Rudman Report were biased. Arguably, because Fannie Mae was paying for the Rudman Report, those who worked on it had an actual predisposition to favor Fannie Mae. Nevertheless, the differences between these two reports are not relevant to whether I should be disqualified as decision maker.

Mr. Downey further asserts that I have used the alleged malfeasance of the Respondents as a means to further my legislative agenda. Downey Aff. ¶ 18. I note that most of the legislative provisions regarding the government sponsored enterprises pending in Congress do not concern matters of alleged mismanagement of Fannie Mae. Further, whether or not true, pushing or not pushing a legislative agenda is not relevant to whether I am able to consider evidence in an enforcement proceeding with an open mind. This claim I also find irrelevant to the issue of my recusal.

Mr. Downey and Mr. Krakoff also make reference to the partial conclusion of the Department of Housing and Urban Development Inspector General Report (IG Report)

17

that OFHEO as an agency was biased against Fannie Mae and Mr. Raines.  Downey Aff.

¶ 19; Krakoff Aff. ¶¶ 3, 23-27.  I was not employed at OFHEO in 2004 when the IG

Report was issued, so that report is irrelevant to the matter of my recusal.  Mr. Krakoff

also cites the analysis of the Washington Post, the New York Times, and a professor at

the University of Texas Law School about why OFHEO brought these charges.  Krakoff

Aff. ¶ 22.  The opinions of these third party commentators are not pertinent to my alleged

bias.

## CONCLUSION

I have carefully considered all the evidence and arguments raised by all three

Respondents as well as the relevant law on the subject and I am satisfied that I should not

be disqualified as the decision maker in this matter.  None of the statements used by

Respondents, as discussed above, has overcome the presumption of my integrity and

honesty by showing that I have prejudged the factual or legal issues of this case or that

my mind is irrevocably closed.  Schweiker, 456 U.S. at 195; Withrow, 421 U.S. at 47;

Morgan, 313 U.S. at 421.  For instance, none of the evidence the Respondents offer has

any bearing on whether I have formed a conclusion about the legal issues of whether the

Respondents failed to ensure proper documentation for debt buybacks (Notice of

Charges- Fourth Claim) or whether Respondents caused inaccurate minimum capital

reports to be submitted to OFHEO in 1999 (Notice of Charges- Thirty-Seventh Claim) or

whether Respondents failed to correct Fannie Mae's accounting policies, practices and

systems with respect to dollar roll accounting (Notice of Charges- Eighty-Eighth Claim)

or any of the dozens of other charges of the 101 alleged in the Notice of Charges.  See

18

Lead Industries Ass'n v. EPA, 647 F.2d 1130, 1178 (D.C. Cir.) cert denied, 449 U.S. 1042 (1980) (holding in part that decision maker could not be disqualified because there was no evidence that he had prejudged any of the legal questions in a rulemaking). Respondents have offered no evidence that I have prejudged either the facts or the law involved in this case. They therefore have not met the burden set out in Cinderella to show both. Cinderella, 425 F.2d at 591.

Furthermore, the Respondents cannot have evidence of actual bias because I have not yet made a decision. ALJ Moran has not made a recommended decision or forwarded the record, and will not do so until after the hearing of the matter on March 18, 2008. Thus, the claims of bias are speculative at this juncture. Indeed, when I do receive the recommended decision of ALJ Moran, I am not at liberty to dismiss it or ignore evidence or the factual determinations of the ALJ who was present at the live testimony of witnesses. Id. at 587-588.

Moreover, having reflected on my statements regarding Respondents' management of Fannie Mae I believe that I have acted and spoken with the single intent of ensuring the safety and soundness of that government sponsored enterprise and without any animus towards Respondents or prejudgment of the legal and factual questions which ALJ Moran will eventually forward to me. I am capable of judging this matter with honesty and integrity based on the specific evidence and law in the record that will be developed.

For the foregoing reasons, after giving full consideration to the arguments of the Respondents, I conclude that neither the facts nor the law support Respondents' arguments that I have prejudged the above captioned matter or that I am predisposed to

19

rule against them.  A disinterested observer would not conclude that I had prejudged the

facts and the law of this case or that my mind is irrevocably closed.  Therefore, I decline

to recuse myself.  This decision shall be made a part of the record in this matter.


_James B. Lockhart III_
James B. Lockhart III
Director,
Office of Federal Housing Enterprise Oversight


Dated:  April 5, 2007

APR-11-2007 11:49 FROM:                                    TO:98228106                    P.2/20

UNITED STATES OF AMERICA

OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

| | |
|---|---|
| In the Matters of | ) |
| | ) |
| Franklin D. Raines | ) |
| | )    Notice No. 2006-1 |
| J. Timothy Howard | ) |
| | ) |
| Leanne G. Spencer | ) |
| | ) |
| | ) |
| Respondents. | ) |

## Order Regarding Respondents' Motion for Entry of Protective Order

Respondents have filed a Motion for Entry of a Protective Order. The Court has considered all responses to the Motion, the last being OFHEO's Surreply to the Respondents' Reply Memorandum. The issues remaining in contention have been identified and they pertain only to Paragraphs 1(c) and 4 from OFHEO's proposed version of the protective order. They involve the appropriateness of OFHEO seeking "a confidentiality designation for any privileged documents that OFHEO is compelled or elects to disclose" and whether OFHEO possesses "the privileges identified in Paragraph 1(c) of the proposed protective order." OFHEO Surreply at 1. Respondents collectively agree with this characterization, noting that the above cited paragraphs are the only ones remaining in issue. Respondents have issues with "OFHEO's insistence that the definition of 'Confidential Information' include materials that OFHEO will produce but as to which it contends that it *could have* asserted various purported privileges." Respondents' Reply at 1. (emphasis in original).

To be precise, the contention revolves around the definition OFHEO seeks for "Confidential Information." OFHEO would define this to "include documents that are privileged pursuant to various privileges, including, but not limited to, the examination, deliberative process and bank supervisory privileges, even if either such documents may be or have been in the hands of third parties (such as examination reports and workpapers) or such documents were produced subject to a Protective Order in other litigation." Respondents' Reply at 2. Respondents argue that this proposed language blurs the distinction between privileges with confidentiality. Respondents contrast the two, suggesting that a protective order is the tool to apply where a privilege is not available and they view the protective order "by its very nature" as pertaining to documents that have been disclosed.

Further, Respondents submit that OFHEO's approach would create "nonsensical practical consequences." As they see it, by permitting OFHEO to raise a privilege claim *after* the document has been disclosed, this has the effect of thereby effectively reviving a confidentiality claim for which OFHEO missed the opportunity to assert. *Id.* at 3. Thus, according to the Respondents, the prior production should foreclose OFHEO not only from a back-door opportunity to assert confidentiality but from any privilege claim as well, as the production itself demonstrates that the documents were not privileged or, even if they were, disclosure means that a litigant has knowingly decided that the privilege was not worth pursuing. *Id.* The same problem manifests itself with OFHEO's proposed Paragraph 4 for the Protective Order, because it too allows a privilege claim to be inappropriately asserted. Respondents suggest that, under their alternative, the question of whether a privilege has been waived can be litigated later, after OFHEO has identified the documents in dispute through its privilege log. The Respondents believe that its approach will stop OFHEO from circumventing the law governing the *waiver* of privileges. *Id.* at 5.

In its Surreply, OFHEO notes that it is recognized that it may assert various privileges, such as the deliberative process privilege. It contends that any protective order must acknowledge the existence of such privileges, a point distinct from a court's ruling on an asserted privilege as to a particular document. As it describes it, any protective order "must recognize the governmental privileges that OFHEO may assert in order to protect OFHEO's ongoing examination and supervisory work with the regulated Enterprises and to preserve relevant, but sensitive documents and information, while ensuring that the issues raised in the administrative enforcement action may be fully and fairly adjudicated." OFHEO Surreply at 2. OFHEO correctly observes that the Rules of Practice and Procedure provide that "privileged documents are not discoverable. Privileges include the attorney-client privilege, work-product privilege, any government's or government agency's deliberative process privilege and any other privileges provided by the Constitution, any applicable act of Congress, or the principles of common law." 12 CFR § 1780.26(d). OFHEO also points out that, pursuant to 12 U.S.C. § 4517, "the Director and each OFHEO examiner shall have the same authority and be subject to the same disclosures, prohibitions, obligations, and penalties as are applicable to examiners employed by the Federal Reserve banks. OFHEO Surreply at 3. Included among these are the "examination privilege," and the "deliberative process privilege." These privileges are important because they involve the important considerations of intra-agency candidness as well as openness between an agency and the regulated entity.

Although OFHEO acknowledges that, for purposes of smoothing the progress of litigation, it has at times produced documents for which a privilege could apply, it did so both with the understanding that the documents were still considered confidential and without surrendering its claim of any applicable privileges. OFHEO Surreply at 7. OFHEO maintains that while it has agreed to produce documents which it contends fall within one or more such privileges, that production is not intended to waive the confidentiality of such documents, and it believes that its proposed language for Paragraph 1(c) accomplishes that intent. In sum, OFHEO asserts that it is important that documents issue "be kept confidential in order to protect sensitive information therein, and to safeguard the continued open lines of communication within the agency, and between agency and regulated entities." OFHEO Surreply at 8.

The Court notes that there are salutary and less-than-salutary reasons for parties in litigation to assert confidentiality claims. In this instance, the basis for OFHEO's general concerns about confidentiality fall into the salutary category, for the substantial and important reasons it identified in its Surreply. It must also be said that there is an element of strategy involved on the part of the Respondents and that their protestations over OFHEO's proposed language are not simply about

their pedantic concern over the principle that confidential information should not conflated with privilege claims. Rather, the underlying purpose seems to be to prevent OFHEO from trying to assert limits on the use of information which it has already disclosed, whether the claim for such a limit stems from a privilege or confidentiality claim. The Court will not base its decision on such grounds, nor will it engage in trying to unravel whether documents were disclosed subject to any understanding that they were to be kept confidential or the terms of any such understanding.

The importance of confidentiality to the effective operation of OFHEO is undeniable and that is determinative for this ruling. Accordingly, the Court adopts the language proposed by OFHEO and denies the version presented by Respondents in their Motion.

**So Ordered.**

_William B. Moran_
William B. Moran
United States Administrative Law Judge

Dated: April 11, 2007
Washington, DC

Attachment: signed copy of Pretrial Protective Order.

3

APR-11-2007 11:49 FROM:                                TO:98228106                P.5/20

In the Matter of Franklin D. Raines, J. Timothy Howard, Leanne G. Spencer
Notice No. 2006-1

## CERTIFICATE OF SERVICE

I certify that a true copy of the **Order Regarding Respondents' Motion for Entry of Protective Order,** dated April 11, 2007 was sent in the following manner to the addressees listed below:

Copy by Regular Mail and facsimile to:

**OFHEO:**

David A. Felt, Esq.
Deputy General Counsel
Office of Federal Housing Enterprises Oversight
1700 G Street N.W.
Washington, D.C. 20552

Joseph Aronica, Esq.
Duane Morris, LLP
1667 K St. N.W.
Washington, DC 20006

**Respondents**

Steven Salky, Esq.
Eric Delinsky
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(*Counsel for J. Timothy Howard*)

David Krakoff, Esq.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, NW
Washington, DC 20006
(*Counsel for Leanne G. Spencer*)

Kevin Downey
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(*Counsel for Franklin Raines*)


Washington, DC
April 11, 2007

*Maria Whiting-Beale for*
Knolyn R. Jones
Legal Assistant

4

APR-11-2007 11:50 FROM:                          TO:98228106                P.6/20

# UNITED STATES OF AMERICA
## OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

| | |
|---|---|
| In the Matter of: | Notice Number 2006-1 |
| FRANKLIN D. RAINES, | Judge William B. Moran |
| J. TIMOTHY HOWARD, | |
| LEANNE G. SPENCER, | |
| Respondents. | |

## PRETRIAL PROTECTIVE ORDER

IT IS HEREBY ORDERED that the following procedures shall govern the production of confidential documents, testimony, discovery materials, and other information in the matter captioned above:

### Definitions

1.      The following definitions shall apply to this Stipulated Protective Order ("Protective Order"):

a.      : "Proceeding" shall refer to the above-captioned proceeding.

b.      The term "Discovery Material" encompasses documents as defined in 12 C.F.R. 1780.26, including but not limited to: any type of written materials, transcripts of testimony, any taped, recorded, filmed, electronic, written or typed matter, including the originals and all marked copies, whether different from the originals by reasons of any notation made on such copies or otherwise; all deposition testimony; , and document requests, including all responses thereto; any physical objects or other items or any other information gained by inspection of any tangible thing, including data or code stored in electronic form.

c.      "Confidential Information" shall mean Discovery Material which a party (i) takes reasonable precautions to maintain the confidentiality of the material, and (ii) in good

DMI 76097 4

faith believes constitutes confidential information that is used by it, or pertaining to, trade secrets, financial information, personal privilege or other personal information, or which information is not generally known and which that party would normally not reveal to third parties, or if disclosed, would require such third parties to maintain in confidence. "Confidential Information" shall include documents that are privileged pursuant to various privileges, including, but not limited to, the examination, deliberative process and bank supervisory privileges, even if either such documents may be or have been in the hands of third parties (such as examination reports and workpapers) or such documents were produced subject to a Protective Order in other litigation. Except as provided above, "Confidential Information" shall not include documents or information that (i) is at any time independently developed without use of or reliance upon any of the producing party's Designated Discovery Material; (ii) is rightfully acquired from an independent source, without restrictions as to use or obligations as to confidence; (iii) was, prior to disclosure, rightfully in the possession or knowledge of the requesting party; (iv) is publicly available in substantially the same form in which it was provided by the producing party claiming confidentiality; (v) is required by law to be made available to third parties; (vi) was, is or becomes public knowledge, not in violation of this Protective Order; or (vii) is voluntarily de-designated by the party producing the Discovery Material.

d.     "Highly Confidential Information" shall mean Discovery Material that counsel in good faith believes constitutes, contains or reveals (i) information that relates to an individual that is of a purely personal nature, (ii) non-public communications, discussions, deliberations, or analyses regarding senior executive hiring initiatives at the Executive Vice President level and above; (iii) non-public communications, discussions, deliberations, or

2

APR-11-2007 11:50 FROM:                                    TO:98228106              P.8/20

analyses regarding executive succession; (iv) internal, non-public communications, discussions, deliberations, or analyses regarding Board of Director succession or hiring initiatives; (v) information detailing competitively sensitive, non-public, compensation for non-officers, which, if made public, could put Fannie Mae at a competitive disadvantage; or (vi) information concerning Fannie Mae's proprietary portfolio methodologies, strategies, modeling, and formulae; or

      e.    "Confidential Legend" shall mean a stamp or similar insignia stating "Confidential" or "Highly Confidential."

      f.    "Designated Discovery Material" shall mean Discovery Material designated as "Confidential" or "Highly Confidential" pursuant to this Protective Order as well as the contents of such Discovery Material.

**Applicability**

2.    This Protective Order shall govern the parties' use of any Discovery Material produced in the Proceeding.

3.    This Protective Order shall be fully applicable to material produced by or depositions taken of third parties and non parties, and any third party or non party from whom discovery is sought shall be entitled to designate material and testimony produced as Confidential Information pursuant to the terms of this Protective Order.

4.    The parties expressly reserve and decline to waive any privilege that may be applicable to any "Confidential" or "Highly Confidential" documents that previously may have been provided by a party governed by this Protective Order or any "Confidential" or "Highly Confidential" document that may be furnished under this Protective Order.

DM1\760971 4

04/11/2007 WED 13:12 [TX/RX NO 8821] ⓐ008

5.    Nothing in this Protective Order shall be construed to require the production of any information, document or thing that a party contends is protected from disclosure by any applicable privilege.

6.    Discovery material produced in other litigation is subject to this Protective Order when used in this Proceeding.  Nothing in this Protective Order shall affect the use of such Discovery Material in the litigation in which it was originally produced.

Designation of Material

7.    Parties may designate any Discovery Material as Confidential Information in accordance with paragraph 1(c) herein, by applying to it the legend "Confidential" or "Highly Confidential." ("Designated Discovery Material") The legend shall be affixed in such a manner that the written material is not obliterated or obscured.  Any Discovery Material so designated shall thereafter be treated pursuant to the appropriate provisions of this Protective Order.  In the case of data stored in electronic form, the "Confidential" or "Highly Confidential" legend shall be printed on the cover or container of the disk, tape, or other medium in which the electronic form data is stored.  A party making Discovery Material available for inspection, however, shall not have to apply a "Confidential" or "Highly Confidential" legend to those materials until such time as a party requests copies, if that ever occurs.  During the period when Discovery Material is made available for inspection but not designated, it shall be treated as "Confidential."

8.    With respect to testimony or deposition transcripts, the producing party shall have twenty-one (21) days from the date upon which the testimony is given to designate said testimony or any portion thereof as "Confidential Information" or "Highly Confidential Information" within the meaning of this Protective Order.  In the event that a party intends to use portions or excerpts of transcripts prior to the expiration of the 21 day period, such party shall

4

give counsel for the deponent 48 hours to designate said testimony or any portion thereof as "Confidential Information" or "Highly Confidential Information" within the meaning of this Protective Order.

9.    In the event that a producing party inadvertently fails to designate material as "Confidential" or "Highly Confidential" or designates material at a lower level of confidentiality pursuant to this Protective Order at the time of the production, the party shall be entitled to make a correction. Such correction and notice thereof shall be made in writing as soon as practicable. The producing party, at their cost, shall also provide substitute copies of each item of Discovery Material, appropriately designated, to all parties who previously received the misdesignated material.    Those individuals who received the Discovery Material prior to notice of the misdesignation by the producing party shall within ten (10) business days of receipt of the substitute copies, destroy or return to the producing party all copies of such misdesignated documents.    Those individuals who reviewed the misdesignated Discovery Material prior to notice of the misdesignation by the producing party shall abide by the provisions of this Protective Order with respect to the use and disclosure of any information contained in the misdesignated Discovery Material after receipt of the notice of misdesignation.

10.    In the event a party produces two or more identical copies of a document and any such copy is designated with a lesser degree of confidentiality than any other copy or without any such designation, all such identical documents shall be treated in accordance with the most restrictive designation on any copy once the inconsistent designation is known. The producing party shall be responsible for informing the party receiving the inconsistently designated information of the inconsistent designation; provided, however, if any person subject to this Protective Order receives such inconsistently designated information, and has actual knowledge

5

of the inconsistent designation, the person shall treat all copies in accordance with the most restrictive designation.

### Disclosure and Use of Confidential Information

11.      Designated Discovery Material shall be treated in accordance with the terms of this Protective Order and is not to be communicated in any manner, directly or indirectly, to anyone other than the person qualified to receive such material under the terms and conditions set forth below.

12.      Any Designated Discovery Material, and the information contained in such material (including extracts and summaries derived from such material), shall be used solely for prosecuting and defending the Proceeding and shall not be used for any other purpose or be revealed to parties or counsel in any action or administrative proceeding other than the Proceeding, unless the Presiding Officer otherwise directs or the producing party otherwise agrees.

13.      Discovery Material designated as "Confidential" shall not be disclosed directly or indirectly by the person receiving such material to persons other than (i) persons identified in the documents or through testimony as already having seen or received such "Confidential" material (excluding persons whose prior access to such Confidential material was known by the disclosing party to be unauthorized) and (ii) the following persons, as to whom disclosure shall be limited to the extent reasonably necessary for the prosecution, defense, and/or appeal of the Proceeding:

      a.      The Presiding Officer or Director of OFHEO in the performance of his/her duties pursuant to 12 C.F.R. § 1780 *et seq.*, persons employed by the Presiding Officer, and the stenographers transcribing the testimony or

argument at a hearing, or deposition in the Proceeding or any appeal therefrom;

b.    Counsel for the parties in the Proceeding, whether or not counsel of record, including in-house counsel, associates, legal assistants, paralegals, secretarial and clerical employees, and outside services (including, without limitation, copy services, litigation consulting services, and graphics services) who are assisting counsel in the Proceeding and/or appeal of the Proceeding;

c.    Persons retained to assist the parties in the Proceeding and/or appeal, including but not limited to experts, consultants, accountants, statisticians, economists retained or employed by OFHEO, the Respondents and/or their respective counsel including their secretarial and clerical employees who are assisting in this proceeding provided that the requirements of Paragraph 16 below have been met;

d.    OFHEO and any party currently named or later joined in the Proceeding, including, in the case of parties other than individuals, their officers, directors, employees, and agents, solely for the purpose of assisting in this Proceeding and/or appeal of the Proceeding;

e.    Any person who is interviewed with respect to this Proceeding because counsel for either party believes in good faith such person may testify as a witness either at a deposition or a hearing in the Proceeding for the purpose of assisting in the preparation or examination of the witness, provided that the requirements of Paragraph 16 have been met;

7

APR-11-2007 11:51 FROM:                                          TO:98228106                    P.13/20

     f.    Any mediator appointed by the Presiding Officer or other individual acting pursuant to Presiding Officer appointment; and

     g.    Other persons upon further order of the Presiding Officer or written consent of the producing party.

14.    Except with the prior consent of the producing party or upon prior order of the Presiding Officer, Discovery Material designated as "Highly Confidential" shall not be disclosed directly or indirectly by the person receiving such material to persons other than (i) persons identified in the documents or through testimony as already having seen or received such "Highly Confidential" material (excluding persons whose prior access to such Confidential material was known by the disclosing party to be unauthorized) and (ii) the following persons, as to whom disclosure shall be limited to the extent reasonably necessary for the prosecution, defense, and/or appeal of the Proceeding:

     a.    The Presiding Officer or Director of OFHEO in the performance of his/her duties pursuant to 12 C.F.R. § 1780 *et seq*, persons employed by the Presiding Officer, and the stenographers transcribing the testimony or argument at a hearing or deposition in the Proceeding or any appeal therefrom;

     b.    Counsel for the parties in the Proceeding, whether or not counsel of record, including in-house counsel, associates, legal assistants, paralegals, secretarial and clerical employees, and outside services (including, without limitation, copy services, litigation consulting services, and graphics services) who are assisting counsel in the Proceeding and/or appeal of the Proceeding;

8

04/11/2007 WED 13:12 [TX/RX NO 8821] ☑013

     c.     Persons retained to assist the parties in the Proceeding and/or appeal, including but not limited to experts, consultants, accountants, statisticians, and economists retained or employed by OFHEO, the Respondents or their respective counsel , including their secretarial and clerical employees who are assisting in this proceeding, provided that the requirements of Paragraph 16 below have been met;

     d.     Respondents and OFHEO;

     e.     Any person who is interviewed with respect to this Proceeding because counsel for either party believes in good faith such person may testify as a witness either at a deposition or a hearing in the Proceeding for the purpose of assisting in the preparation or examination of the witness, provided that the requirements of Paragraph 16 have been met;

     f.     Any mediator appointed by the Presiding Officer or other individual acting pursuant to Presiding Officer appointment; and

     g.     Other persons upon further order of the Presiding Officer or written consent of the producing party.

15.     The undersigned attorneys, as well as their clients and any other personnel of their law firm or litigation support services assisting them in the Proceeding, agree to be bound by the terms of this Protective Order. Other than disclosure of Confidential Information and/or Highly Confidential Information at a deposition or hearing, persons described in subparagraphs 13 c, e, and g above, prior to being given access to any Confidential material, must be provided a copy of this Protective Order and sign the Acknowledgment attached as Exhibit A hereto agreeing to be bound by the terms of the Protective Order and agreeing to subject himself or herself to the

DM1.76097 4

jurisdiction of this tribunal for the purpose of enforcing the terms and conditions of this Protective Order. The Party providing the individual with Designated Discovery Material shall retain copies of all executed Acknowledgments. Said Acknowledgments will only be provided to the producing party as may be ordered by the Presiding Officer. As parties to the Proceeding are bound by Order to the terms of the Protective Order, they are not required to sign an Acknowledgment in order to receive Confidential material. Persons who receive Confidential material and/or Highly Confidential materials at a deposition or hearing who are not otherwise authorized to receive such information pursuant to paragraphs 13 and 14 above and who have not signed an Acknowledgment, may be shown and questioned about the Confidential and/or Highly Confidential materials during the deposition or hearing but will not be entitled to take possession of the Confidential material and/or Highly Confidential materials that were disclosed.

16.     If a party desires to file Designated Discovery Material with the Presiding Officer, whether separately or with or as part of pleadings or other filings, the party shall file the Designated Discovery Materials under seal if the producing party's consent, which shall not be unreasonably withheld, to the public filing of the materials has not been obtained. The Designated Discovery Material shall be filed in a sealed envelope or other appropriate container on which shall be endorsed the caption of this matter; the title of the filing or a brief description of the enclosed material; and the legend "Confidential" or "Highly Confidential."

17.     If or when Designated Discovery Material is ever used during any interview, deposition, hearing or other proceeding, other than during the evidentiary hearing, counsel for the parties shall take appropriate steps to preserve the confidential substance of the Designated Discovery Material, unless otherwise required by order of the Presiding Officer.

APR-11-2007 11:52 FROM:                                    TO:98228106              P.16/20

18.     If a subpoena issued in any other action or administrative proceeding calls or arguably calls for the production by the recipient of the subpoena ("Recipient") of Designated Discovery Material produced to Recipient by any other person in this Proceeding, then the Recipient shall:

      a.    be obligated, within five business days of the Recipient's receipt of the subpoena, to provide notice of the subpoena, as well as a copy of same, to the party who or which produced the Designated Discovery Material to the Recipient; and

      b.    be permitted to respond in a timely manner to such subpoena without violation of this Protective Order if the foregoing notice is timely given and, within the period provided for response to such subpoena, the producing party has neither moved to intervene to seek an order by the appropriate authority preventing disclosure of the Designated Discovery Material nor made other arrangements with the person or entity issuing the subpoena. If the producing party has moved to intervene to seek an order preventing disclosure of the Designated Discovery Material, the Recipient will not disclose the Designated Discovery Material until such motion is adjudicated.

19.     Except as agreed in writing by all parties to this Agreement or by order of the Presiding Officer, persons having knowledge of another producing party's Designated Discovery Material by virtue of their participation in the conduct of this Proceeding shall use that Designated Discovery Material only in connection with the prosecution, defense or appeal of the Proceeding, and shall neither use such Designated Discovery Material for any other purpose nor

DM) 760971.4

04/11/2007 WED 13:12 [TX/RX NO 8821] @016

disclose such Designated Discovery Material to any person who is not permitted access to such Designated Discovery Material by this Protective Order.

20.    The restrictions against disclosure set forth in this Protective Order shall not apply to any producing party's use of its own Designated Discovery Material.

21.    If Designated Discovery Material is disclosed to any person other than in the manner authorized by this Protective Order, the requesting party or any other party responsible for this disclosure shall immediately: (1) provide written notice to the producing party; (2) make every effort to retrieve such material; and (3) prevent further disclosure by the person who was the recipient of such Designated Discovery Material.    The written notice required by subparagraph (1) above shall include the names of all persons who improperly received Designated Discovery Material and a description of the Designated Discovery Material disclosed to such persons.

### Objection to Confidential Information

22.    At any time, a party may challenge a designation of material as "Confidential" or "Highly Confidential," or may object to the treatment of any information as deserving "Highly Confidential" treatment.    In the event of such a challenge, the contesting party will have the burden of making an appropriate motion to the Presiding Officer and obtaining a hearing upon such motion.  At such hearing, the party producing the Designated Discovery Material shall have the burden of establishing the need for such status.  Pending such determination by the Presiding Officer, material designated by the producing party as "Confidential" or "Highly Confidential" shall be treated in accordance with the producing party's designation pursuant to this Protective Order.

DM1 760921 4

### Relief From Terms of Protective Order

23.     This Protective Order is being entered without prejudice to the right of any party or other person to move the Presiding Officer for relief separately, or to move the Presiding Officer for modification of any of its terms on a going-forward basis.

24.     The parties to this Proceeding anticipate utilizing one or more third party vendors for purposes of electronic production, storage, and maintenance of documents. In the event of an unauthorized release of any privileged materials by any such vendor, the producing party shall be entitled to have any and all copies of such documents returned and/or destroyed at the producing party's option. Such unauthorized production of documents shall not constitute a waiver of the right to claim in the Proceeding or thereafter that said documents are "Confidential" or "Highly Confidential" or subject to any valid claim of privilege or protection, including but not limited to, the attorney-client privilege and the work product doctrine. The party whose vendor produced the unauthorized material shall make a request for the return or destruction of the Discovery Material in writing, accompanied by redacted substitute copies of each item of Discovery Material if appropriate. Those individuals who received the Discovery Material shall within three (3) business days of receipt of the substitute copies, destroy or return to the producing party all copies of such documents. No such items shall be copied, distributed or otherwise disseminated for review beyond those individuals who have already been given access to the Discovery Material.

### Return of Confidential Information

25.     Upon final termination of this Proceeding (whether by judgment, settlement, or otherwise), including all appeals and applications for discretionary review, the undersigned, at their election, shall, within sixty (60) days following written request of the producing party,

13

APR-11-2007 11:53 FROM:                                              TO:98228106                    P.19/20

either (i) return all Designated Discovery Material and all copies, extracts, and summaries of such Designated Discovery Material to the party producing it, or (ii) destroy, subject to applicable law, such Designated Discovery Material, including all copies, extracts, and summaries, and provide a letter certifying such destruction to the producing party. The parties shall request that all attachments or exhibits to pleadings designated under this Protective Order and filed under seal with the Presiding Officer shall be returned within sixty (60) days to the party producing it, or the Presiding Officer may destroy such material. For archival purposes, the attorneys in the law firms representing the parties may retain all material constituting attorney work product and one copy of all pleadings, deposition and hearing transcripts, exhibits, and written discovery responses, including portions designated pursuant to this Protective Order.

**Termination of Proceeding**

26.    The terms of this Protective Order shall survive the termination of the Proceeding, and the Presiding Officer shall retain jurisdiction of the Proceeding after final disposition for the purpose of enforcing this Protective Order.

Dated: *April 11*, 2007

_William B. Moran_
William B. Moran
United States Administrative Law Judge

DM1\760971

14

**EXHIBIT A**

**UNITED STATES OF AMERICA**
**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**

| | |
|---|---|
| In the Matter of: | Notice Number 2006-1 |
| **FRANKLIN D. RAINES,** | **Judge Williams B. Moran** |
| **J. TIMOTHY HOWARD,** | |
| **LEANNE G. SPENCER,** | |
| **Respondents.** | |

**ACKNOWLEDGMENT**

I certify that I have received and read a copy of the Protective Order entered in the above-captioned matter and that I agree to be bound by the terms of the Protective Order. I consent and agree to be subject to the jurisdiction and authority of the Presiding Officer in the above-captioned matter for purposes of enforcement of the Stipulated Protective Order.

Dated: _____

_____
Signature

_____
Printed Name